

Nathan P. Roberts
Jackson R. Pahlke
John B. McEntire, IV
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
Hon. Mary K. Dimke

| | |
|---|---|
| Estate of Joseph Alexander Verville, deceased, by and through Joshua Brothers as a personal representative; Abigail Snyder and Jan Verville, both individually, <br><br> Plaintiffs, <br><br> v. <br><br> Chelan County, Washington, a municipal corporation d/b/a Chelan County Regional Justice Center; Christopher Sharp and Kami Aldrich, both individually, <br><br> Defendants. | No. 2:24-cv-010-MKD <br><br> Statement of Material Facts Not in Dispute[1] |

---

[1] *See* LCivR 56(c)(1)(A) (requiring moving party to separately file a "Statement of Material Facts Not in Dispute").

# Table of Contents

I.   The 38 Hours Leading up to Joseph Verville's Death ........................................... 3

   A.   During booking, Chelan County jail receives notice Mr. Verville would
        withdraw from drugs........................................................................................... 3

   B.   Despite notice, the jail waited 24 hours before assessing him. ..................... 5

   C.   Kami Aldrich assessed Mr. Verville and failed to call a medical professional
        despite obvious red flags. ................................................................................ 7

        1.   First red flag: Mr. Verville's vitals placed him in a hypertensive
             crisis. ........................................................................................................ 8

        2.   Second red flag: had Ms. Alrich properly scored Mr. Verville's
             assessment, jail protocols required her to call 911 or seek help from
             someone qualified. .................................................................................15

   D.   Mr. Verville needed to be monitored. ..........................................................19

   E.   Mr. Verville wasn't monitored. .................................................................... 20

        1.   Deputies didn't monitor him. ............................................................... 20

        2.   Ms. Aldrich didn't monitor him, but did log false information in his
             file. .......................................................................................................... 24

        3.   All the while, his withdrawal worsened to "dying sick" symptoms.28

   F.   Deputies find Mr. Verville dead the following morning, rigor mortis fully
        set in. ...............................................................................................................31

   G.   The Medical Examiner performs a delayed autopsy without a complete
        evidentiary picture, compromising the findings. ........................................ 32

II.  The Aftermath..........................................................................................................39

   A.   Of the 38 hours Mr. Verville was in custody, the jail examined 4.5 of them
        to see if staff violated policy—it found 8 staff committed 18 violations. .... 39

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

B.     Staff push back on the violations. ................................................... 46

C.     "I don't believe we did anything differently." ............................ 48

D.     The jail chose not to investigate issues. ..................................... 52

E.     Experts see substandard care and supervision—by nursing, security, and leadership ....................................................................... 56

     1.     Dr. Richard Cummins sees substandard care. ................................. 56

     2.     Dr. Lori Roscoe sees substandard care. ........................................... 58

     3.     Cathy Fontenot sees substandard care. ........................................... 60

     4.     Dr. Matt Layton sees substandard care. ........................................... 61

F.     The jail blames Mr. Verville's death on "the choices that he made prior to coming to jail," not their substandard care. ................................. 61

G.     The jail's conduct shows longtime habits are tough to break. ................... 63

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

Consistent with Local Civil Rule 56(c), Plaintiffs submit the following material facts not in dispute:

## I. The 38 Hours Leading up to Joseph Verville's Death

**A. During booking, Chelan County jail receives notice Mr. Verville would withdraw from drugs.**

1.1 Shortly before 3 p.m. on September 5, 2021, Wenatchee police arrested Mr. Verville on two warrants—the first for not reporting to his supervising DOC officer, the second for missing court on a third-degree theft allegation.[2]

1.2 Police searched Mr. Verville's belongings incident to arrest, finding drugs (methamphetamine and fentanyl), as well as drug paraphernalia.[3]

1.3 When asked about these items, Mr. Verville admitted he uses drugs.[4]

1.4 Roughly 30 minutes after this "rather standard arrest," police transported Mr. Verville to the Chelan County Regional Justice Center.[5]

1.5 At 4:24 p.m., jail staff pat-searched Mr. Verville before meeting with Abigail Dean, the assigned booking officer.[6]

---

[2] ECF No. 27 (Declaration of John B. McEntire, IV – Ex A at 3) (DCSO Detective Sergeant Jason DeMyer's Special Investigative Unit Report) ("The WPD responded and at approximately 2:56 PM[.] Joseph was placed into custody. Joseph's warrants were from the DOC for escape community custody, and from the WPD for failure to appear Theft-3.").

[3] ECF No. 27 (McEntire Dec. – Ex A at 3) (SIU Report) ("Search incident to arrest, Joseph had an open safe in his backpack which contained drug paraphernalia and narcotics (methamphetamine & fentanyl pills.").

[4] ECF No. 27 (McEntire Dec. – Ex A at 3) (SIU Report) ("Post-*Miranda* warnings, Joseph admitted to possession of the narcotics and admitted to using narcotics.").

[5] ECF No. 27 (McEntire Dec. – Ex A at 3, 8) (SIU Report) ("For all intents and purposes this was a rather standard arrest, and nothing of concern noted by the Officers involved."); ("3:37 PM – WPD arrived with Joseph at the sally port.").

[6] ECF No. 27 (McEntire Dec. – Ex A at 9) (SIU Report) ("4:24 PM – Joseph was removed from the temporary intake holding cell and pat searched (Abbott). Joseph then talks with CCRJC booking (Dean).").

**Connelly Law Offices**
2301 N. 30th Street
Tacoma, Washington 98403

1.6    At booking, Deputy Dean documented Mr. Verville appeared to be under the influence of drugs, alcohol, or both, and was exhibiting signs of withdrawal:[7]



CHELAN COUNTY REGIONAL JAIL
MEDICAL RECEIVING SCREENING FORM

Date 9/5/21    Inmate Number 145157    DOB [redacted]    Temperature 98.7
Name Verville    Joseph    Alexander    Booking Officer Dean 2645
     Last    First    Middle

**BOOKING OFFICER VISUAL OPINION**

(Please circle appropriate information within each question, if applicable)    YES    NO

1. Are there signs of trauma or open draining wounds (bleeding, pain, swelling, or other symptoms)?    ___    X
2. Is there obvious fever, swollen lymph nodes, jaundice, or other evidence of infection which might spread throughout the jail?    If yes, please describe: ___    ___    X
3. Is the skin in good condition and appear to be free of vermin?    ___    X
4. Does behavior suggest immediate mental health care?    ___    X
5. Does subject appear to be under the influence of drugs, alcohol, or both?    X    ___
6. Are there any signs of withdrawal?    States yes    X    ___

1.7    During the booking process, jail staff examined Mr. Verville using a body scanner to prevent any contraband from entering the jail.[8]

1.8    They found one item—a screwdriver missed during the pat-down—and removed it during a strip-search.[9]

1.9    At 4:52 p.m., jail staff placed Mr. Verville in 2B-1,[10] which is a single person cell.[11]

---

[7] ECF No. 27 (McEntire Dec. – Ex B) (Verville's 2021 Medical Receiving Screening Form).

[8] ECF No. 27 (McEntire Dec. – Ex A at 15) (SIU Report) ("Joseph entered CCRJC on September 5, 2021 and was scanned with a body image scanner.").

[9] ECF No. 27 (McEntire Dec. – Ex A at 15) (SIU Report) ("The object was a miniature screwdriver taped to the inside of his leg. CCRJC Cpl. Menley removed the screwdriver from Joseph during his strip search.").

[10] ECF No. 27 (McEntire Dec. – Ex A at 9) (SIU Report) ("4:52 PM – Joseph was escorted to 2B cells and provided a sleeping mat. Joseph enters cell 2B-1 and closed the door.").

[11] ECF No. 27 (McEntire Dec. – Ex C at 42:8-11) (Whitmire Dep) ("Q: And 2B and 2D, those are all single-person cells, or at least you only put one person in those cells? A: Yes.").

1.10    Jail staff place withdrawing inmates in cells like 2B-1 so they can be monitored.[12]

1.11    To assist with monitoring, there's a camera inside 2B-1, providing 24-hour surveillance.[13]

1.12    The cameras in 2B can be viewed by booking officers, control room operators, and deputies manning desks on the second, third, and fourth floors of the jail.[14]

1.13    After jail staff finished booking Mr. Verville, they placed his medical screening form in the nursing box for review.[15]

**B.    Despite notice, the jail waited 24 hours before assessing him.**

1.14    At 5:24 p.m., Mr. Verville received a dinner tray in his cell.[16]

1.15    He ate some food, drank water from a cup, and then returned the tray through the port on his cell door.[17]

---

[12] ECF No. 27 (McEntire Decl. – Ex C at 41:25; 42:1-7) (Whitmire Depo) ("Q: Okay. Why are withdrawing individuals or detoxing individuals put in 2B and 2D? A: If they are going to be sick, no one wants to live with that. Also so we can monitor them.").

[13] ECF No. 27 (McEntire Decl. – Ex C at 42:16-18) (Whitmire Depo) ("Q: And then do—I notice that 2B has security cameras in the cells themselves; correct? A: Yes.").

[14] ECF No. 27 (McEntire Decl. – Ex C at 43:8-24) (Whitmire Depo) ("Q: All right. So if I've captured this correctly, essentially there are monitors for jail staff to see inside 2B and 2D, both in booking as well as in the control room? A: Yes. Q: Okay. Are there any other places where there are monitors for jail staff to see what's going on inside 2B and 2D? A: There's cameras at the third-floor desk, there's cameras at the fourth-floor desk. I'm not sure what classification can see and the chiefs and the director. Q: So when you say there are cameras at the third-floor desk and cameras at the fourth-floor desk, are you referring to, like, a monitor or a screen allowing a deputy to see what a security is showing? Is that what you mean? A: Yes.").

[15] ECF No. 27 (McEntire Decl. – Ex D at 91:15-19) (Aldrich Depo) ("Q: Okay. If you know, Kami how does this Medical Receiving Screening Form make its way from essentially booking over to the nursing staff? A: They put it in our nursing box for paperwork for us.").

[16] ECF No. 27 (McEntire Decl. – Ex A at 9) (SIU Report) ("5:24 PM – One CCRJC corrections staff enters cell 2B-1 and provides Joseph a dinner tray.").

[17] ECF No. 27 (McEntire Decl. – Ex A at 9) (SIU Report) ("5:57 PM – One CCRJC corrections staff opened Joseph's cell door food port and Joseph returns the dinner tray.").

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

1.16    At 7:44 p.m., Mr. Verville left his bed to blow his nose.[18]

1.17    The existence of a runny nose, as well as its severity, is a withdrawal symptom nurses should ask about during a withdrawal assessment.[19]

1.18    At 7:52 p.m., Mr. Verville spoke with his mother on the phone (twice) for a total of about eight minutes. It was the last time they would ever speak.[20]

1.19    At 8:50 p.m., Mr. Verville blew his nose a second time.[21]

1.20    At 1:28 a.m. on September 6, Mr. Verville blew his nose a third time.[22]

1.21    At 4:47 a.m., Mr. Verville sat up in bed and vomited into a towel.[23] This was his first vomiting episode.

1.22    Episodes of vomiting is a symptom nurses should ask about during a withdrawal assessment.[24]

1.23    At 5:24 a.m., jail staff provided Mr. Verville a breakfast tray through the cuff port. He ate "a couple bites" from the tray before returning it.[25]

---

[18] ECF No. 27 (McEntire Decl. – Ex A at 9) (SIU Report) ("7:44 PM – Joseph gets out of bed and blows nose.").

[19] ECF No. 27 (McEntire Decl.– Ex E) (Wilcox Opiate Withdrawal Scale) (noting one symptom to monitor is nasal stuffiness or nose running); ECF No. ___ (McEntire Decl. – Ex M at 6) (Darracq's Report) (noting the need to inquire about severity of symptom when administering WOWs tool).

[20] ECF No. 27 (McEntire Decl. – Ex A at 9-10) (SIU Report) ("7:52 PM – Joseph called his mother from jail. The call was about 3 minutes."); ("7:56PM – Joseph called his mother from jail. The call was about 5 minutes."). No other calls are documented before Mr. Verville died.

[21] ECF No. 27 (McEntire Decl. – Ex A at 10) (SIU Report) ("8:50 PM – Joseph blows nose while in bed.").

[22] ECF No. 27 (McEntire Decl. – Ex A at 10) (SIU Report) ("1:28 AM – Joseph exits bed to urinate in toilet, blow nose and then return to bed.").

[23] ECF No. 27 (McEntire Decl. – Ex A at 10) (SIU Report) ("4:47 AM – Joseph sits up in bed and vomits onto white towel.").

[24] ECF No. 27 (McEntire Decl. – Ex E) (WOWs Tool) (noting one symptom to monitor is episodes of vomiting).

[25] ECF No. 27 (McEntire Decl. – Ex A at 10) (SIU Report) ("5:24 AM – Two CCRJC corrections staff serve breakfast. Joseph takes the breakfast tray through the food port. The food

Statement of Material Facts
Not in Dispute

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

1.24    At 9:51 a.m., Mr. Verville vomited several times in the toilet before laying back in bed. This was his second vomiting episode.[26]

1.25    At 12:26 p.m., jail staff attempt to provide Mr. Verville a sack lunch, but he declined, marking his first missed meal.[27]

1.26    At 2:01 p.m., Mr. Verville vomited in the toilet. This was his third vomiting episode.[28]

**C.    Kami Aldrich assessed Mr. Verville and failed to call a medical professional despite obvious red flags.**

1.27    Kami Aldrich is employed as a nurse at the Chelan County jail, working there full-time for roughly 14 years.[29]

1.28    She is a Licensed Practical Nurse, meaning she's allowed to recognize some medical issues but cannot diagnose anything.[30]

---

port remains open. Joseph eats a couple bites of food from the tray and drinks water."); ("5:40 AM – Joseph returns the breakfast tray to food port opening and it is collected by CCRJC corrections staff.").

[26] ECF No. 27 (McEntire Decl. – Ex A at 11) (SIU Report) ("9:51 AM – Joseph vomits in toilet several times and then lays back in bed.").

[27] ECF No. 27 (McEntire Decl. – Ex A at 11) (SIU Report) ("12:26 PM – Two CCRJC corrections staff serve sack lunches. Joseph's food port is opened and a sack lunch is at the door. It appears there is a brief exchange from Joseph not wanting lunch and the sack is picked up.").

[28] ECF No. 27 (McEntire Decl. – Ex A at 11) (SIU Report) ("2:01 PM – Joseph gets out of bed and vomits in toilet.").

[29] ECF No. 27 (McEntire Decl. – Ex D at 18:2-6) (Aldrich Depo) ("Q: And let's pivot to—you're currently employed with the Chelan County Jail. Is that a full-time position? A: Correct."); ("Q: And then you've been there for roughly 14 years, if I'm kind of tracking your timeline correctly. A: Correct. Q: [] Always as an LPN? A: Correct.").

[30] ECF No. 27 (McEntire Decl. – Ex D at 16:6-13) (Aldrich Depo) ("Q: Can you give me some examples of—you know, what sort of falls within your orbit as an LPN? A: As far as—Q: What's the—walk me through the type of training in terms of—that you received in terms of recognizing or diagnosing—you can't diagnose, right, is that my understanding? A: Correct.").

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

1.29　　Instead, Ms. Aldrich identifies issues and brings them to a qualified medical professional, such as a registered nurse.[31] During Mr. Verville's medical screening, she failed to contact a qualified medical professional despite two red flags.

## 1.　　First red flag: Mr. Verville's vitals placed him in a hypertensive crisis.

1.30　　At 4:50 p.m. on September 6, over 24 hours after Mr. Verville was booked, Ms. Aldrich arrived at Mr. Verville's cell (2B-1) to begin her medical screening.[32]

1.31　　Nurses generally performed medical screenings in the morning,[33] but the jail didn't set a completion time[34] despite jail policy 717.2 (effective March 2, 2021),[35] which recognizes drug-withdrawal "can be a life-threatening medical condition" and requires staff to address withdrawal symptoms *promptly*:[36]

---

[31] ECF No. 27 (McEntire Decl. – Ex D at 16:14-18) (Aldrich Depo) ("Q: But essentially stopping short of diagnosis, you are trained to recognize things and bring those to the attention of, let's say, like, the registered nurse; is that accurate? A: Yeah.").

[32] ECF No. 27 (McEntire Decl. – Ex A at 11) (SIU Report) ("4:50 PM – Two CCRJC corrections staff (Fowler & Nores) are conducting medical intakes with medical staff (Aldrich). The cell door is opened and Joseph gets out of bed to talk.").

[33] ECF No. 28 (McEntire 2d. Decl. – Ex NN at 20:6-11) (Donithan Interview) ("A: Right, but then the—but stating by what his intake says that he is detoxing then it would—the next morning is when the nurse would generally check on them.").

[34] ECF No. 27 (McEntire Decl. – Ex J at 68:19-25; 69:1-3) (Tollackson Depo) ("Q: So if I'm capturing this correctly, was it the usual practice for the jail from September twenty–September 7th, 2021, looking back to have withdrawal assessments done in the morning, but there was no clarification on  a time, and now what you're doing is basically inserting a time that they needed to be done? A: There was never any indication that it had to be done in the morning, and so that's why I wanted to make sure that it was clarified that we would make sure it was done in the morning by a certain time.").

[35] ECF No. 27 (McEntire Decl. – Ex S at 14:3-5) (Chelan County 30(b)(6) Depo) ("Q: Policy 717, Detoxification and Withdrawal, the date that was adopted? A: March 2nd, 2021.").

[36] ECF No. 27 (McEntire Decl. – Ex N at 717.2 (jail policies).

