

Nathan P. Roberts
Jackson R. Pahlke
John B. McEntire, IV
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
Hon. Mary K. Dimke

| | |
|---|---|
| Estate of Joseph Alexander Verville, deceased, by and through Joshua Brothers as a personal representative; Abigail Snyder and Jan Verville, both individually,<br><br>              Plaintiffs,<br><br>    v.<br><br>Chelan County, Washington, a municipal corporation d/b/a Chelan County Regional Justice Center; Christopher Sharp and Kami Aldrich, both individually,<br><br>              Defendants. | No. 2:24-cv-010-MKD<br><br>Response Opposing Summary Judgment |



# Table of Contents

I.      Introduction ................................................................................................. 1

II.     Discussion ...................................................................................................... 2

    A.      Rule 56 sets a high bar for taking a case away from a jury ...................... 2

    B.      Plaintiffs' §1983 *Monell* claim on usual practice belongs before a jury. .......... 2

        1.      Facts show Defendants acted under color of state law. ...................... 3

        2.      Facts show Defendants deprived Mr. Verville of his Fourteenth Amendment rights. ................................................................ 3

            a.      Defendants made intentional decisions. ........................... 4

            b.      Those decisions put Mr. Verville at substantial risk. ...................... 5

            c.      Defendants' decisions were objectively unreasonable. .................. 9

            d.      Defendants' inaction caused Mr. Verville's death. ...................... 9

        3.      Facts show Defendants acted consistent with a usual practice ................ 11

        4.      Facts show these usual practices violated Mr. Verville's Fourteenth Amendment rights. ................................................................ 12

    C.      Plaintiffs' §1983 *Monell* claim based on failure to train belongs before a jury. ........ 13

        1.      Facts show Defendants' acts violated Mr. Verville's Fourteenth Amendment rights. ................................................................ 13

        2.      Facts show Defendants acted under color of state law. ...................... 14

        3.      Facts show Defendants' training was inadequate. .................................. 14

        4.      Facts show Defendants acted with deliberate indifference. ...................... 15

        5.      Facts show Defendants' failure to train brought about Mr. Verville's death. ................................................................ 16

    D.      Plaintiffs' §1983 claim against Ms. Aldrich belongs before a jury. ...................... 17

        1.      Facts show Ms. Aldrich acted under color of state law. ...................... 17

        2.      Facts show Ms. Aldrich deprived Mr. Verville of his Fourteenth Amendment rights. ................................................................ 17

        3.      Facts show her acts caused Mr. Verville's death. .................................. 18

E. Plaintiffs' §1983 claim against Director Sharp belongs before a jury ................... 18

 1. Facts show Director Sharp acted under color of state law ....................... 19

 2. Facts show Director Sharp's inaction deprived Mr. Verville of his Fourteenth Amendment rights. ................................................. 19

 3. Facts show Director Sharp disregarded the obvious consequence that deficient cell checks would violate Mr. Verville's rights. ......................... 19

 4. Facts show the training deficiency caused the constitutional deprivation. 20

 5. Facts show Director Sharp's conduct was the moving force that caused the injury ......................................................................... 20

F. Plaintiffs' negligence claim belongs before a jury ................................. 21

G. Defendants recycle a "new" argument, but it's easily dispatched ...................... 21

III. Conclusion ........................................................................... 23

# I.    Introduction

If Defendants' summary judgment feels familiar, that is because they recycle the same arguments and tactics from prior briefing. Like the claim Plaintiffs "intentionally obfuscate" a central issue in this case.[1] Or that "qualified immunity applies."[2] Or that it was reasonable for Ms. Aldrich to walk away from Mr. Verville during med pass, as the "grunting" heard by staff "could easily be mistaken" for something harmless.[3] Or that Plaintiffs "waived" challenging the cause of death.[4] Or that cell checks are "irrelevant."[5] Or twisting the opinions of Plaintiffs' experts to attack them.[6]

Plaintiffs dispatched these unpersuasive points in separate briefing, so there is no need to revisit them here.[7]

Instead, Plaintiffs apply the facts to the elements, giving the Court a clear answer to the key question in every summary judgment: viewing the evidence in a light most favor to Plaintiffs, *could* a jury rule in their favor?

Yes, with ease, which is why Plaintiffs respectfully ask the Court to let the many disputed issues in this case make their way to where they belong—before a jury.

---

[1] ECF No. 54 at 2 (Defendants' Memo Supporting Summary Judgment).
[2] ECF No. 54 at 10 (Defendants' Memo Supporting Summary Judgment).
[3] ECF No. 54 at 11 (Defendants' Memo Supporting Summary Judgment).
[4] ECF No. 54 at 12-13 (Defendants' Memo Supporting Summary Judgment).
[5] ECF No. 54 at 17 (Defendants' Memo Supporting Summary Judgment).
[6] ECF No. 54 at 7 (Defendants' Memo Supporting Summary Judgment).
[7] ECF No. 30 at 6 (Plaintiffs' Motion for Partial Summary Judgment); ECF No. 57 at 6-7, 11 (Plaintiffs' Reply Supporting Motion for Partial Summary Judgment); ECF No. 64 at 18 (Plaintiffs' Response Opposing *Daubert* Challenge).