**Connelly Law Offices**
2301 N. 30th Street
Tacoma, Washington 98403

**717.2 POLICY**

Withdrawal from alcohol or drugs can be a life-threatening medical condition requiring professional medical intervention. It is the policy of this department to provide proper medical care to inmates who suffer from drug or alcohol overdose or withdrawal.

To lessen the risk of a life-threatening medical emergency and to promote the safety and security of all persons in the facility, staff shall respond promptly to medical symptoms presented by inmates.

1.32    To prepare for a medical screening, Ms. Aldrich's usual practice doesn't involve pulling an inmate's medical history.[37]

1.33    Indeed, Ms. Aldrich doesn't believe she reviewed Mr. Verville's prior medical receiving screening forms before seeing him.[38]

1.34    This was true even though Ms. Aldrich agrees an inmate's prior jail medical file could help her understand what medical conditions he suffers from.[39]

1.35    This was true even though Ms. Aldrich agrees an inmate's prior jail medical file could help her understand the medications he's been prescribed.[40]

1.36    This was true even though Ms. Aldrich agrees an inmate's prior jail medical file could help her make more informed decisions during treatment.[41]

---

[37] ECF No. 27 (McEntire Decl. – Ex D at 66:10-17) (Aldrich Depo) ("Q: And so how about this: Back on September 7, 2021, and going back did you—was it your usual practice to pull medical histories, jail medical files of individuals who were withdrawing from opioids? A: Not necessarily their medical history as far as withdrawing.").

[38] ECF No. 27 (McEntire Decl. – Ex D at 70:19-22) (Aldrich Depo) ("Q: And so did you look at Mr. Verville's prior jail medical screening forms for Mr. Verville before seeing him? A: I don't believe so.").

[39] ECF No. 27 (McEntire Decl. – Ex D at 67:4-8) (Aldrich Depo) ("Q: And would you agree that an inmate's prior jail medical file could help you understand what medical conditions they have? [] A: Yes.").

[40] ECF No. 27 (McEntire Decl. – Ex D at 67:9-13) (Aldrich Depo) ("Q: Would you agree that an inmate's prior medical file would help you understand the medications they have been on? [] A: Yes.").

[41] ECF No. 27 (McEntire Decl. – Ex D at 67:14-19) (Aldrich Depo) ("Q: And would you agree that both prior medication and a patient's medical history could help you make more informed decisions when you're treating an inmate at the jail? [] A: Yes.").

1     1.37    This was true even though Healthcare Manager Billye Tollackson

2   (Ms. Aldrich's supervisor) said the jail keeps inmate medical histories for 10 years,

3   they're stored in a filing room next to the nurse's station, and pulling records is an "easy

4   process."[42]

5     1.38    This was true even though Mr. Verville was previously incarcerated at the

6   jail in 2019, his medical history reflecting a history of opioid abuse and high blood

7   pressure:[43]



12    1.39    This was true even though Mr. Verville was previously incarcerated at the

13  jail in 2020, where he was given Clonidine by Ms. Aldrich,[44] a "well-established

14  medication" used to "provide relief for many of the physical signs and subjective

15  symptoms of opioid withdrawal," including "elevated blood pressures and heart rates,"

16  "vomiting," and "chills."[45]

---

[42] ECF No. 27 (McEntire Decl – Ex J at 30:10-21) (Tollackson Depo) ("Q: And so where are those paper charts located? A: They're located next door to our office. We have a separate filing room. Q: How far do those go back? A: We keep them ten years. Q: So if a nurse wanted to access an inmate's jail medical file, they essentially walk next door from the medical team's office and go and, you know, pull it out of a file cabinet? A: Yes. Q: Easy process? A: Yes.").

[43] ECF No. 27 (McEntire Decl. – Ex O at 1) (2019 Medical Receiving Screening Form).

[44] ECF No. 27 (McEntire Decl. – Ex P at 3) (2020 Medication Administration Record).

[45] ECF No. 27 (McEntire Decl. – Ex G at 20, 23) (Cummins's Report).

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

1.40    To begin the medical screening, a jail deputy opened the cell door and Mr. Verville got out of bed to talk[46] while wrapped in a blanket:[47]



1.41    The medical screening started 10 minutes before Ms. Aldrich finished her shift at 5 p.m.[48]

1.42    Ms. Aldrich spent 20 seconds speaking with Mr. Verville, then took his vitals.[49]

1.43    Ms. Aldrich takes vitals because they can reveal unseen issues like hypertension, though she can't recall what systolic and diastolic mean.[50]

[46] ECF No. 27 (McEntire Decl. – Ex A at 11) (SIU Report) ("4:50 PM – Two CCRJC corrections staff (Fowler & Nores) are conducting medical intakes with medical staff (Aldrich). The cell door is opened and Joseph gets out of bed to talk.").
[47] ECF No. 27 (McEntire Decl. – Ex F) (clip of Mr. Verville's Sep. 6 medical screening).
[48] ECF No. 27 (McEntire Decl. – Ex D at 144:18-25) (Aldrich Depo) ("Q: And this was towards the end of your shift; is that accurate? A: Correct. Q: Okay. And then according to your schedule, you were working the following day, that September 7th. And you, again, had that routine shift that started at 7:00 a.m. to 5:00 p.m.? A: Correct.").
[49] ECF No. 27 (McEntire Decl. – Ex F) (clip from Mr. Verville's Sep. 6 medical screening).
[50] ECF No. 27 (McEntire Decl. – Ex D at 130:4-10, 22-25; 131:1-4; 132:12-23) (Aldrich Depo)

CONNELLY LAW OFFICES
2301 N. 30th Street
Tacoma, Washington 98403

1.44    Ms. Aldrich collected the following vitals from Mr. Verville: a heartrate of 121, and a blood pressure of 156/122.[51]

1.45    According to the American Heart Association (AHA), these vitals placed Mr. Verville in hypertensive crisis, something Ms. Aldrich acknowledged during her deposition:[52]



| BLOOD PRESSURE CATEGORY | SYSTOLIC mm Hg (upper number) | | DIASTOLIC mm Hg (lower number) |
|---|---|---|---|
| NORMAL | LESS THAN 120 | and | LESS THAN 80 |
| ELEVATED | 120-129 | and | LESS THAN 80 |
| HIGH BLOOD PRESSURE (HYPERTENSION) STAGE 1 | 130-139 | or | 80-89 |
| HIGH BLOOD PRESSURE (HYPERTENSION) STAGE 2 | 140 OR HIGHER | or | 90 OR HIGHER |
| HYPERTENSIVE CRISIS (consult your doctor immediately) | HIGHER THAN 180 | and/or | HIGHER THAN 120 |

(“Q: And would you agree that vitals can help uncover health issues that you might not be able to visually see in an inmate? A: Sure. Yes. Q: For example, whether an inmate is experiencing heart issues? A: Correct.”); (“Q: Why are vitals important generally as part of these—sort of the assessment procedures of an inmate? [] A: So you can tell if they are hypertensive.”); (“Q: What does—in your nursing experience, what does a systolic blood pressure measure? Like, what does that measure? A: One is, like, the force of the pressure of the blood going out. One is, I believe, the fill rate. It’s been a while since I’ve looked into the specific meanings of the two. Q: So sounds like, you know—so if I asked you a similar question of what a diastolic blood pressure means, you don’t recall off the top of your head; is that accurate? A: Correct.”).

[51] ECF No. 27 (McEntire Decl. – Ex E) (Verville’s 2021 WOWs Screening Tool) (noting vitals).
[52] Understanding Blood Pressure Readings | American Heart Association, last accessed on November 7, 2024; *see also* ECF No. 27 (McEntire Decl. – Ex D at 134:23-25; 135:1-2) (Aldrich Depo) (“Q: So using Mr. Verville’s numbers of 156 over 122 for systolic/diastolic, where does this place him on this chart? A: According to that chart, it would be the hypertensive crisis.”).

1.46    As Ms. Aldrich also recognized, with numbers like these, the AHA recommends "consult[ing] your doctor immediately."[53]

1.47    Despite believing the AHA is an authoritative source on blood pressure, Ms. Aldrich didn't "necessarily agree" Mr. Verville was in hypertensive crisis.[54] So instead of consulting a qualified medical professional, she left him in his cell.[55]

1.48    That was not her decision to make. Dr. Lori Roscoe is an advanced practice registered nurse (APRN) who holds a master's in public administration, a master's in nursing, a doctorate in healthcare administration, and a doctorate in nursing practice.[56]

1.49    Dr. Roscoe specializes in correctional healthcare, serving on the Editorial Board of the Journal of Correctional Healthcare, as well as the program director for the National Commission on Correctional Health Care.[57]

1.50    As an APRN licensed in Washington (and elsewhere) who specializes in corrections medicine, Dr. Roscoe understands the limited licensure for LPNs like Ms. Aldrich. Per the Washington State Department of Health, the "scope of practice" for an LPN "is limited and focused."[58] As an LPN, Ms. Aldrich "can only implement

---

[53] ECF No. 27 (McEntire Decl. – Ex D at 135:3-6) (Aldrich Depo) ("Q: And what is—what does the American Heart Association recommend when someone is experiencing a hypertensive crisis? A: To consult your doctor immediately.").

[54] ECF No. 27 (McEntire Decl. – Ex D at 135:13-17; 136:11-12) (Aldrich Depo) ("Q: Would you agree that the American Heart Association is an authoritative source for information about blood pressure? [Objection]. A: I believe so.") ("A: I don't necessarily agree that because of what his blood pressure is, he's in hypertensive crisis, no.").

[55] ECF No. 27 (McEntire Decl. – Ex D at 138:11-15) (Aldrich Depo) ("Q: Did he go back into his cell? Was he escorted with you to go somewhere else for additional follow-up? I'm trying to understand what you did in follow-up in response? A: Oh, he remained in his cell.").

[56] ECF No. 27 (McEntire Decl. – Ex H at 1) (Roscoe's Report).

[57] ECF No. 27 (McEntire Decl. – Ex H at 1) (Roscoe's Report).

[58] Registered Nurse and Licensed Practical Nurse Scope of Practice, Washington State Department of Health, Nursing Care Quality Assurance Commission Advisory Opinion 13.02 RN and LPN Scope of Practice (2019).

Statement of Material Facts
Not in Dispute

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

treatment plans developed by an authorized healthcare provider."[59] This means her decision to "not contact a provider for Mr. Verville's significantly high and dangerous blood pressure and pulse was outside the LPN scope of practice, and in doing so, [Ms.] Aldrich deviated significantly from the standard of nursing care."[60]

1.51     Dr. Roscoe didn't hold back criticism for her fellow nurse, calling Ms. Aldrich's actions "reckless, as she knew by her foundational nursing knowledge that these readings were extremely high" and "placed Mr. Verville at risk for serious cardiovascular events like stroke and acute coronary syndrome."[61]

1.52     The blood pressure chart isn't the only AHA-related source saying Mr. Verville's vitals required immediate action. Dr. Richard Cummins is an emergency room doctor who has served on several AHA committees, including as Chair of the National Advanced Cardiac Life Support Subcommittee.[62]

1.53     Dr. Cummins helped publish materials for the AHA, including guidelines, instructor manuals, provider manuals, handbooks, and textbooks. In 2005, he received the prestigious "Giants of Resuscitation" award, a recognition by the AHA for his leadership in cardiovascular care.[63]

1.54     Dr. Cummins described Mr. Verville's vitals as "extremely high," "red flag abnormalities" that "mandated" further action.[64]

1.55     He notes blood pressure readings are particularly important because medical professionals refer to a hypertensive crisis as a "silent killer," since it's "detectable not by a patient's complaints, but by an astute clinical assessment."

---

[59] ECF No. 27 (McEntire Decl. – Ex H at 6) (Roscoe's Report).
[60] ECF No. 27 (McEntire Decl. – Ex H at 6) (Roscoe's Report).
[61] ECF No. 27 (McEntire Decl. – Ex H at 6) (Roscoe's Report).
[62] ECF No. 27 (McEntire Decl. – Ex G at 2) (Cummins's Report).
[63] ECF No. 27 (McEntire Decl. – Ex G at 2) (Cummins's Report).
[64] ECF No. 27 (McEntire Decl. – Ex G at 6) (Cummins's Report).

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

### 2. Second red flag: had Ms. Alrich properly scored Mr. Verville's assessment, protocols required her to call 911 or seek help.

1.56    When a nurse learns a newly booked inmate may withdraw from opioids, they administer the Wilcox Opioid Withdrawal (WOW) protocol, an instrument used to assess withdrawal severity.[65]

1.57    The WOWs protocol assesses 11 criteria: 1) pulse; 2) vomiting or diarrhea; 3) chills; 4) restlessness; 5) anxiety; 6) yawning; 7) nasal congestion; 8) pupil size; 9) gooseflesh skin; 10) tremors; and 11) bone or joint aches.[66]

1.58    When Ms. Aldrich administers this instrument, she follows a usual practice—one that didn't vary here.[67]

1.59    For this usual practice, she doesn't necessarily bring the instrument with her.[68]

1.60    This is true even though Ms. Aldrich doesn't know the instrument by heart; instead, she knows it "for the most part."[69]

---

[65] ECF No. 27 (McEntire Decl. – Ex D at 103:18-22) (Aldrich Depo) ("Q: And so if you read on a receiving form that somebody might be withdrawing from opioids, it's the WOWs assessment, or the Wilcox Opioid Withdrawal Scale, that's the one that you would administer. A: Correct.").

[66] ECF No. 27 (McEntire Decl. – Ex E) (WOWs Screening Tool) (noting 11 criteria).

[67] ECF No. 27 (McEntire Decl. – Ex D at 106:15-19; 108:1-9) (Aldrich Depo) ("Q: Not necessarily whether you're the detox nurse, but if you're performing a WOWs assessment, do you have a routine in how you go about performing that assessment? A: Yes.") ("Q: Same sort of question which is, on September 6, 2021, did you single out Joseph Verville to be treated differently during the course of your WOWs assessment for him? A: I don't think so. Q: You treated him in the same manner that you would treat any other inmate as you were going through and performing that assessment? A: Correct.").

[68] ECF No. 27 (McEntire Decl. – Ex D at 105:16-18) (Aldrich Depo) ("Q: So when you're doing an assessment, do you have the forms with you at that time? A: Not necessarily in the tank.").

[69] ECF No. 27 (McEntire Decl. – Ex D at 106:5-8) (Aldrich Depo) ("Q: And so when you do the WOWs assessment, if you don't have the form on you, do you know the WOWs form by heart? A: For the most part.").

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

1.61    For this usual practice, Ms. Aldrich also doesn't ask every question on the form.[70]

1.62    This is not how a WOWs instrument should be administered. Dr. Michael Darracq is board-certified in emergency medicine, toxicology, and addiction medicine.[71]

1.63    Since 2013, Dr. Darracq has served as co-director of inpatient toxicology services at UCSF Fresno Community Medical Center.[72]

1.64    Since UCSF Fresno is a teaching hospital, Dr. Darracq teaches students, residents, and fellows on many topics, including how to use "screening tools to assess for severity of opioid withdrawal."[73]

1.65    Dr. Darracq knows the WOWs instrument, including how to administer it.[74]

1.66    A properly conducted WOWs screening "cannot be made on visual inspection alone," as the assessor must ask follow-up questions "to determine the degree or severity to which symptoms are present."[75]

1.67    Without follow-up, the assessor risks missing either "the presence of or severity of symptoms experienced."[76]

1.68    By failing to ask about each category on the screening tool, Ms. Aldrich incorrectly scored at least three categories: 1) vomiting; 2) nasal congestion; and 3) chills.[77]

---

[70] ECF No. 27 (McEntire Decl. – Ex D at 109:3-6) (Aldrich Depo) ("Q: Do you—is it your usual [sic] practice to verbally ask an inmate every question on the WOWs assessment? A: No.").

[71] ECF No. 27 (McEntire Decl. – Ex M at 1) (Darracq's Report).

[72] ECF No. 27 (McEntire Decl. – Ex M at 1) (Darracq's Report).

[73] ECF No. 27 (McEntire Decl. – Ex M at 1) (Darracq's Report).

[74] ECF No. 27 (McEntire Decl. – Ex M at 5) (Darracq's Report) ("I am familiar with this scale and other similar scales and how to conduct the assessment.")

[75] ECF No. 27 (McEntire Decl. – Ex M at 6) (Darracq's Report).

[76] ECF No. 27 (McEntire Decl. – Ex M at 6) (Darracq's Report).

[77] ECF No. 27 (McEntire Decl. – Ex M at 6) (Darracq's Report) ("Questions were asked of Mr. Verville regarding nausea/vomiting but do not include follow-up questions as to the frequency of these episodes. This would have probably increased scoring for nausea and vomiting

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

1.69    For vomiting, Ms. Aldrich's notes reflect she asked Mr. Verville about nausea generally but didn't ask follow-ups, such as how many vomiting episodes he experienced since being booked.[78]

1.70    Had Ms. Aldrich followed up, she would have learned he experienced multiple episodes of vomiting in the 24 hours before she screened him.[79]

1.71    That impacts Mr. Verville's score, as Ms. Aldrich would have raised the score on vomiting from a "3" to a "4":[80]



**GI Upset**(in the last 1/2 hr):  0 = No GI symptoms   1 = Stomach cramps   2 = Nausea or loose stool   3 = Vomiting or diarrhea
4 = Multiple episodes of vomiting/diarrhea

3

1.72    For runny nose, Ms. Aldrich's usual practice isn't to always ask about it.[81]

1.73    Ms. Aldrich's notes don't reflect she asked about a runny nose.[82]

1.74    Had Ms. Aldrich asked about a runny nose, she would have learned he experienced one (many times) in the 24 hours before she screened him.[83]

---

on the instrument."); ("The presence of nose running as demonstrated by video review would increase score by 2 points"); ("The presence of chills would increase the score by an additional 1 point.").