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

## II.    Discussion

**A.    Rule 56 sets a high bar for taking a case away from a jury.**

Of a judge's many solemn responsibilities, one is to preserve and protect the jury's role in our civil justice system. *See* U.S. Const. amend. VII (recognizing "the right of trial by jury shall be preserved"). This is precisely why reviewing courts advise trial judges to approach the Rule 56 inquiry with care: "on summary judgment, a court cannot weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Craftwood II, Inc. v. Generac Power Systems, Inc.*, 63 F.4th 1121, 1129 (7th Cir. 2023) (cleaned up). Instead, on a defense motion, trial judges "draw all inferences" in Plaintiffs' favor and ask the following: "*could*" a jury "return a verdict" in Plaintiffs' favor? *Diaz v. Eagle Produce Ltd. Partnership*, 521 F.3d 1201, 1207 (9th Cir. 2008) (emphasis added) (cleaned up). If so, then a trial judge fulfills her solemn responsibility by letting the jury sort out the parties' disputes, as our Founders intended.

Against this backdrop, Plaintiffs turn to the elements and facts for each claim.

**B.    Plaintiffs' §1983 *Monell* claim on usual practice belongs before a jury.**

Plaintiffs' §1983 *Monell* claim based on usual practice finds firm footing in the facts. Here are the elements:[8]

    1)  Defendants acted under color of state law;[9]

---

[8] This claim's elements come from two Ninth Circuit Model Civil Jury Instructions: 9.5 (§1983 Claim Against Local Governing Body Based on Longstanding Practice); and 9.30 (Particular Rights—Fourteenth Amendment—Pretrial Detainee's Claim re Conditions/Medical Care). *See*. 9. Civil Rights Action—42 U.S.C. § 1983 | Model Jury Instructions, last accessed on January 7, 2025.

[9] A person acts "under color of state law" when he or she acts in the performance of official duties on the county's behalf. *See* 9.4 Section 1983 Claim Against Supervisory Defendant in

2) their acts deprived Mr. Verville of particular rights under the Fourteenth Amendment;

3) they acted pursuant to a usual or longstanding practice at the jail; and

4) Defendants' usual or longstanding practice caused the deprivation of Mr. Verville's rights—that is, their longstanding practice is so closely related to the deprivation of Mr. Verville's rights as to be the moving force that caused the ultimate injury.

Here are the facts (some disputed, some not) supporting each element:

**1. Facts show Defendants acted under color of state law.**

No disputes here. Chris Sharp is the jail's Director, and he held that job back in September 2021 when Mr. Verville was a pretrial detainee at the jail.[10] Ms. Aldrich has been a jail-employed nurse for over a decade and she screened Mr. Verville.[11] And the deputies involved in the deficient cell checks were jail employees too. Everyone was acting in the performance of their official duties.

**2. Facts show Defendants deprived Mr. Verville of his Fourteenth Amendment rights.**

This element redirects the reader to a different jury instruction, Ninth Circuit Model 9.30, which lays out the elements for a Fourteenth Amendment violation—here, when a jail fails to provide safe confinement conditions and needed medical care. There are four elements:[12]

---

Individual Capacity—Elements and Burden of Proof | Model Jury Instructions, last accessed on January 8, 2025.

[10] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶2.1.

[11] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶1.27.

[12] 9.30 Particular Rights—Fourteenth Amendment—Pretrial Detainee's Claim re Conditions of

1)  Defendants made intentional decisions regarding confinement conditions and needed medical care;

2)  those decisions put Mr. Verville at substantial risk of suffering serious harm;

3)  Defendants did not take reasonable measures to reduce the risk of serious harm, even though a reasonable deputy or nurse under the circumstances would have understood the high degree of risk involved—making the consequence of Defendants' conduct obvious; and[13]

4)  by not taking such measures, Defendants' caused Mr. Verville's injuries.

As set forth below, several facts support each element—many undisputed.

### a.    Defendants made intentional decisions.

Defendants made intentional decisions about Mr. Verville's medical care and confinement conditions. Lots of them.

Many decisions involving Mr. Verville's medical care go undisputed. Such as Ms. Aldrich receiving notice Mr. Verville would withdraw but *deciding* to wait over 24 hours before medically screening him.[14] Or Ms. Aldrich *deciding* to screen Mr. Verville per her usual practice, which involves an 80-second screening without bringing the withdrawal form with her—even though she only knows it for "the most part."[15] Or Ms. Aldrich *deciding* not to ask every question on the form or inquire into severity of

Confinement/Medical Care | Model Jury Instructions

[13] As stated in other briefing, for this element, Plaintiffs must prove Defendants' conduct was "objectively unreasonable, a test that will necessarily on the facts and circumstances of each particular case." *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).

[14] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶1.13, 1.30.

[15] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶1.58–1.60, 1.83.