[78] ECF No. 27 (McEntire Decl. – Ex I) (Aldrich's Progress Notes from medical screening); *see also* Exhibit M at 6 (Darracq's Report) ("Questions were asked of Mr. Verville regarding nausea/vomiting but do not include follow-up questions as to the frequency of these episodes.").

[79] ECF No. 27 (McEntire Decl. – Ex A at 10-11) (SIU Report) (three vomiting episodes in the 24 hours before medical screening).

[80] ECF No. 27 (McEntire Decl. – Ex E) (WOWs screening tool).

[81] ECF No. 27 (McEntire Decl. – Ex D at 111:2-12) (Aldrich Depo) ("Q: Do you have any concerns that they may not be presenting with one of the symptoms during that interaction but they may have those symptoms otherwise? For example, let's take a runny nose or sneezing, okay. Let's say in an interaction that you have they are not sneezing but outside of that interaction they are. Like, is that a question that you would want to ask every time to make sure that you don't overlook anything? A: Not necessarily.").

[82] ECF No. 27 (McEntire Decl. – Ex I at 1-2) (Aldrich's Progress Notes from medical screening).

[83] ECF No. 27 (McEntire Decl. – Ex A at 10-11) (SIU Report) (documenting multiple instances of blowing a runny nose in the 24 hours before the withdrawal assessment).

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

1.75    That impacts Mr. Verville's score, as Ms. Aldrich would have raised the score on "nasal congestion" from a "0" to a "1":[84]



1.76    Ms. Aldrich acknowledged this point during her deposition.[85]

1.77    For chills, Ms. Aldrich's notes don't reflect she asked about chills[86] even though Mr. Verville was wrapped in a blanket during the medical screening.[87]

1.78    If these categories (vomiting, runny nose, and chills) were properly tallied, Mr. Verville's WOWs score would have increased from "9" to an "11"—"at a minimum."[88]

1.79    Of note: while Ms. Aldrich documented Mr. Verville's WOWs score as an "8," it was actually a "9," as Ms. Aldrich incorrectly added up each category's score.[89]

---

[84] ECF No. 27 (McEntire Decl. – Ex E) (WOWs screening tool).

[85] ECF No. 27 (McEntire Decl. – Ex D at 116:6-16) (Aldrich Depo) ("Q: So let me ask you a hypothetical here, which is, assume the security camera footage showed that Mr. Verville was blowing a runny nose repeatedly in the 24 hours between when he was booked and when he was encountered by you during this assessment. If you had that knowledge or with that knowledge, would you adjust the score in that category? A: If I had knowledge that he was having a runny nose? Q: Correct. A: Yes.").

[86] ECF No. 27 (McEntire Decl. – Ex I) (Aldrich's Sep 6, 2021 Progress Notes).

[87] ECF No. 27 (McEntire Decl. – Ex F) (clip of Sep 6 medical screening).

[88] ECF No. 27 (McEntire Decl. – Ex M at 6) (Darracq's Report).

[89] ECF No. 27 (McEntire Decl. – Ex D at 122:10-23) (Aldrich Depo) ("Q: And then adding up these scores here, what did you end up documenting in terms of the total WOWs score? A: Looks like an 8. Q: And is that tabulated correctly? A: It is not. Q: And when did you become aware that it was not tabulated correctly? A: I'm sure at some point in this process. I don't think I realized it by the end of the day that I mis-added. Q: So this is essentially an underscore in terms of what happened here? You wrote down an 8 but it was actually a 9? A: Correct.").

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

1.80    According to the jail's standing medical orders, if an inmate scores an 11 or more on the WOWs screening tool, the nurse needs to contact a qualified medical professional or send the inmate to the emergency department:[90]

> 2. Medications below may be initiated for any inmate with potential for opiate withdrawal if symptoms are present based on WOWS score. If WOWS score of >10 contact medical provider or sent to ED per EMS.

1.81    This directive isn't optional.[91]

1.82    Ms. Aldrich didn't contact either a qualified medical provider or 911, instead returning Mr. Verville to his cell.[92]

1.83    The entire medical encounter lasted 80 seconds.[93]

**D.    Mr. Verville needed to be monitored.**

1.84    After completing the medical screening, Ms. Aldrich started Mr. Verville on the "detox protocol" for nausea and vomiting.[94]

---

[90] ECF No. 27 (McEntire Decl. – Ex L at 8) (jail's medical protocols, effective Sep 2021).

[91] ECF No. 27 (McEntire Decl. – Ex D at 54:15-19) (Aldrich Depo) ("Q: And so fair to say that with respect to at least this standing order right there, if it says over a 10, contact medical provider or send to the emergency department, that's what you would do? A: Correct.").

[92] ECF No. 27 (McEntire Decl. – Ex D at 137:15-24; 138:7-15) (Aldrich Depo) ("Q: And then to your knowledge, Kami, did you ever contact Dr. Fife in response to these numbers? A: I did not contact him regarding the 120. Q: And then did you ever contact EMS regarding these numbers? A: I did not. Q: Did you every contact any other medical professional in response to these numbers? A: Not according to the heart association numbers, no."); ("Q: I'm just saying after you were done with your assessment with Mr. Verville on the 6th, where did he go? A: On the 6th? Q: Correct. Did he go back into his cell? Was he escorted with you to go somewhere else for additional follow-up? I'm trying to understand what you did in follow-up in response? A: Oh, he remained in his cell.").

[93] ECF No. 27 (McEntire Decl. – Ex A at 11) (SIU Report) ("This was a 1 minute and 20 second encounter.").

[94] ECF No. 27 (McEntire Decl. – Ex I at 2) (Aldrich's Progress Notes from medical screening) ("I came back to the nursing office and activated him as a current resident and started him on our opiate detox protocol for n/v.").

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

1.85    The last thing Ms. Aldrich wrote in her notes was he needed to be monitored.[95]

**E.    Mr. Verville wasn't monitored.**

**1.    Deputies didn't monitor him.**

1.86    In September 2021, the deputies' usual practice was to conduct cell checks every hour.[96]

1.87    During these checks, two deputies would move about each cell block, "briefly looking" in each cell.[97]

1.88    A "brief look" was all that was required. Chief Sean Larsen, who oversees jail operations, knows the deputies' usual practices for cell checks.[98]

1.89    Per Chief Larsen, the deputies' usual practice was to "enter a unit and observe all individuals in the unit," "confirm the count in that unit, and then they would exit."[99]

---

[95] ECF No. 27 (McEntire Decl. – Ex D at 143:20-24; 138:7-15) (Aldrich Depo) ("Q: And then the last words right there are—what does that—I'm not sure I'm capturing what that is. A: It's 'P..monitor.' Q: 'P..monitor.' What does that mean? A: That we're going to monitor him."); Exhibit I at 2 (Aldrich's Progress Notes from medical screening).

[96] ECF No. 27 (McEntire Decl. – Ex Q at 33:6-13) (Sharp Depo) ("Q: Let's move down to the fourth bullet point. 'Segregation units will be scheduled to start on the half hour throughout the day (example 0630, 0730, 0830, etc.)' Does this bullet point announce a new policy or confirm an existing one? A: It confirmed an existing one, but it actually established the times they would start. So before that they had to be done once an hour.").

[97] ECF No. 27 (McEntire Decl. – Ex A at 10-13) (SIU Report) (describing deputies repeatedly "briefly looking" into cells).

[98] ECF No. 27 (McEntire Decl. – Ex R at 10:8-16) (Chief Larsen Depo) ("Q: So it sounds like primarily your supervision, if I'm capturing this correctly, is over the custody staff, or put differently, the deputies as well as the corporals and sergeants. A: That's correct. Q: And then, Chief Larsen, I expect that as, you know, deputy chief of operations you're familiar with the deputies' usual practice for cell checks? A: That's correct.").

[99] ECF No. 27 (McEntire Decl. – Ex R at 10:21-25; 11:1-10) (Chief Larsen Depo) ("Q: And going back to September 7, 2021, and looking back, could you please describe to me the deputies' usual practices when it came to performing cell checks? A: Going back to which date? Q: September 7,

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

1.90    The deputies lacked "a task list or an assignment" when doing checks.[100]

1.91    Corporal Whitmire, who worked the morning Mr. Verville died, concurred, saying her deputies' cell checks were "mostly a visual check" at that time,[101] but added deputies were originally trained to watch for sweating, tremoring, and vomiting.[102]

1.92    The deputies followed this usual practice described by Chief Larsen on the evening of September 6 (after Ms. Aldrich charted that Mr. Verville needed to be monitored), "briefly glancing" in his cell approximately every hour—except once, at 11:35 p.m., where one deputy entered Mr. Verville's cell for approximately 12 seconds.[103]

1.93    The deputies followed this usual practice described by Chief Larson in the early-morning hours of September 7, "briefly glancing" in his cell approximately every

---

2021, and kind of looking back. A: To the normal procedure on that date of the deputies and their cell checks? Q: Please. A: The normal procedure for the cell checks was at minimum two deputies will enter a unit and observe all individuals in the unit, and that was pretty much as far as the standard went, is two deputies would enter the rooms, they would check each individual cell, and then they would confirm the count in that unit, and then they would exit.").

[100] ECF No. 27 (McEntire Decl. – Ex R at 11:11-14) (Chief Larsen Depo) ("Q: And so when they would check each individual cell, did they have a task list or an assignment in going about and doing those checks? A: No, they did not.").

[101] ECF No. 27 (McEntire Decl. – Ex C at 68:3-13) (Whitmire Depo) ("Q: And so how would the deputies go about and do that during their jail checks? And, again, I'm focusing sort of on September 2021 and sort of looking back. What would that process look like as they are going through and checking cells? How is that monitoring? What does that look like? A: It's usually just a visual check. At that point in time, it was mostly a visual check, I would say. Every once in a while you would talk to somebody if they were up at the door or the window letting you know that, hey, I don't feel good.").

[102] ECF No. 27 (McEntire Decl. – Ex C at 68:17-23) (Whitmire Depo) ("Q: And so when you described this visual check, what do you teach your deputies—and as the FTO, what do you teach deputies to look for as part of that visual check? A: Excessive sweating, tremoring, some—you would look for some vomiting and not—not projectile vomiting everywhere.").

[103] ECF No. 27 (McEntire Decl. – Ex A at 11-12) (SIU Report) (describing the deputies "briefly looking" into Mr. Verville's cell except at 11:35 p.m., where a 12-second encounter occurred).

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

hour.[104] By way of example, here's Deputy Edge glancing into Mr. Verville's cell for less than 1 second at 2:35 a.m. on September 7 as he walked by, never breaking stride:[105]



1.94    This is not how cell checks should be performed. Cathy Fontenot has spent her entire career in corrections. She currently serves as the Warden and Chief of Corrections for East Baton Rouge Parish Sheriff's Office, making her responsible for managing 350 staff and over 1420 prisoners.[106]

1.95    In her multi-decade experience in corrections, she has held other critical roles, including as President of the National Association of Wardens and Superintendents, as well as Special Assistant to Louisiana's Attorney General.[107]

---

[104] ECF No. 27 (McEntire Decl. – Ex A at 12-13) (SIU Report) (describing the deputies "briefly looking" into Mr. Verville's cell).

[105] ECF No. 28 (McEntire 2d. Decl. – Exhibit PP (clip of 2:35 a.m. cell check on Sep 7); *see also* Exhibit QQ (clip of 1:36 a.m. cell check on Sep. 7).

[106] ECF No. 27 (McEntire Decl. – Ex T at 2) (Fontenot's Report).

[107] ECF No. 27 (McEntire Decl. – Ex T at 1) (Fontenot's Report).

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

1.96    Ms. Fontenot described the "brief glances" that deputies performed back in September 2021 as "grossly inadequate and meaningless."[108]

1.97    Among her criticisms: 1) "[d]eputies were not consistent on which cells they checked and often times were not together when cells were checked"; 2) "[d]eputies often walked by cells at such a brisk pace that it would not have been possible to adequately view the inmate and his surroundings inside the cells"; and 3) "[c]ells were checked by different deputies from hour to hour which didn't allow deputies to determine if inmates were behaving differently than they had from prior observations."[109]

1.98    But above all else: "[d]eputies are supposed to ensure that they see signs of life and that the inmate is ok or otherwise not in distress"— a task that cannot be accomplished with "brief glances."[110]

1.99    These "brief glances" run contrary to jail policy 717.3, effective March 2, 2021,[111] requiring staff to "remain alert" to signs of drug and alcohol overdose and withdrawal:[112]

> **717.3   STAFF RESPONSIBILITY**
> Staff should remain alert to signs of drug and alcohol overdose and withdrawal. These symptoms include, but are not limited to, sweating, nausea, abdominal cramps, anxiety, agitation, tremors, hallucinations, rapid breathing and generalized aches and pains. Any staff member who suspects that an inmate may be suffering from overdose or experiencing withdrawal symptoms shall promptly notify the Sergeant, who shall ensure that a qualified health care professional is promptly notified.

1.100   These "brief glances" run contrary to policy 504.3, adopted a few months after Mr. Verville's death,[113] requiring cell checks to include "a direct visual observation

---

[108] ECF No. 27 (McEntire Decl. – Ex T at 19) (Fontenot's Report).
[109] ECF No. 27 (McEntire Decl. – Ex T at 19) (Fontenot's Report).
[110] ECF No. 27 (McEntire Decl. – Ex T at 19) (Fontenot's Report).
[111] ECF No. 27 (McEntire Decl. – Ex S at 14:3-5) (Chelan Co. Rule 30(b)(6) Depo) ("Q: Policy 717, Detoxification and Withdrawal, the date that was adopted? A: March 2nd, 2021.").
[112] ECF No. 27 (McEntire Decl. – Ex N at 717.3) (jail policies).
[113] ECF No. 27 (McEntire Decl. – Ex S at 11:19-20) (Chelan Co. Rule 30(b)(6) Depo) ("Q: Policy

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

of a living breathing body to assess the individuals well-being and behavior and shall be sufficient to determine whether the inmate is experiencing any stress or trauma."[114]

### 2. Ms. Aldrich didn't monitor him, but did create false medical records.

1.101   Ms. Aldrich agrees drug withdrawal can be a life-threatening condition requiring professional medical intervention.[115]

1.102   She agrees it's important for staff to remain alert to signs of drug withdrawal.[116]

1.103   She knew Mr. Verville needed monitoring—she assessed him, after all.[117]

1.104   Yet she didn't monitor Mr. Verville, even though Ms. Aldrich was the next nurse on duty after she completed his medical screening the night before.[118]

1.105   At 8:53 a.m. on September 7, Ms. Aldrich approached cell 2B-1 with two deputies to distribute Mr. Verville's withdrawal medication.[119]

1.106   Deputy Nores opened the cuff port and yelled "medication" to Mr. Verville.[120]

---

504 having to do with inmate jail checks? A: December 21, 2021.").
[114] ECF No. 27 (McEntire Decl. – Ex N at 504.3) (jail policies).
[115] ECF No. 27 (McEntire Decl. – Ex D at 84:18-22) (Aldrich Depo) ("Q: Would you agree that drug withdrawal can be a life-threatening condition requiring professional medical intervention. [] A: It can be.").
[116] ECF No. 27 (McEntire Decl. – Ex D at 84:23-25; 85:1-3) (Aldrich Depo) ("Q: And then would you agree that because it can be a life-threatening condition, it's important for staff to remain alert to signs of drug withdrawal? [] A: Yes.").
[117] ECF No. 27 (McEntire Decl. – Ex I at 2) (Aldrich's Progress Notes from medical screening).
[118] ECF No. 27 (McEntire Decl. – Ex D at 145:17-21) (Aldrich Depo) ("Q: And then—so essentially you were the—if I understand this correctly, the next nurse to see Mr. Verville after completing the assessment, the withdrawal assessment from the day before? A: Correct.").
[119] ECF No. 27 (McEntire Decl. – Ex A at 13) (SIU Report) ("8:53 AM – Deputy Nores and Deputy Kalafat accompany Nurse Aldrich to inmate cells for medication delivery.").
[120] ECF No. 27 (McEntire Decl. – Ex U at 13) (Aldrich Special Report) ("Deputy Nores opened the pass through and yelled to the inmate medication.").

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

1.107    He didn't respond.[121]

1.108    During this time, Ms. Aldrich waited behind Deputy Nores in the hallway:[122]



1.109    She didn't look inside Mr. Verville's cell to see why he wasn't responding.[123]

1.110    She didn't go inside Mr. Verville's cell to see why he wasn't responding.[124]

1.111    She didn't ask Mr. Verville if he received the medication she ordered (she didn't personally administer it).[125]

---

[121] ECF No. 27 (McEntire Decl. – Ex U at 13) (Aldrich Special Report) ("Deputy Nores asked again if he wanted his medication with no response.").

[122] ECF No. 27 (McEntire Decl. – Ex V) (clip of Sep 7 med pass).

[123] ECF No. 27 (McEntire Decl. – Ex D at 149:20-22) (Aldrich Depo) ("Q: It looks like you didn't look inside Mr. Verville's cell in 2B1? A: I did not.").

[124] ECF No. 27 (McEntire Decl. – Ex D at 149:17-19) (Aldrich Depo) ("Q: So based on your review of that video, it looks like you did not go inside Mr. Verville's cell in 2B1? A: I did not.").

[125] ECF No. 27 (McEntire Decl. – Ex D at 149:23-25; 150:1; 154:2-4) (Aldrich Depo) ("Q: You didn't ask Mr. Verville if he had received the medication that you had ordered for him from the

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

1.112   She didn't ask Mr. Verville if he was still couldn't keep food down.[126]

1.113   Instead, as Deputy Nores opened the door to 2B-1, Ms. Aldrich walked away:[127]



1.114   Deputy Nores entered Mr. Verville's cell, stood there for 5 seconds, and then left, claiming he saw his chest "rising and falling."[128]

1.115   While inside, there was vomit visible across the floor at Deputy Nores's feet:[129]

night before? A: I did not.") ("Q: So you didn't personally administer the medication to Mr. Verville? A: No.").