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

symptoms, two vital steps to properly administer the WOWs.[16] Or Ms. Aldrich collecting dangerously high vitals (121 HR; 156/122 BP) and then *deciding* to do nothing.[17] Or Ms. Aldrich *deciding* to walk away from Mr. Verville during morning med pass, even when he lay unresponsive in his cell and she knew he was ill—she was literally holding medication to treat his withdrawal.[18]

Many decisions involving confinement conditions go undisputed. Such as the jail *deciding* to adopt a usual practice of "briefly looking" in each cell just long enough to confirm the inmate count and move on—no other tasks required.[19] Or deputies *deciding* to follow that usual practice during Mr. Verville's incarceration, rarely breaking stride as they breezed past his cell, choosing efficiency over safety.[20] Or Deputy Nores *deciding* to do nothing for Mr. Verville, even when he stared down at Mr. Verville's unresponsive body and a vomit-covered floor for 5 full seconds.[21]

### b. Those decisions put Mr. Verville at substantial risk.

*Medical decisions.* The parties dispute whether Ms. Aldrich's medical decisions put Mr. Verville at substantial risk of suffering serious harm. Defendants' expert, Dr. Jared Strote, saw nothing wrong with Ms. Aldrich's decisions (except for *over*-scoring the WOWs),[22] finding her actions fell within the standards of care.[23]

---

[16] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶1.58–1.61, 1.66–68.
[17] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶1.44, 1.47.
[18] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶1.103–1.113.
[19] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶1.87–1.90.
[20] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶1.92, 1.93.
[21] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶1.113–1.115.
[22] ECF No. 37-1 (Dr. Jared Strote's Expert Report).
[23] ECF No. 56 at 2-3 (Dr. Jared Strote's *Daubert* Response).

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

Plaintiffs' experts see things differently. Dr. Lori Roscoe said the fact Ms. Aldrich decided *anything* is a problem, as her limited licensure required her to report those "significantly high and dangerous" vitals to qualified medical professional.[24] She would know—she helped write the book on the scope of practice and care standards for corrections nurses.[25]

Dr. Richard Cummins also said these vitals "mandated" action, as they are a precursor to "silent killer" cardiac events—the very type of event that later killed Mr. Verville.[26] Beyond vitals, Dr. Cummins said knowingly delaying Mr. Verville's care for over 24 hours placed him in serious danger for major cardiac events, especially with his history of hypertension, as the "failure to <u>assess</u> for 24 hours was [a] failure to <u>treat</u> for 24 hours."[27] This decision violated jail policy 717.2, which *requires* Ms. Aldrich to "respond promptly" to Mr. Verville's withdrawal symptoms.[28] Without a prompt response, withdrawal complications such as nausea and vomiting, in conjunction with electrolyte loss, can lead to fatal cardiac arrhythmias, especially in someone with a history of hypertension—something Ms. Aldrich would know if she bothered to review his medical records.[29]

Dr. Michael Darracq explained why Ms. Aldrich's inaction was so dangerous. Mr. Verville's vitals, when paired with his symptoms (nausea and vomiting), create concerns for end-organ damage in hypertensive crisis—a condition that can prove fatal

---

[24] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶1.50.
[25] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶1.48–1.51.
[26] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶1.52–1.55.
[27] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶2.78
[28] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶1.31.
[29] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶1.38, 2.80.

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

without "immediate intervention."[30] Dr. Darracq said Ms. Aldrich should have called a qualified medical professional (or 911) for other reasons, as a properly administered WOWs instrucment required her to do so under the jail's medical protocols.[31]

Since the Court "cannot weigh" the conflicting opinions on this element, this dispute belongs before a jury. *Craftwood II,* 63 F.4th at 1129.

***Confinement conditions.*** The parties dispute whether Defendants' decisions about confinement conditions put Mr. Verville at substantial risk of serious harm. Defendants' expert, Penny Bartley, thought the deputies' cell checks were "quite short," but saw nothing wrong with them.[32] And despite agreeing with Ms. Fontenot that meal service is an important "time for meaningful contact with inmates," she found no fault with deputies leaving meals on the cuff port, which helps avoid inmate interaction altogether.[33]

Plaintiffs' expert sees things differently. Cathy Fontenot, a lifelong corrections veteran and Warden who oversees a prison and 350 deputies, found many problems with Defendants' decisions. She called the brief-glance cell checks "grossly inadequate and meaningless," as deputies cannot see if inmates are "ok or otherwise not in distress" if they walk by cells without stopping.[34] Which deputies did. Routinely.[35] She also said these brief-glance checks run contrary to the jail policy (717.3), which requires staff to "remain alert" to withdrawal symptoms.[36] Beyond their rushed nature, Ms. Fontenot

---

[30] ECF No. 64-2 (Dr. Darracq's *Daubert* Response Letter).
[31] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶1.65–1.82.
[32] ECF No. 37-3 at 24 (Bartley's Expert Report).
[33] ECF No. 37-3 at 46 (Bartley's Expert Report).
[34] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶1.96.
[35] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶1.92–1.93.
[36] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶1.98, 1.99.

said cells were checked by different deputies from hour to hour, preventing deputies from tracking changes in inmates' health.[37] Taken together, a jury could find these meaningless checks placed Mr. Verville at substantial risk of serious harm because they caused deputies to ignore that Mr. Verville was "decompensating" the night he died, becoming increasingly "uncomfortable and ill" from withdrawal—a "dying sick," as one nurse called it.[38] It appears Director Sharp agreed his deputies' cell checks were not up-to-constitutional-snuff—after all, he disciplined them after Mr. Verville's death for conducting cell checks that "took no more than a couple of seconds."[39]