[126] ECF No. 27 (McEntire Decl. – Ex D at 151:23-25; 152:1) (Aldrich Depo) ("Q: And then you didn't check to see if Mr. Verville was still having difficulty keeping food down? A: I was not assessing him at the time.").

[127] ECF No. 27 (McEntire Decl. – Ex V) (clip of Sep. 7 med pass).

[128] ECF No. 27 (McEntire Decl. – Ex A at 14) (SIU Report) ("Deputy Nores entered Joseph's cell and stood by Joseph in his bed for 5 seconds. Per Deputy Nores written report and audio statement he saw Joseph's chest 'rising and falling' (breathing).").

[129] ECF No. 27 (McEntire Decl. – Ex A at 12-14) (SIU Report).

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403



1.116    When Ms. Aldrich later charted her "encounter," she said Mr. Verville "refused" his withdrawal medication:[130]

**Caregiver Key**

  KA-Kami Aldrich [Nurse]

**Exceptions for JOSEPH VERVILLE**

| Date / Time | Medication / Treatment | Reason | Given By |
|---|---|---|---|
| 7-Sep-2021 8:33 AM | PROMETHAZINE HCL 25 MG TABS | INMATE REFUSED | KA |

1.117    She charted "inmate refused" the jail's software offers limited entry options, and "inmate asleep" or "inmate unresponsive" weren't among them.[131]

1.118    Ms. Aldrich acknowledged what she documented was incorrect.[132]

---

[130] ECF No. 27 (McEntire Decl. – Ex W) (2021 Medication Administration Record).

[131] ECF No. 27 (McEntire Decl. – Ex D at 155:2-5) (Aldrich Depo) ("Q: And so the documented reason here is inmate refused; is that accurate? A: For the reasoning codes we have available to us, yes).

[132] ECF No. 27 (McEntire Decl. – Ex D at 156:4-7) (Aldrich Depo) ("Q: But that isn't actually— that the selection that you made, but you would agree that that wasn't accurate in terms of what

1.119    She acknowledged it was her "usual practice" to falsely document chart notes when an inmate was unresponsive during medication pass.[133]

1.120    Other nurses did it too.[134]

1.121    Ms. Aldrich received no guidance from the healthcare manager (Ms. Tollackson) about charting what really happened.[135]

1.122    This was true even though Ms. Tollackson knew about this issue.[136]

1.123    Ms. Aldrich acknowledged that entering false information into medical records could mislead a reviewing provider about whether Mr. Verville needed his medication.[137]

**3.    All the while, his withdrawal worsened to "dying sick" symptoms.**

1.124    In the hours after his medical screening, while deputies performed their hourly "brief glances," Mr. Verville decompensated before their eyes.[138]

---

happened? A: Correct.").

[133] ECF No. 27 (McEntire Decl. – Ex D at 157:8-12) (Aldrich Depo) ("Q: Was it your usual practice to sort of select 'inmate refused' for any time an inmate was [un]responsive or didn't respond? [] A: Correct. Yeah.").

[134] ECF No. 27 (McEntire Decl. – Ex D at 157:22-25) (Aldrich Depo) ("Q: And so was it the usual practice, essentially, for the nurses to select or input 'inmate refused' any time there was a nonresponsive inmate during med pass? A: Correct.").

[135] ECF No. 27 (McEntire Decl. – Ex D at 157:18-21) (Aldrich Depo) ("Q: And then did you receive guidance from Ms. Tollackson on what to do in this situation in terms of otherwise documenting what really happened? A: No.").

[136] ECF No. 27 (McEntire Decl. – Ex J at 137:11-19) (Tollackson Depo) ("Q: Do you recall ever— were you aware that this was an issue for the jail in the sense that a nurse wasn't able to accurately enter into the software the difference between an inmate refusing medication and an inmate who essentially wasn't responding during med pass? A: Yes. Q: And how did that issue get raised to your attention? A: Just—honestly, I use the software myself, so I was aware.").

[137] ECF No. 27 (McEntire Decl. – Ex D at 163:1-5) (Aldrich Depo) (Q: And could that lead a medical provider to say, hey, it looks like Mr. Verville doesn't need that medication if he refused it? [] A: He could draw that conclusion.").

[138] ECF No. 27 (McEntire Decl. – Ex T at 20) (Fontenot's Report) ("It was clear to me from the well documented video that Verville was decompensating."); *see also* Ex A at 17 (SIU Report)

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

1.125    As one jail nurse (Heather Donithan) described, fentanyl withdrawal causes inmates to "feel like they're dying sick"—and that's what happened.[139]

1.126    At 5:08 p.m., Mr. Verville skipped dinner, marking his second missed meal.[140]

1.127    At 10:42 p.m., he vomited into the toilet.[141] This was his fourth vomiting episode.

1.128    At 1:58 a.m. on September 7, Mr. Verville vomited into a white rag on the cell floor near the bed. He then made his way across the cell and vomited into the toilet standing up.[142] These were his fifth and sixth vomiting episodes.

1.129    At 3:44 a.m., Mr. Verville vomited onto the floor by the stool and table, then vomited onto his bed.[143] These were his seventh and eighth vomiting episodes.

1.130    At 3:47 a.m., Mr. Verville got out of bed and vomited "*at* the toilet," not *in* the toilet.[144] This was his ninth vomiting episode.

---

("As time went on Joseph appeared to become uncomfortable and ill.").

[139] ECF No. 28 (McEntire 2d. Decl. – Ex NN at 9:8-13) (Donithan Interview) ("Q: What would be—what would be the typical detox? What would happen, typically, for detoxing from fentanyl? A: In my experience from the ones that I've dealt with, they're sick for about a day, feel like they're dying sick, and then the next day they're usually much better.").

[140] ECF No. 27 (McEntire Decl. – Ex A at 11) (SIU Report) ("5:09 PM – Joesph enters his cell with a dinner try and cup then closed the cell door. Joseph did not eat the food on the tray.").

[141] ECF No. 27 (McEntire Decl. – Ex A at 12) (SIU Report) ("10:42 PM – Joseph gets out of bed and vomits in the toilet then returns to bed.").

[142] ECF No. 27 (McEntire Decl. – Ex A at 12) (SIU Report) (1:58 AM – Joseph vomits onto white rag on cell floor near bed while seated in bed. Joseph then vomits into the toilet standing up.").

[143] ECF No. 27 (McEntire Decl. – Ex A at 12) (SIU Report) ("3:44 AM – Joseph vomits onto the floor by the stool and table while sitting up in bed. Joseph vomits more while seated on the bed.").

[144] ECF No. 27 (McEntire Decl. – Ex A at 12) (SIU Report) ("3:47 AM – Joseph gets out of bed and vomits at the toilet then returns to the bed.").

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

1.131  At 4:46 a.m., Mr. Verville sat up and vomited onto his bed.[145] This was his tenth vomiting episode, with vomit now spread throughout the cell.

1.132  At 5:08 a.m., Mr. Verville settled into his final position in the bed.[146] The jail believes this is the approximate time Mr. Verville died.[147]

1.133  At 5:32 a.m. on September 7, deputies delivered Mr. Verville breakfast by opening the cuff port and setting a tray on it.[148]

1.134  Thirty minutes later, 6:04 a.m., deputies collected Mr. Verville's uneaten food tray, marking the third consecutive meal he missed.[149]

1.135  A deputy purportedly heard Mr. Verville "moan," but didn't check on him.[150]

1.136  Although Director Sharp said nurses should be notified if an inmate misses several meals, it doesn't appear they were, as Ms. Aldrich didn't check on Mr. Verville in the morning.[151]

---

[145] ECF No. 27 (McEntire Decl. – Ex A at 13) (SIU Report) ("4:36 AM – Joseph sits up in the bed and vomits.").

[146] ECF No. 27 (McEntire Decl. – Ex A at 13) (SIU Report) ("5:08 AM – Joseph settles into his final position in the bed.").

[147] ECF No. 27 (McEntire Decl. – Ex Q at 99: 3-7) (Sharp Depo) ("Q: Based upon your—the fact finding that Chief Smith had done, was that essentially the jail's conclusion that Mr. Verville had passed away sometime around that 5:08 a.m. time in the morning on September 7th? A: Yes.").

[148] ECF No. 27 (McEntire Decl. – Ex A at 13) (SIU Report) ("5:32 AM – Deputy Edge and Deputy Cutshell deliver breakfast food trays. The food is put on the cell door food port.").

[149] ECF No. 27 (McEntire Decl. – Ex A at 13) (SIU Report) ("6:04 AM – Deputy Edge and Deputy Cutshell collect the breakfast food trays and close the food ports."); ("Joseph did not retrieve his breakfast from the food port.").

[150] ECF No. 27 (McEntire Decl. – Ex A at 13) (SIU Report) ("5:32 AM – Deputy Edge and Deputy Cutshell deliver breakfast food trays. The food is put on the cell door food port. Per Deputy Edge in his statement Joseph 'moaned' after he announced breakfast.").

[151] ECF No. 27 (McEntire Decl. – Ex Q at 129:13-21) (Sharp Depo) ("Q: The follow-up to that was do you know whether that information that's logged in the Spillman system by the deputies is communicated to the nursing staff so they're aware of whether or not a detoxing individual is

Statement of Material Facts
Not in Dispute

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

**F.      Deputies find Mr. Verville dead the following morning, rigor mortis fully set in.**

1.137    At 9:31 a.m., jail staff attempted to verbally summon Mr. Verville for a Zoom court appearance.[152]

1.138    After Mr. Verville didn't respond, a deputy entered 2B-1 and attempted to wake him by nudging his unresponsive body with a foot—an action corrections expert Fontenot described as "inappropriate, callous, and unprofessional."[153]

1.139    Jail staff noted Mr. Verville "had pale skin, a blueish tint to his face, was cold to the touch, and his arm was stiff." Additionally, staff noted his teeth were "tightly clinched."[154]

1.140    Rigor mortis is a post-mortem condition where the body becomes hardened. The process begins at death, usually manifesting after two to four hours and continuing for roughly  twelve hours.[155]

1.141    Seeing no response, jail staff started CPR and called 911.[156]

1.142    At 9:45 a.m., EMTs pronounced Mr. Verville deceased.[157]

---

missing meals? A: I would—you would—I would suppose that it should be, but I —normally we don't do it on one meal, but if they miss several meals, then that would be relayed to the nursing staff, yes.").

[152] ECF No. 27 (McEntire Decl. – Ex A at 14) (SIU Report) ("Prior to this Joseph had been unresponsive to Deputy Stockman over the intercom. Joseph was one of several inmates who were due to appear in Chelan County Court via zoom.").

[153] ECF No. 27 (McEntire Decl. – Ex A at 14) (SIU Report) ("9:31 AM – Deputy Hawkins and Deputy Stockman enter Joseph's cell and attempt to gain his attention with no response."); *see also* Exhibit T at 22 (Fontenot's Report).

[154] ECF No. 27 (McEntire Decl. – Ex A at 17) (SIU Report).

[155] ECF No. 27 (McEntire Decl. – Ex A at 17) (SIU Report).

[156] ECF No. 27 (McEntire Decl. – Ex A at 14) (SIU Report) (noting CPR started at 9:32 a.m., and 911 called at 9:34 a.m.).

[157] ECF No. 27 (McEntire Decl. – Ex A at 17) (SIU Report) ("9:45AM – Joseph was pronounced deceased.").

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

**G.     The Medical Examiner performs a delayed autopsy without a complete evidentiary picture, compromising the findings.**

1.143    At 9:57 a.m. on September 7, Earl Crowe, Chief Deputy Coroner for Chelan County, was notified about Mr. Verville's death.[158]

1.144    Mr. Crowe collected his body and, the next day, contacted the King County Medical Examiner's Office about performing an autopsy per an ongoing service agreement.[159]

1.145    On September 10, Mr. Verville's body was transported to the King County.[160]

1.146    On September 14, a week after death, Dr. Richard Harruff performed an autopsy.[161]

1.147    On September 21, blood collected from Mr. Verville was sent to the Washington State Patrol (WSP) toxicology lab for analysis.[162]

1.148    The WSP lab sent the blood to NMS labs for analysis.[163]

1.149    NMS tested the blood, identifying several drugs in Mr. Verville's system, including methamphetamine, fentanyl, and an unspecified benzodiazepine.[164]

1.150    On December 21, 2021, Dr. Harruff received the toxicology results.[165]

1.151    On January 19, 2022, Dr. Harruff filed an Autopsy Report that reflected a cause of death (acute combination drug intoxication including fentanyl, methamphetamine, and unspecified benzodiazepine), as well as a contributing condition

---

[158] ECF No. 27 (McEntire Decl. – Ex Z at 3) (Chelan Coroner Records) ("On 09/07/21 at 0957 hours I was notified by the Chelan County regional Jail concerning an in-custody death.").
[159] ECF No. 27 (McEntire Decl. – Ex Z at 5) (Coroner Records).
[160] ECF No. 27 (McEntire Decl. – Ex Z at 7) (Coroner Records).
[161] ECF No. 27 (McEntire Decl. – Ex Z at 17) (Coroner Records).
[162] ECF No. 27 (McEntire Decl. – Ex Z at 9) (Coroner Records).
[163] ECF No. 27 (McEntire Decl. – Ex Z at 10) (Coroner Records).
[164] ECF No. 27 (McEntire Decl. – Ex Z at 16) (Coroner Records).
[165] ECF No. 27 (McEntire Decl. – Ex Z at 9) (Coroner Records).

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

(left ventricular cardiac hypertrophy, probably due to hypertensive cardiovascular disease).[166]

1.152    Dr. Harruff recognized the information he relied on for his autopsy was limited. When preparing his report, Dr. Harruff lacked any information about Mr. Verville's tolerance, while acknowledging tolerance plays a role when deciding whether someone died from acute intoxication.[167]

1.153    When preparing his report, Dr. Harruff lacked Mr. Verville's 2019 jail medical records.[168]

1.154    When preparing his report, Dr. Harruff lacked his 2020 jail medical records.[169]

1.155    When preparing his report, Dr. Harruff lacked 2021 jail medical records.[170]

---

[166] ECF No. 27 (McEntire Decl. – Ex Z at 16) (Coroner Records).
[167] ECF No. 28 (McEntire 2d. Decl. – Ex AA at 49:8-20; 51:4-7) (Dr. Richard Harruff Depo) ("Q: Would you mind sharing with us what those factors are that could shape dosing and whether or not they're fatal? A: Well, tolerance is a factor, especially with opioids, I have no way to assess tolerance. Q: And what do you mean by tolerance, Dr. Harruff? A: A person, especially with opioids, develops more or less a resistance to some of the more serious effects of—of the drug, of the opioid. So a person that's tolerant may be able to tolerate—that's what the word means—tolerate larger amounts of opioid without adverse consequences such as respiratory depression and death. So there's no way to measure that."); ("Q: Did that documentation, Dr. Harruff, contain specific amounts or details regarding the length of use, history of use, amounts of use, or any of those details? A: No.").
[168] ECF No. 28 (McEntire 2d. Decl. – Ex AA at 51:14-18) (Harruff Depo) ("Q: Mr. Verville had medical records from his 2019 incarceration at the Chelan County Jail. Did you have access to those records or the benefit of those records when preparing your Autopsy Report? A: No.").
[169] ECF No. 28 (McEntire 2d. Decl. – Ex AA at 51:19-22) (Harruff Depo) ("Q: And he also had medical records from his 2020 incarceration at the Chelan County Jail. Did you have the benefit of those records when preparing your Autopsy Report? A: No.").
[170] ECF No. 28 (McEntire 2d. Decl. – Ex AA at 51:23-25; 52:1-5) (Harruff Depo) ("Q: Mr. Verville also had medical records form his 2021 incarceration at the Chelan County Jail. Did you have the benefit of those records when paring your Autopsy Report? A: No, I wasn't aware of those.").

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

1.156    When preparing his report, Dr. Harruff lacked the jail's fact-finding report.[171]

1.157    When preparing his report, Dr. Harruff lacked the SIU Report.[172]

1.158    When preparing his report, Dr. Harruff lacked the in-cell surveillance video.[173]

1.159    Dr. Harruff acknowledged he doesn't know whether what he lacked might change his opinions.[174]

1.160    Dr. Darracq, who is board-certified in emergency medicine, toxicology, and addiction medicine, did benefit from reviewing all records surrounding Mr. Verville's death.[175] He identified four problems with Dr. Harruff's cause-of-death determination.[176]

---

[171] ECF No. 28 (McEntire 2d. Decl. – Ex AA at 52:14-20) (Harruff Depo) ("Q: My next question. Dr. Harruff, is the Chelan County Jail had prepared a fact-finding report into the circumstances surrounding Mr. Verville's death on the morning of September 7th. Did you have the benefit of that report when preparing your Autopsy Report? A: No.").

[172] ECF No. 28 (McEntire 2d. Decl. – Ex AA at 52:21-25; 53:1-2) (Harruff Depo) ("Q: And the North Central Washington Special Investigation Unit had prepared a report that investigated the circumstances surrounding Mr. Verville's incarceration and death in September of 2021. Did you have the benefit of that report when preparing your Autopsy Report? A? No.").

[173] ECF No. 28 (McEntire 2d. Decl. – Ex AA at 53:10-16) (Harruff Depo) ("Q: There was 24-hour video surveillance inside Mr. Verville's cell during his incarceration in September 2021. Did you have the benefit of that video footage when preparing your Autopsy Report? A: I stated what I had access to and that is not included.").