Beyond cell checks, Defendants made other confinement decisions that placed Mr. Verville at substantial risk of serious harm. Such as when deputies never checked on Mr. Verville even though he missed multiple meals in a row—a fact that *should* be tracked and brought to the nurses' attention.[40] Or when deputies did not provide Mr. Verville with unlimited access to an electrolyte replacement drink in his cell, as contemplated by the jail's medical protocols.[41] It appears Director Sharp agrees—he also disciplined staff for not checking on Mr. Verville after he missed meals.[42]

Since the Court "cannot weigh" the conflicting opinions on this element, this factual dispute belongs before a jury. *Craftwood II,* 63 F.4th at 1129.

---

[37] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶1.97.
[38] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶1.124–1.125.
[39] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶2.32.
[40] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶1.25, 1.126, 1.134. 1.136.
[41] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶2.82, 2.93, 2.94.
[42] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶2.28.

### c. Defendants' decisions were objectively unreasonable.

Defendants made many decisions a jury could find objectively unreasonable. Such as waiting over 24 hours before seeing a drug-sick inmate when jail policy requires a "prompt" response. Or not reviewing easily accessible medical records that would have revealed Mr. Verville's history of hypertension.[43] Or collecting "significantly high and dangerous" vitals and doing nothing—a care decision Ms. Aldrich was not even licensed to make.[44] Or under-scoring the WOWs assessment, when a properly-scored test would have sent Mr. Verville to a qualified medical professional or the ER, per jail policy. Or walking away from an unresponsive patient without checking on his well-being. Or not giving Mr. Verville unlimited access to an electrolyte replacement drink, as the medical protocols discuss. Or never noticing he missed multiple meals. Or never noticing his decompensation, even as he vomited throughout his cell.

A jury could find Defendants' decisions (one or all) were objectively unreasonable.

### d. Defendants' inaction caused Mr. Verville's death.

A jury could find Defendants' decisions caused Mr. Verville's death. As Dr. Cummins said, Defendants "forged the causal chain leading to [Mr. Verville's] demise."[45]

Ms. Aldrich ignored jail policy and let Mr. Verville go unseen for over 24 hours as he vomited and experienced other withdrawal symptoms like nausea. That is a link. Ms. Aldrich did not review Mr. Verville's easily accessible medical file, which showed he has a history of hypertension and was previously given blood pressure medication by the

---

[43] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶1.33–1.39.
[44] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶1.50.
[45] ECF No. 27-7 at 23 (Dr. Richard Cummins's Expert Report).

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

jail (specifically, Ms. Aldrich). She did not review this file despite agreeing an inmate's prior jail medical file could help her make more informed decisions during treatment.[46] She chose to be uninformed. That is a link. Mr. Verville's heart told Ms. Aldrich during the medical screening something was wrong, yet she ignored it. That is a link. Ms. Aldrich incorrectly administered the WOWs instrument, causing her to underscore it—a significant moment, as a properly scored WOWs would have required her to call a medical professional or dial 911. This prevented Mr. Verville from getting seen by someone qualified who would do something about his significantly high and dangerous vitals. That is a link. Deputies failed to follow medical protocols and give him unlimited access to an electrolyte replacement drink, which can throw a heart into dangerous arrhythmias. That is a link. The deputies should have been a failsafe, intervening after recognizing Mr. Verville missed three straight meals and vomited all over the floor. But they were not, walking right by Mr. Verville hour after hour. That is a link. And while the parties' experts disagree on the exact cause of death, they agree Mr. Verville experienced a fatal cardiac event—an event originally broadcast by Mr. Verville's vitals and history of hypertension. That is a link. And while Defendants try and fault Mr. Verville for not pressing the "help" button during his final hours, how was he to know these "silent killer" vitals were broadcasting an emergency? That was the jail's job to recognize.

Dr. Darracq agrees with this causal chain, noting nothing about this chain should surprise qualified medical professionals—the American College of Cardiology has stated for years that "both opioid overdose and withdrawal can trigger major cardiovascular events" leading to death.[47]

---

[46] ECF No. 58, ¶1.36 (Defendants' LR 56 Reply Statement).
[47] ECF No. 42-4, Exhibit C (Dr. Michael Darracq's Rebuttal Report).

Since the Court "cannot weigh" the conflicting opinions on this element, this dispute belongs before a jury. *Craftwood II,* 63 F.4th at 1129.