[174] ECF No. 28 (McEntire 2d. Decl. – Ex AA at 53:24-25; 54:1-10) (Harruff Depo) ("Q: Basically, since you haven't seen all the records and recording or reports we were just talking about that weren't party of your file, you have no way of knowing whether or not any information in those reports or opinions might change your conclusion on the cause of death? Fair? [] A: My—yeah. Once again my conclusion is based on the attachments that I've been provided, and so I have no way to even answer that. I don't know if these things even exist. So please accept my explanation that my opinion standing on what has been stated already and is expressed in the documents that I have generated. On nothing else.").

[175] ECF No. 27 (McEntire Decl. – Ex M at 2) (Darracq's Report).

[176] ECF No. 27 (McEntire Decl. – Ex M at 2-5) (Darracq's Report).

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

1.161     First, *intoxication* describes "a condition that follows the administration of a psychoactive substance and results in a disturbance in the level of consciousness, cognition, perception judgment, affect or behavior, or other psychophysiological functions and response*s*."[177] Given how *intoxication* is defined, board-certified addiction doctors don't diagnose *intoxication* using numbers from a toxicology report; they diagnose from a medical screening that examines clinical signs and symptoms.[178]

1.162     A doctor needs to understand signs and symptoms, as "intoxication is highly dependent on the type and dose of drug and is influenced by an individual's tolerance level and other factors."[179]

1.163     "Tolerance is a very important determinant in how drug effect will be demonstrated. An individual with large tolerance to the effects of a particular drug may show little clinical symptoms, even at an arguably 'high' drug concentration."[180]

1.164     Dr. Darracq notes the more an individual uses a drug, the greater doses that individual needs "to achieve the same clinical effects."[181]

1.165     Toxicologists agree toxicology numbers, standing alone, carry little value "when there is little to no information about a specific individual's tolerance."[182]

1.166     Without knowing Mr. Verville's tolerance, there's no way to determine whether the numbers from his toxicology report are significant or not.[183]

1.167     Second, there is ample evidence showing Mr. Verville exhibited signs of withdrawal while incarcerated at the jail. This evidence includes the following: "1) A

---

[177] ECF No. 27 (McEntire Decl. – Ex M at 3) (Darracq's Report) (emphasis in original) (citing Encyclopedia of Forensic and Legal Medicine).
[178] ECF No. 27 (McEntire Decl. – Ex M at 3) (Darracq's Report).
[179] ECF No. 27 (McEntire Decl. – Ex M at 3) (Darracq's Report).
[180] ECF No. 27 (McEntire Decl. – Ex M at 4) (Darracq's Report).
[181] ECF No. 27 (McEntire Decl. – Ex M at 4) (Darracq's Report).
[182] ECF No. 27 (McEntire Decl. – Ex M at 4) (Darracq's Report).
[183] ECF No. 27 (McEntire Decl. – Ex M at 4) (Darracq's Report).

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

booking form reflecting use of heroin or other opioids; 2) a booking form reflecting that he would be withdrawing; 3) surveillance video demonstrating symptoms unique to opioid withdrawal," such as "multiple episodes of vomiting, runny nose, wrapped in blanket, breaks in sleep, elevated heart rate, and elevated blood pressure approximately 24 hours after arrival to Chelan County Jail."[184]

    1.168    If Mr. Verville was suffering from acute opioid intoxication, Dr. Darracq would expect to see those symptoms, including "sleepiness, slowed responses to verbal questioning, difficulty keeping his eyes open, and dragging feet when moving." Neither the video footage nor Mr. Verville's medical records reflect these symptoms.[185]

    1.169    If Mr. Verville was experiencing acute meth intoxication, Dr. Darracq would expect to see those symptoms, including "increased body movement, hyperactivity, difficulty staying in the same location for long periods of time, pacing, agitation, responding to imaginary objects, yelling, screaming." Neither the video footage nor Mr. Verville's medical records reflect these symptoms.[186]

    1.170    Dr. Matt Layton agrees. Dr. Layton is a medical doctor who also holds a PhD in pharmacology. For years, he has served as the Medical Director for an opioid treatment program run through Washington State University, putting Dr. Layton in the trenches with hundreds of individuals suffering from opioid use disorder.[187]

    1.171    After witnessing countless patients withdraw, Dr. Layton knows what withdrawal looks like and agrees "Mr. Verville's post-arrest symptoms were definitely consistent with someone actively withdrawing from substances."[188]

    1.172    Mr. Verville's symptoms line up with what Ms. Tollackson teaches her nurses withdrawal look like, as reflected in her training materials:

---

[184] ECF No. 27 (McEntire Decl. – Ex M at 4) (Darracq's Report).
[185] ECF No. 27 (McEntire Decl. – Ex M at 4) (Darracq's Report).
[186] ECF No. 27 (McEntire Decl. – Ex M at 4) (Darracq's Report).
[187] ECF No. 28 (McEntire 2d. Decl. – Ex BB at 2) (Layton's Report).
[188] ECF No. 28 (McEntire 2d. Decl. – Ex BB at 4) (Layton's Report).

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403



**WITHDRAWAL**

WITHDRAWAL SYMPTOMS
- Intense cravings
- Watery eyes
- Runny nose
- Agitation
- Excessive perspiration
- Flu-like symptoms
- Nausea, vomiting, diarrhea
- Extreme abdominal cramping
- Muscle and bone pain
- Dysphoria – this may lead to suicidal thoughts

1.173    Mr. Verville's symptoms don't line up with what Ms. Tollackson teaches her nurses an overdose looks like, as reflected in her training materials:

**OVERDOSE**

*WHAT DOES AN OPIOID OVERDOSE LOOK LIKE?*
- Unresponsive to outside stimulus
- Awake but unable to talk, difficulty staying awake
- Breathing is slow and shallow, erratic, or has stopped
- Pulse is slow or not able to be felt
- Pinpoint pupils
- Choking sounds or snore-like gurgling sounds (death rattle)
- Vomiting
- Skin tone might be bluish purple or grayish, ashen
- Cold and clammy skin
- Muscle spasms or seizures

1.174    Third, Dr. Harruff relied on blood drawn a week after death, triggering a "well-recognized phenomenon in toxicology called postmortem drug redistribution."[189]

---

[189] ECF No. 27 (McEntire Decl. – Ex M at 5) (Darracq's Report).

CONNELLY LAW OFFICES
2301 N. 30th Street
Tacoma, Washington 98403

1.175    According to Dr. Darracq, drug users absorb drug chemicals into the tissues and organs.[190] After death, the body releases those chemicals back into the blood stream, causing drug levels to increase by as much as 1.5 times for drugs like methamphetamine and fentanyl.[191]

1.176    Simply, drug levels can increase after death, which is why toxicologists agree a toxicology report from blood collected well after death can't be relied on to reflect an individual's pre-death drug levels.[192]

1.177    Fourth, the timeline doesn't support toxicity. Methamphetamine intoxication lasts about 12-14 hours, while fentanyl intoxication lasts a few hours.[193]

1.178    Since Mr. Verville died approximately 38 hours after being booked, his death occurred well "outside the window for anticipated intoxication from fentanyl, methamphetamine or benzodiazepine."[194]

1.179    This is especially true when video didn't show Mr. Verville consume any illicit drugs while in-custody[195]—a point Chelan County emphasized during its Rule

---

[190] ECF No. 27 (McEntire Decl. – Ex M at 5) (Darracq's Report).
[191] ECF No. 27 (McEntire Decl. – Ex M at 5) (Darracq's Report).
[192] ECF No. 27 (McEntire Decl. – Ex M at 5) (Darracq's Report).
[193] ECF No. 27 (McEntire Decl. – Ex M at 5) (Darracq's Report).
[194] ECF No. 27 (McEntire Decl. – Ex M at 5) (Darracq's Report); *see also* Ex G at 12 (Cummins's Report) ("If [Mr. Verville had taken a fatal overdose of these drugs right before being placed in custody, he would have expired much sooner—within the first 24-hours of his arrest. To illustrate, the terminal elimination half-life of fentanyl, the most likely fatal drug of the ones found in his system is 4 hours; the duration of action is 1-2 hours. For alprazolam, peak serum levels occur in 0.7 to 2.1 hours and the serum half-life is 12-15 hours. For methamphetamine, the elimination half-life is approximately 10 hours. These drugs were either out of his system by the time of his death, or were far below fatal levels.").
[195] ECF No. 27 (McEntire Decl. – Ex A) (SIU Report) (making no notations that Mr. Verville used illicit drugs while in custody); *see also* Ex G at 12 (Cummins's Report) ("The Justice Center made continuous videotape recordings of Mr. Verville while he was incarcerated. There have been multiple reviews, by multiple reviewers, of these recordings. At no point did any reviewer observe suspicious activity that might have indicated drug-receipt, drug-retrieval or drug-ingestion by Mr. Verville.").

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

30(b)(6) deposition: "there was absolutely no video evidence that shows that anybody interacted with him to give him drugs, force drugs upon him, or put them in him while he was incarcerated in our facility."[196]

## II.    The Aftermath

**A.    Of the 38 hours Mr. Verville was in custody, the jail examined 4.5 of them to see if staff violated policy—it found 8 staff committed 18 violations.**

2.1    Chris Sharp serves as Director of the Chelan County Jail, a position he's held since April 1, 2020.[197]

2.2    As Director, Mr. Sharp understands 75% of people booked into the jail are detoxing from drugs or alcohol and "must receive advanced monitoring from the staff."[198]

2.3    As Director, Mr. Sharp has final say on hiring decisions for deputies and nurses, as well as disciplinary decisions for deputies and nurses.[199]

2.4    As Director, Mr. Sharp has final say on 1) setting policy at the jail,[200] 2) whether existing policies should be changed,[201] 3) how deputies should perform cell

---

[196] ECF No. 28 (McEntire 2d. Decl. – Ex KK at 43:17-20 (Chelan Co.'s Rule 30(b)(6) Depo).
[197] ECF No. 27 (McEntire Decl. – Ex Q at 11:13-18) (Sharp Depo) ("Q: You're the director of the Chelan County Jail? A: That is correct. Q: And how long have you been in that position? A: Since April 1st of 2020.").
[198] ECF No. 27 (McEntire Decl. – Ex G at 16) (Cummins's Report).
[199] ECF No. 27 (McEntire Decl. – Ex Q at 15:3-22) (Sharp Depo) ("Q: As director, Chris, do you have final say on hiring decisions for deputies? A: Yes. Q: And then as director do you have final say on disciplinary decisions for deputies? A: Yes. Q: As director, do you have final say on hiring decisions for the medical team? A: Yes. Q: As director, do you have final say on disciplinary decisions for the medical team? A: Yes. Q: As director, do you have final say on setting policy at the jail? [] A: Yes, we work as a team, but the final say would be me on policies.").
[200] ECF No. 27 (McEntire Decl. – Ex Q at 15:15-22) (Sharp Depo) ("Q: As director do you have final say on setting policy at the jail? [] A: Yes, we work as a team, but the final say would be me on policies.").
[201] ECF No. 27 (McEntire Decl. – Ex Q at 17:3-5) (Sharp Depo) ("Q: And then as director do you have final say on whether existing policies should be changed? A: Yes, I would have final say on that.").

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

checks,[202] 4) how deputies should perform meal distribution,[203] 5) how nurses should do withdrawal assessments,[204] and 6) how nurses should perform medical passes.[205]

2.5 Director Sharp's responsibilities include ensuring staff follow policies.[206]

2.6 To ensure staff follow policies, Director Sharp knows the policies.[207]

2.7 Director Sharp has observed deputies enough to understand how they carry out their daily tasks.[208]

2.8 Director Sharp has observed the nurses enough to understand how they carry out their daily tasks.[209]

---

[202] ECF No. 27 (McEntire Decl. – Ex Q at 17:6-8) (Sharp Depo) ("Q: As director do you have final say on how deputies should perform cell checks? A: Yes.").

[203] ECF No. 27 (McEntire Decl. – Ex Q at 17:9-11) (Sharp Depo) ("Q: As director, do you have final say on how deputies should do meal distribution? A: Yes.").

[204] ECF No. 27 (McEntire Decl. – Ex Q at 17:12-19) (Sharp Depo) ("Q: As director do you have final say on how nurses should do withdrawal assessments? A: Yes, I would have final say, but again, I would go back to what I've said previously. That would be based on the subject matter experts of medical protocols and detox protocols and all of the things that they do medically that, again, I do not have the educational experience for.").

[205] ECF No. 27 (McEntire Decl. – Ex Q at 17:22-24; 18:1) (Sharp Depo) ("Q: And so probably a similar answer, I'm guessing, is do you have final say on how nurses should be performing, you know, medical passes in conjunction with the deputies? A: Yes.").

[206] ECF No. 27 (McEntire Decl. – Ex Q at 18:8-11) (Sharp Depo) ("Do you agree that one of your responsibilities is to ensure that jail staff follow jail policies? [] A: Yes.").

[207] ECF No. 27 (McEntire Decl. – Ex Q at 18:12-18) (Sharp Depo) ("Q: To enforce those policies, I expect you need to know the jail's policies? A: Correct. Q: Would you say that you are, for lack of a better term, conversational—or you understand what the jail's policies are in a day-in, day-out basis? A: Yes.").

[208] ECF No. 27 (McEntire Decl. – Ex Q at 67:4-8) (Sharp Depo) ("Q: Would you say—have you observed your deputies enough to understand how they perform their jobs on a day-in and day-out basis? A: Yes. I've been a correction officer for 25 years, so I understand the basic concepts.").

[209] ECF No. 27 (McEntire Decl. – Ex Q at 67:9-13) (Sharp Depo) ("Q: Same question for the nurses. Have you observed them enough to have an understanding of how they perform their jobs on a day-in and day-out basis in the daily life of a nurse? A: Yes.").

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

2.9     On September 8, 2021, a day after Mr. Verville's death, Director Sharp tasked Michael Smith, Chief of Administration, "to investigate allegation(s) of employee misconduct."[210]

2.10     Chief Smith said the investigation's goal wasn't to understand what happened to Mr. Verville.[211]

2.11     Chief Smith said the investigation's goal wasn't to understand if the nurses fell short in caring for Mr. Verville.[212]

2.12     Chief Smith said the investigation's goal wasn't to understand if the deputies fell short in monitoring Mr. Verville.[213]

2.13     Chief Smith said the investigation didn't examine Mr. Verville's entire stay, instead focusing on a four-and-a-half-hour window from 5:00 a.m. to roughly 9:30 a.m. on September 7, 2021—the morning he died.[214]

2.14     Director Sharp and Chief Smith agreed they wanted to focus on nothing else.[215]

2.15     This means Chief Smith didn't investigate any policy violations on September 6, the day Ms. Aldrich medically screened Mr. Verville.[216]

---

[210] ECF No. 27 (McEntire Decl. – Ex Y at 2) (Jail's Unredacted Factfinding Report).
[211] ECF No. 27 (McEntire Decl. – Ex X at 58:5-10) (Chief Smith Depo) ("Q: What—was one of your goals, Mike, to understand what happened to Mr. Verville? [] A: To—what happened to Mr. Verville? Q: Yes, sir. A: No.").
[212] ECF No. 27 (McEntire Decl. – Ex X at 58:11-15) (Chief Smith Depo) ("Q: Was one of your goals to understand whether the medical team fell short in caring for Mr. Verville? [] A: No.").
[213] ECF No. 27 (McEntire Decl. – Ex X at 58:18-23) (Chief Smith Depo) ("Q: And, then, similar question, which is: was one of the goals to understand whether the deputies fell short in looking after Mr. Verville? [] A: No.").
[214] ECF No. 27 (McEntire Decl. – Ex X at 65:16-21) (Chief Smith Depo) ("Q: So if I'm capturing this correctly, your fact-finding mission focused on what happened during that four-and-a-half-hour window from essentially five a.m. to roughly 8:30 a.m. on September 7, 2021? [] A: Yes.").
[215] ECF No. 27 (McEntire Decl. – Ex X at 67:2-5) (Chief Smith Depo) ("Q: And did you all reach consensus on that that was the—the scope of time that you wanted to focus on? A: Yes.").
[216] ECF No. 27 (McEntire Decl. – Ex Q at 133:4-7) (Sharp Depo) ("Q: So you weren't looking for

2.16     This means Chief Smith didn't investigate any policy violations on September 5, the day Mr. Verville was booked.[217]

2.17     Instead, Chief Smith focused on the 4.5-hour window because it covered Mr. Verville's last known movement (roughly 5:00 a.m.) to when he was found unresponsive (roughly 9:30 a.m.).[218]

2.18     Chief Smith chose not to review surveillance footage on September 6, the day Ms. Aldrich medically screened Mr. Verville.[219]

2.19     Chief Smith chose not to review surveillance footage on September 5, the day Mr. Verville was booked.[220]

2.20     Chief Smith chose not to review Mr. Verville's jail medical file.[221]

2.21     Chief Smith chose not to review Mr. Verville's Spillman file, the jail's software.[222]

---

and did not investigate any policy violations that would have occurred the day before, on September 6th? A: No.").

[217] ECF No. 27 (McEntire Decl. – Ex Q at 133:8-10 (Sharp Depo) ("Q: And weren't looking for and did not investigate any policy violations that occurred on September 5th? A: No.").

[218] ECF No. 27 (McEntire Decl. – Ex X at 67:6-14 (Chief Smith Depo) ("Q: And do you recall how or why you arrived at a decision to focus on that four-and-a-half-hour window? A: I think it was just basically because that was the—watching the video, that was the last—about that 5:08:34 is the last time that we could see on video movement, and then we went up to the time where he was found at 9:31:31. So that was the time that we were focused on was the last movement to when he was found. That's what we decided we wanted to focus on.").