### 3. Facts show Defendants acted consistent with a usual practice.

Many facts show Defendants acted consistent with a usual practice. Ms. Aldrich said she performed Mr. Verville's screening consistent with her usual practice.[48] This usual practice does not involve reviewing medical histories—an undisputed point.[49] Or bringing the WOWs form with her to a medical screening—also undisputed.[50] Or asking all the questions on the form—also undisputed.[51] This practice also involved falsely documenting chart notes when an inmate was unresponsive during medication mass—also undisputed.[52]

Chief Sean Larsen said the deputies' usual practice was to conduct "brief look" cell checks, a process where two deputies enter a cell block, "confirm the count," and then leave—no specific tasks (like, say, checking on inmates' health) required.[53] Such cell checks violate the Fourteenth Amendment—so says the Ninth Circuit. *See Gordon II v. County of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) (holding cell checks must be "sufficient to determine" whether an inmate needs medical treatment). These deficient cell checks were so ingrained that jail leadership had to *physically* show deputies how to conduct proper cell checks after the union complained the jail "failed to train them."[54]

---

[48] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶1.58.
[49] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶1.32.
[50] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶1.59.
[51] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶1.61.
[52] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶1.119
[53] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶1.86–1.93.
[54] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶2.49

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

But the most telling evidence Defendants' followed a usual practice is the staff's response to Director Sharp's widespread discipline.[55] They fought it, with Healthcare Billye Tollackson saying Ms. Aldrich did "what she was supposed to do that time,"[56] and Corporal Whitmire saying her deputies "understood expectations and followed them."[57]

A jury could find jail staff acted according to usual practices for both the medical screening *and* cell checks. Since the Court "cannot weigh" the conflicting opinions on this element, this dispute belongs before a jury. *Craftwood II,* 63 F.4th at 1129.

### 4. Facts show these usual practices violated Mr. Verville's Fourteenth Amendment rights.

A jury could find these usual practices violated Mr. Verville's Fourteenth Amendment rights to proper medical care. The parties do not dispute Mr. Verville possessed the right to a medical screening that, "at a minimum," assesses an inmate for "critical medical needs." *Gordon II*, 6 F.4th at 970. But the parties do dispute whether Ms. Aldrich's 80-second screening was up-to-snuff. Defendants' expert says "yes"; Plaintiffs' experts say "no."

A jury could also find these usual practices violated Mr. Verville's Fourteenth Amendment rights to adequate cell checks. The parties do not dispute Mr. Verville possessed the right to cell checks "sufficient to determine whether [his] presentation indicates the need for medical treatment." *Id.* at 973. But the parties dispute whether brief-glance cell checks that ignored vomit and missed meals were up-to-snuff. Again, Defendants' expert says "yes"; Plaintiffs' experts say "no."

---

[55] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶2.13–2.35.
[56] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶2.36.
[57] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶2.39.

With every element either met or disputed, this claim belongs before the jury.

**C.     Plaintiffs' §1983 *Monell* claim based on failure to train belongs before a jury.[58]**

Plaintiffs' §1983 *Monell* claim based on failure to train finds firm footing in the facts. Here are the elements:[59]

1) Defendants' acts deprived Mr. Verville of particular rights under the Fourteenth Amendment;

2) the jail's staff acted under color of state law;

3) Defendants' training was inadequate to prevent the staff from handling usual and recurring situations with which they must deal;

4) Defendants were deliberately indifferent to the known or obvious consequences of their failure to train staff; and

5) Defendants' failure to train caused the deprivation of Mr. Verville's rights; that is, Defendants' failure to train played a substantial part in bringing about or actually causing Mr. Verville's injuries.

Here are the facts (some disputed, some not) supporting each element:

**1.     Facts show Defendants' acts violated Mr. Verville's Fourteenth Amendment rights.**

As set forth above, the parties dispute whether Defendants violated Mr. Verville's Fourteenth Amendment rights to a proper medical screening, proper monitoring, and

---

[58] Plaintiffs' claim based on failure to train is not a separate claim, but rather a separate path to *Monell* liability under §1983.

[59] This claim's elements come from two Ninth Circuit Model Civil Jury Instructions: 9.8 (§1983 Claim Against Local Governing Body Based on Failure to Train); and 9.30 (Particular Rights— Fourteenth Amendment—Pretrial Detainee's Claim re Conditions/Medical Care). *See.* 9. Civil Rights Action—42 U.S.C. § 1983 | Model Jury Instructions, last accessed on January 7, 2025.

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

proper cell checks. Since the Court "cannot weigh" the conflicting opinions for each element, this dispute belongs before a jury. *Craftwood II,* 63 F.4th at 1129.

**2.      Facts show Defendants acted under color of state law.**

As set forth above, no disputes here. Defendants were all jail employees acting in the performance of their official duties when Mr. Verville was incarcerated in September 2021.

**3.      Facts show Defendants' training was inadequate.**

Facts show Defendants' medical training was inadequate and touched on "usual and recurring situations" for staff.[60] Ms. Aldrich could not recognize Mr. Verville's "significantly high and dangerous vitals," a nursing task so basic and recurring that the jail doesn't bother to train its nurses on the topic. As Ms. Tollackson said, nurses "should have learned that in nursing school."[61] The lack of training was widespread, as other nurses did not see Mr. Verville's vitals as anything "crazy" either.[62]

The same is true with the WOWs. A jail's training is inadequate when a nurse feels comfortable winging her way through an assessment she knows "for the most part," failing to ask about—or follow up on—important withdrawal symptoms that would have raised Mr. Verville's score to a mandatory response under the jail's policies.