[219] ECF No. 27 (McEntire Decl. – Ex X at 76:9-14 (Chief Smith Depo) ("Q: So, for example, you probably didn't review—sounds like you didn't review any video footage from September 6th, the day before? [] A: No.").

[220] ECF No.27 (McEntire Decl. – Ex X at 76:15-18 (Chief Smith Depo) ("Q: And, again, just to clarify again, it sounds like also you didn't review any footage on the day that he was booked, or September 5th? A: No.").

[221] ECF No. 27 (McEntire Decl. – Ex X at 76:21-23) (Chief Smith Depo) ("Q: And so beyond security footage, did you review Mr. Verville's jail medical file? A: Not his file, no.").

[222] ECF No. 27 (McEntire Decl. – Ex X at 76:24-25; 77:1) (Chief Smith Depo) ("Q: Did you review any of the information available for Mr. Verville that's recorded in Spillman? A: No, I did

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

2.22    Chief Smith didn't review the SIU report, as Director Sharp didn't provide it.[223]

2.23    Even with the investigation's narrow scope, Chief Smith identified 19 violations among 9 staff.[224]

2.24    To identify these 19 violations among 9 staff, Chief Smith "pulled up the standards of conduct policy" and "went through that basically start to finish."[225]

2.25    The "standards of conduct policy" refers to Lexipol Policy 108.[226]

not.").

[223] ECF No. 27 (McEntire Decl. – Ex X at 77:17-24) (Chief Smith Depo) ("Q: And we touched on this earlier when we were just getting started with the deposition, but my understanding is that you did not review the—the North Central Washington Special Investigation Unit report that was completed by Detective Sergeant Jason DeMyer from the Douglas County Sheriff's Office? A: No. I have a copy now, but I have not reviewed it.").

[224] ECF No. 27 (McEntire Decl. – Ex X at 90:11-22) (Chief Smith Depo) ("Q: And so counting those out, what's the total number of violations that you identified? A: Sergeant Cheever had three, Sergeant Kent Williams had three, Corporal Whitmire had one, Deputy Hisey had two, Deputy Cutshall two, Deputy Edge two, Deputy Nores two, Deputy Kalafat two, and Nurse Aldrich two. Q: So adding that together that looks like 19 total violations among nine staff during that four-and-a-half-hour window? [] A: Yeah. But a lot of those are repeat ones. Q: In terms of the same violations—so the—different staff are committing the same violations? Is that what you're—" A: Yes.").

[225] ECF No. 27 (McEntire Decl. – Ex X at 91:14-25; 92:1-3) (Chief Smith Depo) ("Q: You had indicated that you saw down with Director Sharp in order to, you know, sort of discuss the—the policy violations that you identified. Can you please share with—can you please share with me what that—what that process looked like? Did you sort of start at the policy manual age page one and start thumbing through? I mean, how did this—how did this come about? A: If I recall correctly, I think it was just basically we pulled up the standards of conduct policy, because, I mean, not all the policies are gonna deal with this kind of situation, so we just went to the standards of conduct policy and went through that basically start to finish and just basically highlighted the violations that we thought were possibly there.").

[226] ECF No. 27 (McEntire Decl. – Ex X at 92:11-18) (Chief Smith Depo) ("Q: And so—and it looks like that is essentially Chapter—Chapter One, if you will, or Chapter 100, for lack of a better description, right? There's a particular chapter that deals with all of these standards of conduct? A: Yeah, there's different standards in Lexipol. But this would have been under Chapter One, whatever that is. And this would have been Policy 108.").

2.26    Chief Smith didn't examine any other chapters in the Lexipol manual to see what other policies jail staff may have violated.[227]

2.27    Director Sharp agreed with the violations Chief Smith identified. He found two violations against Ms. Aldrich when she failed to interact with—and get a response from—Mr. Verville during medication pass on September 7.[228] As a sanction, she received a written reprimand, as well as a verbal one.[229]

2.28    Director Sharp found three violations against Sergeant Jeremy Cheever because his deputies didn't conduct proper welfare checks during the feeding process, especially when Mr. Verville didn't touch his meal.[230] As a sanction, he received 1 day without pay, a written reprimand, and a verbal one.[231]

2.29    Director Sharp found two violations against Deputy Zachary Cutshall for not "checking on Mr. Verville or asking him why he did not eat his meal."[232] As a sanction, he received 1 day without pay, as well as a verbal reprimand.[233]

2.30    Director Sharp found two violations against Deputy Williams Edge for not "checking on Mr. Verville or asking him why he did not eat his meal."[234] As a sanction, he received 1 day without pay, as well as a verbal reprimand.[235]

---

[227] ECF No. 27 (McEntire Decl. – Ex X at 92:19-23) (Chief Smith Depo) ("Q: And so did you—as part of this review, as you're going through and—and—and examining potential policy violations, did you look at other—other chapters in the Lexipol manual for other violations? A: Not that I recall.").
[228] ECF No. 28 (McEntire 2d. Decl. – Ex CC at 2) (Admin. Results Re: Aldrich).
[229] ECF No. 28 (McEntire 2d. Decl. – Ex CC at 1) (Admin. Results Re: Aldrich).
[230] ECF No. 28 (McEntire 2d. Decl. – Ex DD at 4) (Admin. Results Re: Jeremy Cheever).
[231] ECF No. 28 (McEntire 2d. Decl. – Ex DD at 1) (Admin. Results Re: Cheever).
[232] ECF No. 28 (McEntire 2d. Decl. – Ex EE at 3) (Admin. Results Re: Zachary Cutshall).
[233] ECF No. 28 (McEntire 2d. Decl. – Ex EE at 1) (Admin. Results Re: Cutshall).
[234] ECF No. 28 (McEntire 2d. Decl. – Ex FF at 3) (Admin. Results Re: Williams Edge).
[235] ECF No. 28 (McEntire 2d. Decl. – Ex FF at 1) (Admin. Results Re: Edge).

2.31     Director Sharp found two violations against Deputy Dave Hisey for not inquiring why his "co-workers did not check on Mr. Joseph Verville."[236] As a sanction, he received a letter of reprimand, as well as a verbal reprimand.[237]

2.32     Director Sharp found two violations against Deputy Chris Nores for taking "no more than a couple of seconds looking into the windows of the individual cells" during cell checks.[238] As a sanction, he received 1 day without pay, as well as a verbal reprimand.[239]

2.33     Director Sharp found two violations against Corporal Whitmire for supervising deputies who "took no more than a couple of seconds looking into the windows of the individual cells."[240] As a sanction, she received 1 day without pay.[241]

2.34     Director Sharp found three violations against Sergeant Kent Williams for supervising deputies who "took no more than a couple of seconds looking into the windows of the individual cells."[242] As a sanction, he received 1 day without pay, a letter of reprimand, and a verbal reprimand.[243]

2.35     Deputy James Kalafat was the only deputy involved who wasn't disciplined—and that's because he retired during the disciplinary process.[244]

---

[236] ECF No. 28 (McEntire 2d. Decl. – Ex GG at 2) (Admin. Results Re: Dave Hisey).
[237] ECF No. 28 (McEntire 2d. Decl. – Ex GG at 1) (Admin. Results Re: Hisey).
[238] ECF No. 28 (McEntire 2d. Decl. – Ex HH at 3) (Admin. Results Re: Chris Nores).
[239] ECF No. 28 (McEntire 2d. Decl. – Ex HH at 1) (Admin. Results Re: Nores).
[240] ECF No. 28 (McEntire 2d. Decl. – Ex II at 4) (Admin. Results Re: Kris Whitmire).
[241] ECF No. 28 (McEntire 2d. Decl. – Ex II at 1) (Admin. Results Re: Whitmire).
[242] ECF No. 28 (McEntire 2d. Decl. – Ex JJ at 4) (Admin. Results Re: Kent Williams).
[243] ECF No. 28 (McEntire 2d. Decl. – Ex JJ at 1) (Admin. Results Re: Williams).
[244] ECF No. 28 (McEntire 2d. Decl. – Ex KK at 32:17-25; 33:1-5) (Chelan Co. Rule 30(b)(6)) ("Q: And so focusing on Mr. Kalafat, do you know was there actual—any formal discipline entered against Deputy Kalafat based upon his actions back in September of 2021? A: There was none. Q: Okay. And is that because the reason that you were guessing back in your deposition in your individual capacity, is that he had retired? A: Yes. He retired in October. Q: And so as a result, you made no formal findings regarding whether or not Deputy Kalafat had or had not committed any policy violations? A: He wasn't here for me to do that. He retired.").

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

**B. Staff push back on the violations.**

2.36    In response to Director Sharp's discipline, staff pushed back. Ms. Tollackson made Director Sharp "very aware" she "didn't agree" with Ms. Aldrich's discipline because "[s]he had done what she was supposed to do at that time"—that is, walk away from an unresponsive patient without checking on him.[245]

2.37    Ms. Tollackson pushed back because she's observed her nurses long enough to understand how they perform daily tasks.[246] If she saw a nurse performing a withdrawal assessment outside the usual practice, she would address that issue,[247] and she never saw Ms. Aldrich acting outside the jail's usual practice leading up to Mr. Verville's death.[248]

2.38    Ms. Tollackson pushed back because she never saw Ms. Aldrich acting outside the jail's usual practice for med passes leading up to Mr. Verville's death.[249]

---

[245] ECF No. 27 (McEntire Decl. – Ex J at 145:16-25; 146:1-2) (Tollackson Depo) ("Q: So even though you're her immediate supervisor, that disciplinary process wasn't sort of fully share with you; is that accurate? A: That's accurate. At the time Director Sharp and I had discussed this, that, you know, I didn't agree with Director Sharp in his decision to write her a letter, and he was very aware of my thoughts to that at the time. So there was no, you know, protocol violation or policy violation. She had done what she was supposed to do at that time, and so that—but again, he's the director, and he made that decision.").

[246] ECF No. 27 (McEntire Decl. – Ex J at 34:24-25; 35:1-3 (Tollackson Depo) ("Q: If you saw a nurse doing, let's say, a withdrawal assessment that was outside kin of the jail's usual practice for doing things, would you address that issue with the nurse? A: Yes.").

[247] ECF No. 27 (McEntire Decl. – Ex J at 34:19-23) (Tollackson Depo) ("Q: Would you say, Billye, that essentially you're in the trenches enough and observing your nurses enough where you've got a good understanding of how they perform their day-in and day-out tasks? A: Yes.").

[248] ECF No. 27 (McEntire Decl. – Ex J at 35:17-23) (Tollackson Depo) ("Q: So from September 7th, 2021, looking back in time, right, did you ever identify Kami Aldrich as acting outside the jail's usual practice for how she was doing her withdrawal assessments? [] A: No.").

[249] ECF No. 27 (McEntire Decl. – Ex J at 38:2-6) (Tollackson Depo) ("Q: And again, same line, which is from September 7th, 2021, going back, did you every identify essentially Kami Aldrich as acting outside the jail's usual practice regarding her med passes? A: No."). Would you say, Billye, that essentially you're in the trenches enough and observing your nurses enough where you've got a good understanding of how they perform their day-in and day-out tasks? A: Yes.").

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

1   2.39    The security team pushed back too. Corporal Whitmire disagreed with

2   Director Sharp's discipline against her and her deputies, believing they understood

3   expectations and followed them.[250] No other staff identified concerns either.[251]

4   2.40    Corporal Whitmire also pushed back because her usual practice is to

5   observe deputies enough to understand whether they're doing their jobs.[252] If she saw a

6   deputy acting outside the jail's usual practice, she would address that issue,[253] and she

7   never saw her deputies acting outside the usual practice leading up to Mr. Verville's

8   death.[254]

---

[250] ECF No. 27 (McEntire Decl. – Ex C at 96:21-25; 98:2-7) (Whitmire Depo) ("Q: And a different question along those lines is, do you agree with the discipline that you received? A: I agree that discipline had to be handed out. My staff members not understanding what my expectations are, I don't agree with that portion of it."); ("Q: And do you believe that your deputies did understand what your expectations were? A: Yes. Q: Do you believe that your deputies were following your expectations? A: Yes.").

[251] ECF No. 27 (McEntire Decl. – Ex J at 38:8-14) (Tollackson Depo) ("Q: And similar question from September 7th, 2021, going back in time. Did another jail staff member ever identify Kami Aldrich as acting outside the jail's usual practices regarding her med passes? [] A: No.").

[252] ECF No. 27 (McEntire Decl. – Ex C at 20:4-9) (Whitmire Depo) ("Q: So maybe the better way to ask this is over the course of your responsibilities, fair to say that you have a goal or practice of trying to observe the deputies when you can, right, to see whether or not they are doing their job? A: Yes.").

[253] ECF No. 27 (McEntire Decl. – Ex C at 27:17-22) (Whitmire Depo) ("Q: And so just to sort of clarify that, which is, if you saw one of your deputies sort of veering, right, or going outside how you normally see them conduct their tasks, is that something that you would bring to the deputy's attention? A: Yes.").

[254] ECF No. 27 (McEntire Decl. – Ex C at 28:20-23) (Whitmire Depo) ("Q: From September 7th, 2021, looking back, Kris, did you ever identify jail check issues with the deputies that you were supervising, looking back? A: No.").

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

## C. "I don't believe we did anything differently."

2.41    Twice Ms. Tollackson was asked what changed at after Mr. Verville's death. Twice she responded "I don't believe we did anything differently. We didn't do anything incorrectly there."[255]

2.42    Other staff, like Deputy Chris Nores, disagree: "There's lots of things that have changed since that time period."[256]

2.43    Director Sharp outlined what changed. Three days after Mr. Verville's death, September 10, the jail issued "Directive 21-003," which outlined new procedures for cell checks.[257]

2.44    One change encouraged staff to "have regular interaction" with inmates in segregation "to better assess the well-being of the individuals."[258]

2.45    Another change established specific start times for cell checks.[259]

2.46    Another change established starting locations for cell checks.[260]

---

[255] ECF No. 27 (McEntire Decl. – Ex J at 143:23-25; 144:1-9) (Tollackson Depo) ("Q: Again, during your November 2023 deposition. You were—you know, you were asked what remedial measures that the jail took in response to Mr. Verville's death, and your response was 'I don't believe we did anything differently. We didn't do anything incorrectly there.' Do you recall that testimony? A: Yes. Q: And do you essentially—do you agree that that's accurate and stand by the testimony that you provided back in November of 2023? A: Yes.").

[256] ECF No. 28 (McEntire 2d. Decl. – Ex LL at 29:18-20) (Deputy Chris Nores Depo) ("Q: Did it change after that time period? A: There's lots of things that have changed since that time period.").

[257] ECF No. 28 (McEntire 2d. Decl. – Ex MM) (Directive 21-003 Re: Security Checks).

[258] ECF No. 27 (McEntire Decl. – Ex Q at 30:1-7) (Sharp Depo) ("Q: 'Staff is encouraged to have regular interaction with the individuals housed in these units to better assess the well-being of the individuals.' Does that sentence announce a new policy or confirm an existing one? A: That would be a new [sic]. We wanted them to interact more, so that was new").

[259] ECF No. 27 (McEntire Decl. – Ex Q at 33:22-25) (Sharp Depo) ("Q: It's a new policy in the sense that it assigns a specific time that deputies now need to follow for then they're doing their cell checks? A: Correct.").

[260] ECF No. 27 (McEntire Decl. – Ex Q at 34:8-17) (Sharp Depo) ("Q: 'Staff should take into consideration using the same starting point to begin their security checks to better ensure

1   2.47    Directive 21-003 also reiterated existing policies that weren't being

2   followed, such as deputies not splitting up during cell checks.[261]

3   2.48    Directive 21-003 also "tightened up" existing policies that weren't being

4   followed, such as two deputies looking in each cell.[262]

5   2.49    The jail even physically showed staff how to conduct cell checks, as the

6   deputies' union representatives claimed the jail "failed to train them."[263]

7   2.50    Beyond Directive 21-003, which addressed the security team, the jail

8   changed practices for the medical team. After the deaths of Mr. Verville and Ms. Nelson,

9   nurses were required to check vitals one hour after administering detox medications.[264]

---

[261] consistency and adhere to the hourly schedule.' Does this bullet point announce a new policy or confirm an existing one? A: This is new because we found that they might be starting on fourth floor, and the next check they might be starting on second, so we wanted them to start at the same starting point for each hourly check.").

[261] ECF No. 27 (McEntire Decl. – Ex Q at 32:20-25; 33:1-5) (Sharp Depo) ("Q: And the jail was providing that directive—or you and Chief Larsen were providing that directive essentially based on concerns or issues that you were identifying that deputies were not saying together during cell checks? A: Well, yeah. We—we noticed through our video watching that maybe some of them were doing—they were putting two people in the unit, but maybe one was taking the upstairs and one was taking the downstairs, and that was not the clear expectation of how those should have been done.").

[262] ECF No. 27 (McEntire Decl. – Ex Q at 35:11-17) (Sharp Depo) ("Q: Were you concerned that deputies weren't understanding that policy? A: We weren't concerned they didn't understand it. We were concerned that they weren't doing it exactly how the expectation was. That's why we wanted to tighten up as far as two people, making sure that they were looking at each individual that was locked down in a cell.").

[263] ECF No. 27 (McEntire Decl. – Ex Q at 37:4-8, 19-22) (Sharp Depo) ("Q: During that deposition you had testified that after Blair Nelson's death you had 'reiterated' Directive 21-003 and physically showed staff how to conduct a jail check. My question is why reiterate that? A: [] And then when we had the incident on—in November, when I went to—when we started looking at our internal review process of how we conduct our business, the union advised that we had failed to train them.").