Facts also show Defendants' cell checks were inadequate and touched on "usual and recurring situations" for staff.[63] Cell checks qualify as a "recurring situation"— they

---

[60] 9.8 Section 1983 Claim Against Local Governing Body Defendants Based on Policy of Failure to Train—Elements and Burden of Proof | Model Jury Instructions
[61] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶2.86.
[62] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶2.83.
[63] 9.8 Section 1983 Claim Against Local Governing Body Defendants Based on Policy of Failure to Train—Elements and Burden of Proof | Model Jury Instructions

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

happen every hour of every day.[64] It is undisputed the deputies' union said the jail "failed to train them" on how to perform proper cell checks—an understandable point since Chief Larsen said "brief looks" were all the jail required leading up to Mr. Verville's death.[65] At least in practice. On paper, jail policy required staff to slow down their cell checks enough to "remain alert to signs" of "overdose and withdrawal."[66] They did not.

A jury could find Defendants failed to train their staff, especially when staff said they were not properly trained on basic tasks. Since the Court "cannot weigh" the conflicting opinions on this element, this dispute belongs before a jury. *Craftwood II,* 63 F.4th at 1129.

### 4.    Facts show Defendants acted with deliberate indifference.[67]

Several facts show a jury could find Defendants knew about their training deficiencies, yet did nothing. Such as Director Sharp understanding his nurses set no time for medically screening inmates, even when he knew jail policy required a *prompt* response.[68] Or Director Sharp disciplining Ms. Aldrich for not checking on Mr. Verville's well-being,[69] while the healthcare manager (Ms. Tollackson) and Chief of Operations (Sean Larsen) thought walking away from an unresponsive inmate was consistent with

---

[64] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶1.88.

[65] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶1.88, 2.83. While Defendants *technically* objected to this fact about the union's complaint, this quote came from Director Sharp during his deposition. Being unhappy with an incriminating admission from the jail's Director does not justify disputing its truth.

[66] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶1.99.

[67] "*Deliberate indifference* is the conscious choice to disregard a known or obvious consequence[] of one's acts or omissions." 9.8 Section 1983 Claim Against Local Governing Body Defendants Based on Policy of Failure to Train—Elements and Burden of Proof | Model Jury Instructions

[68] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶1.31, 2.8, 2.55, 2.61.

[69] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶2.67.

"what she was supposed to do at that time."[70] Or Director Sharp disciplining his staff for brief-glance cell checks, while a corporal thought these deputies "understood expectations and followed them."[71] Or Director Sharp understanding his deputies' jobs enough to know staff were not following up when inmates missed meals, yet he did not act.[72]

When the jail's Director and his leadership cannot agree on how staff should be performing basic, "recurring situations" like medical screenings, monitoring, and cell checks, a jury could find Defendants were deliberately indifferent to training issues.

### 5. Facts show Defendants' failure to train brought about Mr. Verville's death.

A jury could find these training issues brought about Mr. Verville's death. The jail never bothered to train its nurses on collecting vitals (they should have learned that in nursing school, Ms. Tollackson said),[73] and Plaintiffs' experts agree Mr. Verville's unattended vitals contributed to his cardiac death from withdrawal complications. So did the deputies' hourly failure to monitor Mr. Verville and see he was missing meals, getting increasingly ill, and not receiving the electrolyte replacement his body needed—a training deficiency the union complained about. As briefed above, the lack of training on basics like vitals and cell checks helped "forge the causal chain" leading to Mr. Verville' death.[74]

With every element either met or disputed, this claim belongs before the jury.

---

[70] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶2.36–2.38, 2.67–2.68.
[71] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶2.38–2.39.
[72] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶2.7, 2.28.
[73] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶2.86.
[74] ECF No. 27-7 at 23 (Dr. Cummins's Expert Report).

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

**D.    Plaintiffs' §1983 claim against Ms. Aldrich belongs before a jury.**

Plaintiffs' §1983 claim against Ms. Aldrich firm footing in the facts. Here are the elements:[75]

> 1) Ms. Aldrich acted under color of state law;
>
> 2) her acts deprived Mr. Verville of particular rights under the Fourteenth Amendment; and
>
> 3) her acts were an actual cause of Mr. Verville's injury.

Here are the facts (some disputed, some not) supporting each element:

**1.    Facts show Ms. Aldrich acted under color of state law.**

As set forth above, no disputes here. Ms. Aldrich was employed as a jail nurse performing her official duties when Mr. Verville was incarcerated in September 2021.

**2.    Facts show Ms. Aldrich deprived Mr. Verville of his Fourteenth Amendment rights.**

As set forth above, the parties dispute whether Ms. Aldrich violated Mr. Verville's Fourteenth Amendment rights to a proper medical screening and care. Defendants' expert says "no"; Plaintiffs' experts say "yes." Since the Court "cannot weigh" the conflicting opinions on this element, this dispute belongs before a jury. *Craftwood II,* 63 F.4th at 1129.

---

[75] This claim's elements come from two Ninth Circuit Model Civil Jury Instructions: 9.3 (§1983 Claim Against Defendant in Individual Capacity); and 9.30 (Particular Rights—Fourteenth Amendment—Pretrial Detainee's Claim re Conditions/Medical Care). *See.* 9. Civil Rights Action—42 U.S.C. § 1983 | Model Jury Instructions, last accessed on January 7, 2025.