[264] ECF No. 27 (McEntire Decl. – Ex Q at 39:18-25) (Sharp Depo) ("Q: During your 30(b)(6) deposition you had testified that after Blair Nelson's death you required nurses to check vitals one hour after—after administering detox medications. Do you recall that? A: Yes. Q: And then

2.51    After the deaths of Mr. Verville and Ms. Nelson, the jail went from one mandatory check per day to two mandatory checks per day for anyone that was detoxing.[265]

2.52    After Mr. Verville's death, the jail ordered UA kits that could identify fentanyl.[266]

2.53    After Mr. Verville's death, the medical team gave deputies a list of which inmates were detoxing.[267] Before, passing down inmate information from shift to shift was a "courtesy," not a practice.[268]

2.54    After Mr. Verville's death, the medical team gave detoxing inmates a bucket for vomiting.[269]

---

was that a new jail practice? A: Yes.").

[265] ECF No. 27 (McEntire Decl. – Ex Q at 43:20-25; 44:1-2) (Sharp Depo) ("Q: During the 30(b)(6) deposition you had testified that the jail went from one mandatory check per day to two mandatory checks per day for anyone that was detoxing. Do you recall that transition and practice? A: Yes. Q: Was that a new practice? A: Yes.").

[266] ECF No. 27 (McEntire Decl. – Ex Q at 46:18-21) (Sharp Depo) ("During the 30(b)(6) deposition you testified that the jail started ordering UA kits that could identify fentanyl. Was that a new practice? A: Yes.").

[267] ECF No. 27 (McEntire Decl. – Ex Q at 47:25; 48:1-7) (Sharp Depo) ("Q: During his deposition earlier this summer Deputy Nores had testified that the medical staff now gives deputies a list of which inmates who are detoxing. Are you aware of this, you know, information that's now provided from the medical team to the deputies? A: Yes. Q: And was that a new jail practice? A: Yes.").

[268] ECF No. 28 (McEntire 2d. Decl. – Ex LL at 28:12-25; 29:1-4) (Nores Depo) ("Q: Is there a specific process for how a verbal pass down happens, or is it more just sort of happenstance? [] A: It's more like, if I show up to work ten minutes early and that previous officer is available, to give me pass down, I can receive verbal pass down, off the clock, just verbally. Q: So there's not a specific process for it to happen, but, perhaps, if you are there early, another officer is there to talk to, and there is someone who has an issue, that's how it could happen? A: Correct. Pass down is not a requirement because one shift gets off at 7:00 and the other shift comes on at 7:00, and we don't—we aren't technically on the clock, but, as a courtesy we give verbal pass down to each other if we show up early and the other deputy is available.").

[269] ECF No. 27 (McEntire Decl. – Ex Q at 49:12-18) (Sharp Depo) ("Q: During his deposition

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

1    2.55    After Mr. Verville's death, the jailed required nurses to perform medical

2    screenings by 9:30 a.m.[270]

3    2.56    After Mr. Verville's death, the jail added buprenorphine to its withdrawal

4    protocol,[271] which is an "opiate-agonist that directly counteracts opiate withdrawal

5    symptoms," serving as a "keystone for the highly recommended approach of Medication-

6    Assisted Treatment (MAT) of acute opiate withdrawal."[272]

7    2.57    After Mr. Verville's death, the jail reduced the WOW's triggering score for

8    contacting a qualified medical professional from 11 to 7.[273]

9    2.58    These were the first changes to cell checks in a long time. Director Sharp

10   cannot recall practices changing between 2019 and the date of Mr. Verville's death.[274]

---

Deputy Nores testified that the jail now provides detoxing inmates a bucket for vomiting. Are you aware of this new practice? A: Yes. Q: I suppose I should clarify. Is that a new practice? A: Yes.").

[270] ECF No. 27 (McEntire Decl. – Ex K) (Nov. 22, 2021 e-mail regarding changes to withdrawal procedures) ("I would like to see the withdrawal assessments done in the morning by a certain time. My thoughts on this are before 0930."); *see also* Exhibit Q at 57:21-24 (Sharp Depo) ("Q: So it's new in the sense that it's setting a specific time for—or a goal of a specific time for withdrawal assessments to be completed? A: Correct.").

[271] ECF No. 27 (McEntire Decl. – Ex Q at 60:12-17) (Sharp Depo) ("Q: It looks like the standing order number 27 also added buprenorphine to the withdrawal protocol. SO that also was a new change to the practices that was completed or put into effect after Mr. Verville's death? A: Yes.").

[272] ECF No. 27 (McEntire Decl. – Ex G at 6) (Cummins's Report).

[273] ECF No. 27 (McEntire Decl. – Ex Q at 60:24-25; 61:1-8) (Sharp Depo) ("Q: And if you look down at again Exhibit 5, Page 78, item number 27, and then it's Paragraph 2F, there was an adjustment in the WOWS score essentially lowering it from 10 down to 7. Was that another one of the changes that the jail put into effect in terms of adjusting its detox protocols? A: After Mr. Verville? Q: Correct. A: Yes.").

[274] ECF No. 27 (McEntire Decl. – Ex Q at 22:7-20) (Sharp Depo) ("Q: Looking from January 2021 to September 7th, 2021, did the jail introduce new policies or directives for how deputies should perform cell checks? A: I don't believe so.") ("Q: And then going back a year before to 2020, did the jail introduce new policies or directives on how deputies should perform cell checks? A: Not that I'm aware of. Q: Same question for 2019. Are you aware whether or not the

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

2.59    These were the first changes to meal distribution in a long time. Director Sharp cannot recall practices changing between 2019 and the date of Mr. Verville's death.[275]

**D.    The jail chose not to investigate issues.**

2.60    Mr. Verville's death revealed issues the jail chose not to investigate. One issue was what Deputy Nores reported during med pass on September 7. According to Deputy Nores, after Mr. Verville didn't respond, he entered Mr. Verville's cell around 8:50 a.m. and claimed to see him alive and breathing.[276]

2.61    This claim contradicts the jail's own investigation, which showed Mr. Verville died around 5:08 a.m.—hours before med pass.[277]

2.62    Director Sharp knew about the discrepancy between what Deputy Nores reported and what the jail found,[278] yet he didn't follow-up.[279]

---

jail introduced new policies or directives for how deputies should perform cell checks? A: Not that I'm aware of.").

[275] ECF No. 27 (McEntire Decl. – Ex Q at 24:3-14) (Sharp Depo) ("Q: Switching to policy changes regarding meal distribution, from January 2021 to September 7th, 2021, did the jail introduce any new policies or directives for how deputies should perform meal distribution? A: No. Q: Going back a year, in 2020 did the jail introduce any new policies or directives for how deputies should perform meal distribution? A: No. Q: In 2019 did the jail introduce new policy directives for how deputies should perform meal distribution? A: No.").

[276] ECF No. 27 (McEntire Decl. – Ex Q at 99:8-13) (Sharp Depo) ("Q: Deputy Nores had indicated both in reports and then also in depositions that he saw Mr. Verville alive and breathing at a med pass at around 8:50 a.m. that morning. Are you familiar with that statement that he's made? [] A: Yes.").

[277] ECF No. 27 (McEntire Decl. – Ex Q at 99:3-7) (Sharp Depo) ("Q: Based on your—the fact finding that Chief Smith had done, was that essentially the jail's conclusion, is that Mr. Verville had passed away sometime around that 5:08 a.m. time in the morning on September 7th? A: Yes.").

[278] ECF No. 27 (McEntire Decl. Declaration – Ex Q at 99:21-25; 100:1) (Sharp Depo) ("Q: Do you see a disconnect essentially or some tension between his observation and what the jail's internal fact finding concluded? [] A: Yes.").

[279] ECF No. 27 (McEntire Decl. – Ex Q at 100:2-4) (Sharp Depo) ("Q: Did you follow up with

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

2.63    Another issue was how the jail signs off on "special reports." Jail staff complete special reports when something "out of the ordinary" happens (like a jail death).[280]

2.64    When a staff member completes a special report, either the Director or a Chief must sign off on it, certifying the staff member's actions comply with training and policy:[281]



After review, Employees actions comply with Training and Policy _____ (initials) Director or Chief          Exhibit U

2.65    Director Sharp doesn't review special reports, so this task falls Chief Smith and Chief Larsen.[282]

2.66    Between the two Chiefs, Chief Smith doesn't "review many" special reports, leaving the "bulk of the special reports" to Chief Larsen.[283]

2.67    After Mr. Verville died, Ms. Aldrich prepared a special report addressing her med pass that morning.[284] In that report, Ms. Aldrich outlined her conduct—conduct

---

Deputy Nores about that inconsistency? A: No.").

[280] ECF No. 27 (McEntire Decl. – Ex X at 79:19-25) (Chief Smith Depo) ("Q: So tell me about— what—what is a special report? A: Well, we do special reports any time—well, special reports can be done for a myriad of reasons. I mean if we have—kind of anything that's kind of out of the ordinary, I guess, could be done on a special report if there's a —like a medical situation, a use of force.").

[281] ECF No. 27 (McEntire Decl. – Ex U) (Aldrich Special Report).

[282] ECF No. 27 (McEntire Decl. – Ex Q at 108:16-20) (Sharp Depo) ("Q: So as director do you review and sign off on special reports? A: No. Q: At all? A: No.").

[283] ECF No. 27 (McEntire Decl. – Ex X at 80:20-24; 81:4-9) (Chief Smith Depo) ("Q: In your capacity as chief of administration, is it—have you reviewed a fair amount of these reports in your—in your tenure? A: I don't review many of them in my—my current position."); ("Q: And is that just because, by virtue of the departments that you supervise, there are less special reports coming out of those departments than, let's say, what the chief of operations might encounter? A: Yes. The chief of operations is gonna see probably a bulk of the special reports.").

[284] ECF No. 27 (McEntire Decl. – Ex U) (Aldrich Special Report).

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

she was disciplined for by Director Sharp (i.e., not checking on Mr. Verville's well-being despite knowing "how important these medications are during the withdrawal time period").[285]

2.68    Chief Larsen reviewed Ms. Aldrich's special report and certified that, after review, her actions complied with training and policy at the jail.[286]

2.69    Chief Larsen isn't aware of a policy or procedure that outlines how to review special reports before signing off on them.[287]

2.70    Chief Larsen didn't receive any training on how to review special reports before signing off on them.[288]

2.71    Chief Larsen "doesn't necessarily have a process" for reviewing special reports.[289] Generally, the more complex a situation, the more thorough his review ends up being.[290]

---

[285] ECF No. 27 (McEntire Decl. – Ex Q at 111:9-14) (Sharp Depo) ("Q: And it covers the same time window that Nurse Aldrich had received discipline in terms of her conduct and performance on the morning of September 7th? [] A: Yes."); *see also* Ex CC at 2 (Aldrich Admin. Results) ("With your experience as a nurse in corrections you know how important these medications are during the withdrawal time period.").

[286] ECF No. 27 (McEntire Decl. – Ex R at 26:22-25; 27:1-3) (Chief Larsen Depo) ("Q: And who is the report writer for this special report? A: The report writer in this case is Kami Aldrich. Q: And in the bottom right-hand corner there's a place for a signature. Do you recognize that signature? A: There's some initials. Yes, I do. Q: And who are those—who do those initials belong to? A: Those are my initials.").

[287] ECF No. 27 (McEntire Decl. – Ex R at 28:8-10) (Chief Larsen Depo) ("Is there a written policy or procedure that outlines how to review special reports before signing off on them? A: Not that I'm aware.").

[288] ECF No. 27 (McEntire Decl. – Ex R at 28:5-7) (Chief Larsen Dep) ("Q: Did you receive any training on how to review special reports before signing off on them? A: No.").

[289] ECF No. 27 (McEntire Decl. – Ex R at 28:11-16) (Chief Larsen Depo) ("Q: Would you—do you have a—given that you review special reports daily, do you have a process or a procedure or usual practice that you go through when reviewing a special report before certifying that an employee's actions comply with training and policy? A: I don't necessarily have a process.").

[290] ECF No. 27 (McEntire Decl. – Ex R at 30:10-13) (Chief Larsen Depo) ("Q: So it sounds like

Statement of Material Facts
Not in Dispute

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

1   2.72    To see if staff's actions comply with policy, Chief Larsen generally doesn't
2   review the jail's policy manual.[291]

3   2.73    Before signing off on Ms. Aldrich's special report, Chief Larsen didn't
4   interview anyone.[292]

5   2.74    Before signing off on Ms. Aldrich's special report, Chief Larsen didn't
6   review Mr. Verville's medical records.[293]

7   2.75    Before signing off on Ms. Aldrich's special report, Chief Larsen didn't
8   consult the jail's policy manual because "in watching the video it appeared that
9   everything was within the parameters of the policy and instruction to the staff of what to
10  do in situations like that." [294]

11  2.76    Simply, Chief Larsen found Ms. Aldrich's conduct complied with policy,
12  while Chief Smith and Director Sharp found otherwise. When asked about the conflicting
13  reports among leadership, Director Sharp couldn't say why Chief Larsen signed off on
14  her behavior.[295]

---

the more complex a situation is, the more thorough your review ends up being. Is that a fair
characterization? A: Correct.").
[291] ECF No. 27 (McEntire Decl. – Ex R at 30:14-17) (Chief Larsen Depo) ("Q: Before signing off
on a special report that an employee's actions comply with training and policy, do you review the
policy manual? A: Not generally.").
[292] ECF No. 27 (McEntire Decl. – Ex R at 31:25; 32:1-2) (Chief Larsen Depo) ("Q: As part of the
review process for this special report, Exhibit 2, did you interview any individuals? A: I did
not.").
[293] ECF No. 27 (McEntire Decl. – Ex R at 33:6-8) (Chief Larsen Depo) ("Q: Before signing off on
that special report did you review any medical records of Mr. Verville? A: I did not.").
[294] ECF No. 27 (McEntire Decl. – Ex R at 33:9-19) (Chief Larsen Depo) ("Q: Before signing off
on that report did you consult the Lexipol policy manual? A: I did not. Q: How would you know
whether or not an employee's actions complied with training and policy without reviewing the
policy manual? [] A: In the case of this report, in watching the video it appeared that everything
was within the parameters of policy and instruction to the staff of what to do in situations like
that.").
[295] ECF No. 27 (McEntire Decl. – Ex Q at 112:16-22) (Sharp Depo) ("Q: So you're saying there's
[no] tension between [what] Chief Larsen thought that there was no policy violations here, but

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

**E. Experts see substandard care and supervision—by nursing, security, and leadership.**

**1. Dr. Cummins sees substandard care.**

2.77    Several experts found fault with the jail's actions, including Dr. Cummins, an ER doctor who specializes in cardiac care.[296]

2.78    Dr. Cummins faulted Ms. Aldrich's decision to wait over 24 hours before assessing Mr. Verville, for the "failure to <u>assess</u> for 24 hours was [a] failure to <u>treat</u> for 24 hours."[297] This delay matters someone like Mr. Verville is arrested and placed into "forced withdrawal."[298]

2.79    Dr. Cummins also identified a cause of death for Mr. Verville: untreated opiate withdrawal syndrome.[299] More specifically, Dr. Cummins says it's "the <u>complications</u> of opiate withdrawal, rather than withdrawal itself, that prove lethal."[300]

2.80    Experts (including Dr. Cummins) recognize the complications from opioid withdrawal syndrome kill people in a familiar way: 1) an individual begins to withdraw, triggering nausea, vomiting, diarrhea, and autonomic hyperactivity; 2) these symptoms cause the individual to develop dehydration and electrolyte imbalances; 3) these conditions, taken together, create fatal cardiac arrhythmias.[301]

---

you thought otherwise? [] A: No, I'm not saying that. I'm just saying that he—I wasn't there when he signed off on this, so I don't know why he signed off on it. I'm saying during the investigative fact finding report and the investigative results I determined, based on her actions that day, that she should have done something different.").

[296] ECF No. 27 (McEntire Decl. – Ex G at 2) (Cummins's Report).

[297] ECF No. 27 (McEntire Decl. – Ex G at 21) (Cummins's Report) (emphasis in original).

[298] ECF No. 27 (McEntire Decl. – Ex G at 16 (Cummins's Report) ("Joseph Verville had the lethal package: a) he was addicted to opiates when he was arrested; and b) incarceration would deprive him of opiates and force him into severe opiate withdrawal (forced withdrawal.").

[299] ECF No. 27 (McEntire Decl. – Ex G at 16) (Cummins's Report).

[300] ECF No. 27 (McEntire Decl. – Ex G at 18) (Cummins's Report) (emphasis in original).

[301] ECF No. 27 (McEntire Decl. – Ex G at 18) (Cummins's Report).