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

### 3. Facts show her acts caused Mr. Verville's death.

As set forth above, a jury could find Ms. Aldrich's acts were an actual cause of Mr. Verville's death. As briefed above, Ms. Aldrich helped "forge[] the causal chain leading" to Mr. Verville's death.[76] She waited over 24 hours to assess. She conducted an 80-second assessment. She underscored the assessment. She didn't report Mr. Verville's vitals. She didn't check to see if Mr. Verville received access to unlimited electrolyte in his cell. She walked away as Mr. Verville lay unresponsive in his cell. All these acts put Mr. Verville alone in his cell, un-helped and unaware his vitals were broadcasting a crisis.

Since the Court "cannot weigh" the conflicting opinions on this element, this dispute belongs before a jury. *Craftwood II,* 63 F.4th at 1129.

### E. Plaintiffs' §1983 claim against Director Sharp belongs before a jury.

Plaintiffs' §1983 claim against Director Sharp finds firm footing in the facts. Here are the elements:[77]

   1) Director Sharp acted under color of state law;

   2) Director Sharp's inaction deprived Mr. Verville of his Fourteenth Amendment rights;

   3) Director Sharp disregarded the known or obvious consequences that a particular training deficiency would cause his staff to violate Mr. Verville's constitutional rights;

   4) the training deficiency caused his subordinates to deprive Mr. Verville of his constitutional rights; and

---

[76] ECF No. 27-7 at 23 (Dr. Richard Cummins's Expert Report).
[77] This claim's elements come from two Ninth Circuit Model Civil Jury Instructions: 9.4 (§1983 Claim Against Supervisory Defendant in Individual Capacity); and 9.30 (Particular Rights—Fourteenth Amendment—Pretrial Detainee's Claim re Conditions/Medical Care). *See.* 9. Civil Rights Action—42 U.S.C. § 1983 | Model Jury Instructions, last accessed on January 7, 2025.

5) Director Sharp's conduct was so closely related to the deprivation of Mr. Verville's rights as to be the moving force that caused the injury.

Here are the facts (some disputed, some not) supporting each element:

**1.      Facts show Director Sharp acted under color of state law.**

As set forth above, no disputes here. Director Sharp ran the jail and was performing his official duties when Mr. Verville was incarcerated in September 2021.

**2.      Facts show Director Sharp's inaction deprived Mr. Verville of his Fourteenth Amendment rights.**

As set forth above, the parties dispute whether Director Sharp violated Mr. Verville's Fourteenth Amendment rights by tolerating his deputies' deficient cell checks for years.[78] Defendants' expert says these cell checks were "very short" but permissible; Plaintiffs' expert called them "grossly inadequate and meaningless." Director Sharp seems to agree with Ms. Fontenot since he disciplined his deputies for conducting the same deficient cell checks they have been doing for years, generating resentment and push back among his staff.[79]

Since the Court "cannot weigh" the conflicting opinions on this element, this dispute belongs before a jury. *Craftwood II,* 63 F.4th at 1129.

**3.      Facts show Director Sharp disregarded the obvious consequence that deficient cell checks would violate Mr. Verville's rights.**

To show there is a genuine dispute for trial, the Court need look no further than Director Sharp's disciplinary letters to his staff. He criticizes his staff for not completing "satisfactory security jail check[s]" because they did not "ensure that each and every

---

[78] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶2.58.
[79] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶¶2.32, 2.36, 2.39.

CONNELLY LAW OFFICES
2301 N. 30th Street
Tacoma, Washington 98403

individual was alive and breathing."[80] This fact shows Director Sharp knew what his

deputies *should* have been doing all along, yet he disregarded the consequences as he

allowed brief-glance cell checks to go on for years. So does the complaint from the

deputies' union that they were never trained how to ensure an individual was alive and

breathing. This dispute belongs before a jury.

### 4. Facts show the training deficiency caused the constitutional deprivation.

As set forth above, the parties' dispute whether the deputies' deficient cell checks

caused Mr. Verville's death. Plaintiffs' experts say these meaningless cell checks helped

"forge the causal chain," as Mr. Verville decompensation went unnoticed and in

violation of jail policy requiring staff to remain alert for withdrawal signs. Since

Defendants' expert disagrees, this element belongs before a jury.

### 5. Facts show Director Sharp's conduct was the moving force that caused the injury.

A jury could find Director Sharp was the moving force that led to Mr. Verville's

death. As Director, Mr. Sharp has final say 1) on setting policy at the jail, 2) whether

policies should be changed, 3) how deputies should perform cell checks, and 4) how

deputies should distribute meals.[81] He *knew* deputies were engaging in deficient cell

checks for years, with even his Chief of Operations candidly admitting brief-glance cell

checks were the norm—and he allowed it to happen. Had deputies been properly trained

how to check and see if an inmate is alive, breathing, and okay, they would have noticed

---

[80] ECF No. 28-10, Exhibit JJ at 6 (Disciplinary Materials for Kent Williams).
[81] ECF No. 58 (Plaintiffs' LR 56(c) Reply Statement), ¶2.4.