CONNELLY LAW OFFICES
2301 N. 30th Street
Tacoma, Washington 98403

2.81    To conclude Mr. Verville experienced opioid withdrawal, Dr. Cummins relied on a compelling clinical picture: 1) Mr. Verville was arrested with opioids, supporting recent use; 2) he reported to police he uses drugs, supporting recent use; 3) he has prior drug-related convictions, supporting a history of use; 4) he appeared under the influence at booking; 5) he reported to booking he'd be withdrawing; 6) he has experienced withdrawal during prior stays at the jail; 7) he was strip-searched and body scanned during booking, with jail staff finding no drugs on him; 8) the autopsy showed no evidence of drugs secreted in his body; 9) there's no video evidence he received contraband drugs from an outside source, retrieved the drugs from a secreted location, or ingested any drug after he was placed in custody; 10) the half-life of the drugs in his system show those drugs were well below fatal levels when he died; 11) video footage inside Mr. Verville's cell showed him experiencing withdrawal symptoms, including nausea, lack of appetite, vomiting, discomfort, runny nose, and chills; 12) medical records show he was experiencing abnormal vitals, another withdrawal symptom; 13) video footage inside Mr. Verville's cell showed him missing three consecutive meals, another textbook withdrawal symptom; 14) during his medical screening, Mr. Verville said he's withdrawing from fentanyl; 15) his improperly-scored WOWs instrument (9) showed he was experiencing opioid withdrawal; 16) his properly-scored WOWs instrument (11) showed the nurse needed to call a doctor or dial 911; and 17) the nurse activated him on the jail's withdrawal protocol.[302]

2.82    To conclude Mr. Verville's forced withdrawal went untreated, Dr. Cummins relied on a compelling picture: 1) the jail waited over 24 hours before medically screening Mr. Verville despite knowing he would withdraw, allowing him to decompensate during this time; 2) when the medical screening began, Ms. Aldrich didn't review his medical history, which reflected a history of withdrawal and high blood

---

[302] ECF No. 27 (McEntire Decl. – Ex G at 12-14, 17) (Cummins's Report).

pressure; 3) his vitals showed he was in a hypertensive crisis, but the nurse did nothing; 4) the WOWs instrument was underscored because video footage from inside Mr. Verville's cell gives a clear picture of his symptoms; 5) a properly-scored WOWs instrument showed Ms. Aldrich needed to call a doctor or 911, but didn't; 6) he didn't receive unlimited access to an electrolyte replacement drink, as contemplated by the jail's medical protocols; 7) his vitals weren't regularly monitored; 8) deputies didn't check on him even though he missed three consecutive meals; 9) the deputies' brief-glance cell checks prevented them from remaining alert for withdrawal symptoms, such as vomit everywhere; 10) the deputies didn't have a meaningful way to pass down information about withdrawing inmates, as pass down was a courtesy, not a practice; 11) the deputies' brief-glance cell checks weren't performed in a consistent manner, preventing them from tracking whether Mr. Verville was deteriorating over time (he was); 12) the jail didn't give him widely-used withdrawal drugs like Clonidine (the jail previously used this drug) or buprenorphine (the jail started using this drug right after Mr. Verville's death); and 13) the jail didn't monitor Mr. Verville's decompensation despite being placed in a cell with 24-hour footage.[303]

### 2. Dr. Roscoe sees substandard care.

2.83    In addition to the criticisms outlined above (i.e., Ms. Aldrich's inaction in response to Mr. Verville's hypertensive crisis), correctional nursing expert Dr. Roscoe identified a bigger problem: it wasn't just Ms. Alrich who overlooked his hypertensive crisis. Both Ms. Tollackson (healthcare manager) and Ms. Donithan (another nurse at the jail) reviewed his vitals, finding they were nothing "crazy."[304]

---

[303] ECF No. 27 (McEntire Decl. – Ex G at 6, 11-14, 17) (Cummins's Report).

[304] ECF No. 27 (McEntire Decl. – Ex H at 6-7) (Roscoe's Report); *see also* Ex NN at 11:5-14 (Donithan Interview) ("Q: So vitals are normal. Everything's— A: Okay, well, a little bit elevate—elevated blood pressure. Not—not normal—but nothing like, oh, my gosh, this is crazy.").

2.84    Dr. Roscoe found it "very concerning" that "three nurses working at the Chelan County Regional Just Center saw no problem with Mr. Verville's significantly abnormal blood pressure"—numbers "considered by the American Heart Association to be hypertensive crisis."[305]

2.85    As a correctional nursing expert, Dr. Roscoe notes this widespread ignorance meant "Mr. Verville, and all the incarcerated individuals at the Chelan County Regional Justice Center were being provided inappropriate care by nurses who did not have even the basic, foundational knowledge required of nurses in practice."[306]

2.86    Nor does the jail refresh nurses on this foundational knowledge during its trainings, for as Ms. Tollackson said, nurses "should have learned that in nursing school."[307]

2.87    Beyond vitals, Dr. Roscoe criticized the jail for failing to have a "system in place" to verify deputies provided medication—and that the inmate ingested it.[308] Dr. Roscoe couldn't confirm whether Mr. Verville received the anti-nausea medication ordered by Ms. Aldrich until reviewing the toxicology report.[309]

2.88    Finally, Dr. Roscoe noted Ms. Aldrich's decision to walk away Mr. Verville, even though he was unresponsive, "deviated significantly from the standard of nursing care."[310] Even as a LPN, Ms. Aldrich "was required to obtain an informed refusal and that required her to interact with her patient and ensure that he understood the ramifications of not taking the medication."[311]

---

[305] ECF No. 27 (McEntire Decl. – Ex H at 6-7) (Roscoe's Report).
[306] ECF No. 27 (McEntire Decl. – Ex H at 7) (Roscoe's Report).
[307] ECF No. 27 (McEntire Decl. – Ex J at 85:1-5) (Tollackson Depo) ("Q: And what about—I suppose, like, do you do something as basic as vitals for your nurses, or is that something again, like, they're experienced so they— A: They should have learned that in nursing school.").
[308] ECF No. 27 (McEntire Decl. – Ex H at 7) (Roscoe's Report).
[309] ECF No. 27 (McEntire Decl. – Ex H at 7) (Roscoe's Report).
[310] ECF No. 27 (McEntire Decl. – Ex H at 8) (Roscoe's Report).
[311] ECF No. 27 (McEntire Decl. – Ex H at 8) (Roscoe's Report).

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

### 3. Ms. Fontenot sees substandard care.

2.89     In addition to criticisms outlined above (i.e., the deputies' brief-glance cell checks were meaningless), correctional practices expert Cathy Fontenot identified other issues that contributed to Mr. Verville's death.[312]

2.90     One issue was meal pass. As Ms. Fontenot notes, "[m]eal service is intended to be a time when deputies have meaningful interaction and/or contact with inmates. It is especially important that newly booked inmates, especially those determined to need closer supervision, are observed eating and drinking."[313]

2.91     That meaningful interaction didn't occur here, as the jail set most of Mr. Verville's food on the cuff port, preventing deputies from opening the cell door and having "an unobstructed view of the inmate and his entire cell."[314]

2.92     Another issue was monitoring. As Ms. Fontenot notes, the jail never sought to learn "who was responsible for monitoring the 2B-1 camera, especially once Verville had been placed on detox protocol on the evening of 9/6/21."[315] In Ms. Fontenot's experience, surveillance footage isn't just a tool to "investigate after the fact"; it's "a tool to prevent or intervene when inmates are placed on higher levels of supervision or housed in camera cells."[316]

2.93     Another issue was access to an electrolyte replacement drink. Per the jail's standing medical orders, inmates activated on detox protocol should receive "unlimited access" to an electrolyte replacement drink *in the cell*, with a goal of drinking 8 oz. per hour:[317]

---

[312] ECF No. 27 (McEntire Decl. – Ex T at 18-23) (Fontenot's Report).
[313] ECF No. 27 (McEntire Decl. – Ex T at 20) (Fontenot's Report).
[314] ECF No. 27 (McEntire Decl. – Ex T at 20) (Fontenot's Report).
[315] ECF No. 27 (McEntire Decl. – Ex T at 23) (Fontenot's Report).
[316] ECF No. 27 (McEntire Decl. – Ex T at 23) (Fontenot's Report).
[317] ECF No. 27 (McEntire Decl. – Ex L at 8) (jail's medical protocols).

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

> C. **Unlimited access to electrolyte replacement drink in cell** with a goal of 8 oz intake per hour for 3-4 days. Inmate should be cautioned to avoid intake of free water.

2.94    The jail didn't comply with this medical standing order.[318]

### 4.    Dr. Layton sees substandard care.

2.95    Building on other experts, Dr. Layton identified substandard care when the jail's failed to monitor Mr. Verville's vitals. As he explains, withdrawal from fentanyl, methamphetamine, and benzodiazepines "are all associated with unstable vital signs," which is why any valid withdrawal protocol mandates "frequent vital signs monitoring for this very reason."[319] The jail's protocols lacked instructions for nurses to monitor vitals more regularly.[320]

## F.    The jail blames Mr. Verville's death on "the choices that he made prior to coming to jail," not their substandard care.

2.96    During Chelan County's Rule 30(b)(6) deposition, it was asked to share all facts that support affirmative defense 3 (failure to mitigate damages), affirmative defense 4 (comparative fault), and affirmative defense 5 (damages caused by a third party outside Chelan County's control).[321]

---

[318] ECF No. 27 (McEntire Decl. – Ex T at 26) (Fontenot's Report) ("Video footage confirmed Verville did not have free, unlimited access to Gatorade as outlined in Standing Order #27.").

[319] ECF No. 28 (McEntire 2d. Decl. – Ex BB at 5) (Layton' Report).

[320] ECF No. 28 (McEntire 2d. Decl. – Ex L at 8) (jail's medical protocols).

[321] ECF No. 28 (McEntire 2d. Decl. – Ex KK at 41:8-9; 52:10-25; 53:1-2) (Chelan Co. Rule 30(b)(6) Depo) ("Q: And so starting with facts, if you could please share all facts that support this affirmative defense."); ("Q: So let me just build a quick record on this, Chris, and then I can save us from having to come back after lunch, which is for topic number 7 and for topic number 8, those speak to essentially affirmative defenses number 4 and 5, and those topics were asking for all facts, witnesses, and documents related to those affirmative defenses. Based on what we've just discussed here, are the facts, witnesses, and documents that we went through and discussed for topic number 6 equally applicable to topics number 7 and 8? A: Yes, they are. Q: And to your knowledge at this time, setting aside the proviso of additional information in the expert reports, is that the—sort of the scope of the County's factual information that it plans on relying for the

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

2.97    In response, it outlined facts that blame Mr. Verville's death on his pre-custody life choices, not their in-custody care. Specifically, the following: 1) "Mr. Verville was known drug user"; 2) "he was arrested by the Wenatchee Police Department for drugs in his backpack"; 3) "he had a previous conviction of drugs"; 4) "[h]e admitted to using fentanyl when he arrived at the jail"; 5) the jail didn't "know whether or not he had something in his system"; 6) "the autopsy report," which identified acute drug intoxication as the cause of death; 7) "the certificate of death, " which identified acute drug intoxication as the cause of death; 8) video of "Mr. Verville completely moving around, interacting with staff, receiving his meals, taking his meds, up and down movement"; 9) "medical records that we were giving him his detoxification meds"; 10) "the autopsy report that stated that he had fentanyl or heroin and meth in his system"; 11) statements from Mr. Verville's mother that "he was using drugs, I believe, for 18 years"; 12) "[h]e had outstanding warrants"; 13) "[h]e was arrested on a DOC community supervision violation, which means he wasn't complying with his release"; 14) family "providing Mr. Verville $850 over the few weeks—last few weeks," and "[w]hether or not he used the cash to get the hotel and/or buy drugs"; 15) "Mr. Verville did not exercise his own care for his own self"; 16) "our staff or correction officers and their medical staff had him on a protocol for detox"; 17) "there was absolutely no video evidence that shows that anybody interacted with him to give him drugs, force drugs upon him, or put them in him while he was incarcerated in our facility"; and 18) "he was contributing to his own—he was contributing to his death by the choices that he made prior to coming to jail and the life that he chose to live and how he chose to do that."[322]

---

affirmative defenses 3, 4, and 5? A: Yes.").

[322] ECF No. 28 (McEntire 2d. Decl. – Ex KK at 41:8-25; 42:1-25; 43:1-20) (Chelan Co. Rule 30(b)(6) Depo).

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

**G.    The jail's conduct shows longtime habits are tough to break.**

2.98    The jail's actions after Mr. Verville's death show it's tough to break old habits. As stated above (¶2.41), twice Billie Tollackson said "I don't believe we did anything differently [after Mr. Verville died]. We didn't do anything incorrectly there."[323]

2.99    Blair Nelson's death shows the jail may have changed its policies after Mr. Verville died, but it didn't change its practices, showing just how engrained they were. Ms. Nelson was booked into the Chelan County jail at 2:09 a.m. on November 21, 2021.[324]

2.100    Like Mr. Verville,[325] Ms. Nelson told booking she'd be withdrawing and the booking officer observed signs she was under the influence.[326]

2.101    Like Mr. Verville,[327] Ms. Aldrich didn't "promptly" assess Ms. Nelson as policy required, seeing Ms. Nelson several hours into her shift.[328]

2.102    Like Mr. Verville, the medical screening was brief—three-and-a-half minutes.[329]

---

[323] ECF No. 27 (McEntire Decl. – Ex J at 143:23-25; 144:1-9) (Tollackson Depo) ("Q: Again, during your November 2023 deposition. You were—you know, you were asked what remedial measures that the jail took in response to Mr. Verville's death, and your response was 'I don't believe we did anything differently. We didn't do anything incorrectly there.' Do you recall that testimony? A: Yes. Q: And do you essentially—do you agree that that's accurate and stand by the testimony that you provided back in November of 2023? A: Yes.").

[324] *See Estate of Blair Nelson et. al. v. Chelan County et. al*, 22-CV-308-TOR, ECF No. 26 at 10 (Plaintiff's Statement of Disputed Material Facts).

[325] *See* ¶1.6.

[326] *See Estate of Blair Nelson et. al. v. Chelan County et. al*, 22-CV-308-TOR, ECF No. 44 at 4–5 (Order Denying Defendants' Summary Judgment).

[327] *See* ¶¶1.30, 1.41.

[328] *See Estate of Blair Nelson et. al. v. Chelan County et. al*, 22-CV-308-TOR, ECF No. 44 at 38 (Order Denying Defendants' Summary Judgment) ("However, the internal policy states that inmates at risk of experiencing withdrawal shall be seen 'promptly,' and Ms. Nelson was not seen until almost six hours after LPN Aldrich began her shift, and then never reassessed again.").

[329] *See Estate of Blair Nelson et. al. v. Chelan County et. al*, 22-CV-308-TOR, ECF No. 26 at 12 (Plaintiff's Statement of Disputed Material Facts).

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

2.103 Like Mr. Verville, Ms. Aldrich ignored troubling withdrawal signs—for Mr. Verville, it was dangerous vitals;[330] for Ms. Nelson, it was dangerous tremors.[331]

2.104 Like Mr. Verville, Ms. Aldrich administered a withdrawal instrument—for Mr. Verville, it was the WOWs;[332] for Ms. Nelson it was the "Clinical Institute Withdrawal Assessment," or CIWA.[333]

2.105 Like Mr. Verville,[334] Ms. Aldrich failed to correctly administer the withdrawal instrument, causing it to be underscored.[335]

2.106 Like Mr. Verville,[336] Ms. Nelson entered false information in the medication administration record.[337]

2.107 Like Mr. Verville,[338] Ms. Aldrich didn't contact a medical provider despite protocols saying she should have.[339]

2.108 Like Mr. Verville,[340] Ms. Nelson decompensated but no deputies noticed during their cell checks.[341]

---

[330] *See* ¶¶1.44, 1.45.

[331] *See Estate of Blair Nelson et. al. v. Chelan County et. al*, 22-CV-308-TOR, ECF No. 26 at 12–13 (Plaintiff's Statement of Disputed Material Facts).

[332] *See* ¶1.56.

[333] *See Estate of Blair Nelson et. al. v. Chelan County et. al*, 22-CV-308-TOR, ECF No. 44 at 6 (Order Denying Defendants' Summary Judgment).

[334] *See* ¶¶1.66-79.

[335] *See Estate of Blair Nelson et. al. v. Chelan County et. al*, 22-CV-308-TOR, ECF No. 26 at 12–13 (Plaintiff's Statement of Disputed Material Facts).

[336] *See* ¶1.116–1.23.

[337] *See Estate of Blair Nelson et. al. v. Chelan County et. al*, 22-CV-308-TOR, ECF No. 44 at 8–9 (Order Denying Defendants' Summary Judgment).

[338] *See* ¶1.82.

[339] *See Estate of Blair Nelson et. al. v. Chelan County et. al*, 22-CV-308-TOR, ECF No. 26 at 13 (Plaintiff's Statement of Disputed Material Facts).

[340] *See* ¶1.124.

[341] *See Estate of Blair Nelson et. al. v. Chelan County et. al*, 22-CV-308-TOR, ECF No. 26 at 15–16 (Plaintiff's Statement of Disputed Material Facts).

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

2.109   Like Mr. Verville, Ms. Aldrich never reassessed Ms. Nelson again.[342]

2.110   Like Mr. Verville, Ms. Nelson's body was in rigor mortis when first responders arrived, suggesting her dead body went unnoticed for hours.[343]

Dated: November 27, 2024.

Connelly Law Offices, PLLC

By_____
John B. McEntire, IV, WSBA No. 39469
Nathan P. Roberts, WSBA No. 40457
Jackson R. Pahlke, WSBA No. 52812
2301 North 30th Street
Tacoma, Washington 98403
253.593.5100
*Attorneys for Plaintiffs*

## Service Certificate

I certify that on November 27, 2024, I filed this document on CM/ECF, which sent an electronic copy to the following attorneys: Pat McMahon.

Connelly Law Offices, PLLC

By_____
John B. McEntire, IV, WSBA No. 39469
2301 North 30th Street
Tacoma, Washington 98403
253.593.5100
*Attorneys for Plaintiffs*

---

[342] *See Estate of Blair Nelson et. al. v. Chelan County et. al*, 22-CV-308-TOR, ECF No. 44 at 38 (Order Denying Defendants' Summary Judgment) ("However, the internal policy states that inmates at risk of experiencing withdrawal shall be seen 'promptly,' and Ms. Nelson was not seen until almost six hours after LPN Aldrich began her shift, and then never reassessed again.").

[343] *See Estate of Blair Nelson et. al. v. Chelan County et. al*, 22-CV-308-TOR, ECF No. 26 at 16 (Plaintiff's Statement of Disputed Material Facts).