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

Mr. Verville's missed meals and vomit, allowing medical professionals to intervene. This dispute belongs before the jury.

**F.      Plaintiffs' negligence claim belongs before a jury.**

Plaintiffs' negligence claim finds firm footing in the facts. Here are the elements: 1) duty; 2) breach; 3) proximate causation; and 4) damages. *See*, *e.g.*, *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552 (2008).

Two elements are not in dispute—duty and damages. There is no dispute Defendants owed a duty to Mr. Verville. *See Gregoire v. City of Oak Harbor*, 170 Wn.2d 628, 635 (2010) ("Washington courts have long recognized a jailer's special relationship with inmates, particularly the duty to ensure health, welfare, and safety."). And there is no dispute he died.

Two elements are in dispute—breach and proximate causation. For these elements, the very same facts that support Plaintiffs' §1983 claims support the negligence claim. Defendants provided a deficient medical screening, deficient care, and deficient monitoring, and these deficiencies caused him to die alone in a cell, his body going undiscovered for hours. Since breach and causation are generally fact questions for the trier of fact," this negligence claim belongs before the jury too. *Hertog, ex. rel. S.A.H. v. City of Seattle*, 138 Wn.2d 265, 275 (1999).

**G.      Defendants recycle a "new" argument, but it's easily dispatched.**

Defendants' "new" argument goes after Plaintiffs' state law negligence claim, arguing it is "impossible" Defendants "did anything rising to the level of Negligence."[82]

---

[82] ECF No. 54 at 15 (Defendants' Memo Supporting Summary Judgment).

A bold claim, but hardly persuasive considering Chelan County copied this language straight from its summary judgment briefing in Blair Nelson's case, word-for-word:[83]

> 16    Here, it is impossible to make a claim that the individual defendants or
> 17    Chelan County did anything rising to the level of Negligence. There is no
> 18    evidence that Ms. Nelson was hindered from having access to medical care and

Like Defendants' other arguments, this new-but-recycled argument is easily dispatched:

Viewing the evidence in the light most favorable to Plaintiffs, a jury could find Defendants breached their duty of care when they did the following: 1) wait 24 hours before medically screening Mr. Verville despite knowing he would withdraw—a policy violation; 2) underscore a WOWs assessment, causing Mr. Verville to return to his cell, not go to a hospital; 3) collect "red flag" vitals and then doing nothing, a decision outside Ms. Aldrich's licensure; 4) walk away from an unresponsive inmate during med pass; 5) allow brief-glance cell checks that prevented deputies from tracking that Mr. Verville was missing meals and vomiting all over his floor—another policy violation; 6) fail to provide Mr. Verville with unlimited access to electrolyte replacement drink, as medical protocols contemplate. The list goes on.

Viewing the evidence in the light most favorable to Plaintiffs, a jury could find Defendants' actions caused Mr. Verville's death. As discussed above, Defendants "forged the causal chain leading to his demise."[84] They took an individual with a history of hypertension and recent drug use and let him slip into withdrawal unmonitored,

---

[83] *See Estate of Blair Nelson et. al. v. Chelan County et. al.*, 22-cv-308-TOR, ECF No. 15 at 16 (Defendants' Motion and Memo Supporting Summary Judgment).
[84] ECF No. 27-7 at 23 (Dr. Richard Cummins's Expert Report).

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

causing his uncontrolled symptoms (nausea, vomiting, and abnormal vitals) to create dehydration and electrolyte imbalances, which generated fatal cardiac arrythmias.[85]

Since the Court "cannot weigh" the conflicting opinions on this claim, this dispute belongs before a jury. *Craftwood II,* 63 F.4th at 1129.

### III.    Conclusion

Back in April 2024, Judge Rice denied Defendants' summary judgment and qualified immunity requests on a sadly similar case—a withdrawing pretrial detainee who died at the Chelan County Jail due to delayed and poor care from Kami Aldrich, deficient monitoring by deputies, and poor supervision and training by leadership.[86] The same tragic and triable facts from that case exist here. Like in *Nelson*, Plaintiffs respectfully asks the Court to send this case to a jury.

Dated: January 10, 2025.

Connelly Law Offices, PLLC

By_____
John B. McEntire, IV, WSBA No. 39469
Nathan P. Roberts, WSBA No. 40457
Jackson R. Pahlke, WSBA No. 52812
2301 North 30th Street
Tacoma, Washington 98403
*Attorneys for Plaintiffs*

---

[85] ECF No. 27-7 at 23 (Dr. Richard Cummins's Expert Report).
[86] *See Estate of Nelson et. al. v. Chelan County et. al.*, 2024 WL 1705923 (E.D. Wash. Apr. 19, 2024).

**Service Certificate**

I certify that on January 10, 2025, I filed this document on CM/ECF, which sent an electronic copy to the following attorneys for Defendants: Pat McMahon.

Connelly Law Offices, PLLC

By_____
John B. McEntire, IV, WSBA No. 39469
2301 North 30th Street
Tacoma, Washington 98403
253.593.5100