

Nathan P. Roberts
Jackson R. Pahlke
John B. McEntire, IV
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
Hon. Mary K. Dimke

| | |
|---|---|
| Estate of Joseph Alexander Verville, deceased, by and through Joshua Brothers as a personal representative; Abigail Snyder and Jan Verville, both individually, | No. 2:24-cv-010-MKD |
| | Statement of Disputed Material Facts[1] |
| Plaintiffs, | |
| v. | |
| Chelan County, Washington, a municipal corporation d/b/a Chelan County Regional Justice Center; Christopher Sharp and Kami Aldrich, both individually, | |
| Defendants. | |

---

[1] *See* LCivR 56(c)(1)(B) (requiring non-moving party to separately file a "Statement of Disputed Material Facts").

Plaintiffs previously filed a LR 56(c)(1)(A) Statement of Material Facts Not in Dispute,[2] as well as a LR 56(c)(1)(C) Reply.[3] Since those documents lay out Plaintiffs' material facts in detail, this LR Statement will just address Defendants' alleged facts.

| # | Defendants' Alleged Fact | Plaintiffs' Response |
|---|---|---|
| 1 | On 09/05/2021, Joseph Verville was arrested at the Safeway store in Wenatchee, Washington, subsequent to the WPD receiving information he was at that location and had outstanding warrants. | **No dispute.** |
| 2 | Verville was arrested for outstanding warrants. | **No dispute.** |
| 3 | As search incident to his arrest resulted in the recovery of numerous drugs and paraphernalia contained within a "safe" that Verville had in his backpack. | **No dispute.** This fact supports Plaintiffs, as it shows Mr. Verville possessed (and used) drugs *before* he entered the jail. |
| 4 | The items included syringes, Ziploc plastic bags, Tooters, digital scale, blue bandana with two (2) clear smoking devices, oxycodone pills, hydrochloride with fentanyl in them. | **Objection.** No dispute with the fact, but Plaintiffs will seek (later, via motions practice) to prevent Defendants from suggesting Mr. Verville was in a gang or distributed drugs. |
| 5 | Verville admitted taking fentanyl because he couldn't find black tar heroin. | **No dispute.** This fact supports Plaintiffs, as it shows Mr. Verville possessed (and used) drugs *before* he entered the jail. |
| 6 | Methamphetamine was found along with Perc 30's. He also had approximately $170.00 in cash. | **Objection.** No dispute with the fact, but Plaintiffs will seek (later, via motions practice) to prevent Defendants from suggesting the cash indicates Mr. Verville was stealing or distributing drugs. |
| 7 | Verville complained that his personal use of drugs was not a crime, however, given the totality of items found in the safe, there was a concern he was in possession with intent to deliver. | **Objection.** *First*, the allegation that items in Mr. Verville's possession suggest drug distribution is an opinion, not a fact. To offer it, Defendants would need a Rule 702 expert in drug distribution, and they did not identify one. *Second*, as feared, Defendants want to baselessly label Mr. Verville as a drug dealer in the hopes of inflaming the jury in a trial that should rightly focus on Defendants' conduct, not Mr. Verville's history. This opinion is irrelevant under Rule 401 (this isn't a criminal case), unfairly prejudicial under Rule 403, and Plaintiffs will seek (later, via motions practice) to exclude this |

[2] ECF No. 27 (Plaintiffs' LR 56(c)(1)(A) Statement of Material Facts Not in Dispute).
[3] ECF No. 58 (Plaintiffs' LR 56(c)(1)(C) Reply Statement of Material Facts Not in Dispute).

Connelly Law Offices
2301 N. 30th Street
Tacoma, Washington 98403

| # | Defendants' Alleged Fact | Plaintiffs' Response |
|---|---|---|
| | | character attack by Defendants. |
| 8 | The colored photographs were the actual items seized from the safe/lock box and Verville's person. | **Objection.** No dispute with the fact, but Plaintiffs will seek (later, via motions practice) to prevent Defendants from introducing these photographs. They are irrelevant under Rule 401 and unfairly prejudicial under Rule 403, as this is nothing more than an attempt by Defendants to smear Mr. Verville's character before the jury. They just want to tell the jury he is a bad person, hoping that will excuse their misconduct. |
| 9 | Verville was taken to the Chelan County jail where he was booked. The arresting officer also advised that Verville was being held on an outstanding warrant [sic] DOC warrant. | **Objection.** No dispute with the fact, but Plaintiffs will seek (later, via motions practice) to prevent Defendants from referring to the DOC warrant. It is irrelevant under Rule 401 and unfairly prejudicial under Rule 403, as this is nothing more than an attempt by Defendants to smear Mr. Verville's character before the jury. They just want to tell the jury he is a bad person, hoping that will excuse their misconduct. |
| 10 | Robert W. Sealby is the Chelan County Prosecuting Attorney who explains that his role was to review the investigation and Mr. Verville's incarceration at the jail which resulted in a death to determine if criminal charges should be filed. | **Objection.** No dispute with the fact, but Plaintiffs will seek (later, via motions practice) to prevent Defendants from any reference to Robert Sealby or his role in evaluating whether Mr. Verville died due to a crime. It is irrelevant under Rule 401 and unfairly prejudicial under Rule 403, as it risks confusing a jury with a different proof standard that Mr. Sealby relied on for his decisions (beyond a reasonable doubt). |
| 11 | Towards that end, he reviewed the North Central Washington Special Investigation Report. He reviewed the SIU Report conducted at the direction of Detective Sgt. Jason DeMyer of the Douglas County Sheriff's Office. | **Objection.** No dispute with the fact, but Plaintiffs will seek (later, via motions practice) to prevent Defendants from any reference to Robert Sealby or his role in evaluating whether Mr. Verville died due to a crime. It is irrelevant under Rule 401 and unfairly prejudicial under Rule 403, as it risks confusing a jury with the different (and higher) proof standard Mr. Sealby used for his decision making (beyond a reasonable doubt). This is also impermissible vouching, as Defendants are attempting to shield their civil liability by claiming that Mr. Sealby, an elected prosecutor whose opinion should be trusted, found Defendants did no wrong. |
| 12 | The SIU Report has already been submitted in the record by Plaintiffs' counsel and is identified by ECF No. 27 and filed on November 27, 2024. | **No dispute.** |
| 13 | Mr. Sealby determined that the SIU Investigation complied with WAC 139-12-030 and no charges would be filed. | **Objection.** No dispute with the fact, but Plaintiffs will seek (later, via motions practice) to prevent Defendants from any reference to Robert Sealby or his role in evaluating whether Mr. Verville died due to a crime. It is irrelevant under Rule 401 and unfairly prejudicial under Rule 403, as it risks confusing a jury with the different (and higher) proof standard Mr. Sealby used for his decision making (beyond a |

| # | Defendants' Alleged Fact | Plaintiffs' Response |
|---|---|---|
| | | reasonable doubt.) This is also impermissible vouching, as Defendants are attempting to shield their civil liability by claiming that Mr. Sealby, an elected prosecutor whose opinion should be trusted, found Defendants did no wrong. |
| 14 | Verville had a criminal record with felony convictions dated October 9, 2019 for Identify Theft-II, forgery, and controlled substances possession without a prescription. He was supervised by the DOC out of Wenatchee. | **Objection.** No dispute with the fact, but Plaintiffs will seek (later, via motions practice) to prevent Defendants from any reference to criminal history. It is irrelevant under Rule 401 and unfairly prejudicial under Rule 403. This is another effort by Defendants to fight bad facts by attacking Mr. Verville's character. None of Defendants' defenses in this case turn on Mr. Verville being under DOC supervision or having priors for theft and forgery. They just want to tell the jury he is a bad person, hoping that will excuse their misconduct. |
| 15 | At the time of arrest, Verville was not having any medical issues or injuries while with WPD. | **Objection.** No expert knows whether Mr. Verville was experiencing medical issues (or not) during his arrest—he was not evaluated. |
| 16 | Verville admitted to using both heroin and other opioids and would be interested in an opioid treatment program. | **Undisputed.** This fact supports Plaintiffs, as it shows Mr. Verville possessed (and used) drugs *before* he entered the jail and would therefore be withdrawing while in jail. He also affirmatively asked for medical help—something he never meaningfully received. |
| 17 | Although relied on incorrectly by Plaintiffs and their witness, Dr. Cummins, the Wilcox Opioid Withdrawal Scale (WOWS) applied an erroneous jail medical department standing order #27 which was not in effect at the time of Verville's death on September 7, 2021. It was relied on by Plaintiff in the Complaint and by Cummins. The correct protocol was followed based on Verville's WOWs score. | **Objection.** Plaintiffs addressed this false fact in their Response Opposing *Daubert* Challenge. (ECF No. 64 at 12-13.) Defendants claim (again) Dr. Cummins relied on the wrong jail protocols (i.e., those enacted *after* Mr. Verville's death) when arriving at his opinions. This is false. Plaintiffs' experts had access to *both* protocols when crafting their opinions—the ones in effect *before* Mr. Verville died, as well as the ones enacted *after*.

This is easily provable. Under the "Major Documents Reviewed" section in his report, Dr. Cummins *literally* said he reviewed both: "Medical Dept Standing Orders, (two versions, one pre- and one post-Verville's death)." (ECF No. 27-7, Ex. G at 4.) As if that was not enough, Dr. Cummins's report compares the jail protocols in effect *at the time* of Mr. Verville's death with those enacted *after* his death, commenting the jail's changes to its withdrawal protocols "came too late" to help Mr. Verville. (ECF No. 27-7, Ex. G at 6, 17.) It is unclear why Defendants continue pushing this false fact when a quick glance at Dr. Cummins's opinion disproves it. Plaintiffs' experts possessed both sets of protocols when arriving at their informed opinions. |
| 18 | SIU investigator DeMyer verifies Plaintiff's and Dr. Cummins' error in his supplemental report. | **Objection.** Plaintiffs addressed this false fact in their Response Opposing *Daubert* Challenge. (ECF No. 64 at 12-13.) Defendants claim (again) Dr. Cummins relied on the wrong jail protocols (i.e., those enacted *after* Mr. Verville's |

| # | Defendants' Alleged Fact | Plaintiffs' Response |
|---|---|---|
| | | death) when arriving at his opinions. This is false—Plaintiffs' experts had access to *both* protocols when crafting their opinions—the ones in effect *before* Mr. Verville died and the ones enacted *after*.<br><br>This is easily provable. Under the "Major Documents Reviewed" section in his report, Dr. Cummins *literally* said he reviewed both: "Medical Dept Standing Orders, (two versions, one pre- and one post-Verville's death)." (ECF No. 27-7, Ex. G at 4.) As if that was not enough, Dr. Cummins's report compares the jail protocols in effect *at the time* of Mr. Verville's death with those enacted *after* his death, commenting the jail's changes to its withdrawal protocols "came too late" to help Mr. Verville. (ECF No. 27-7, Ex. G at 6, 17.) It is unclear why Defendants continue pushing this false fact when a quick glance at Dr. Cummins's opinion disproves it. Plaintiffs' experts possessed both sets of protocols when arriving at their informed opinions. |
| 19 | Abigail Snyder, Verville's mother, was interviewed by the SIU and informed them that her son was an opioid user for the last 20 years, and self-reported to the family he would smoke heroin and not inject. | **No dispute.** This fact supports Plaintiffs, as it shows Mr. Verville had a high tolerance, which is something the medical examiner should have examined before interpreting the drug values in Mr. Verville's toxicology report. |
| 20 | He had been to drug/alcohol programs three (3) times in Wenatchee over the last 20 years, with the last time being 3 to 4 years ago. | **No dispute.** This fact supports Plaintiffs, as it shows Mr. Verville worked to manage his substance abuse disorder. |
| 21 | He had a history of high blood pressure and was supposed to be taking medication. | **No dispute.** True, and had Kami Aldrich reviewed Mr. Verville's medical history at the jail, she would also know this and could put him on the same effective blood pressure medication he took the last time he was at the Chelan County jail. (ECF No. 58, ¶1.39.) |
| 22 | Verville had told his mother that he had Covid and needed money to quarantine in a hotel. | **Objection.** No dispute with the fact, but Plaintiffs will seek (later, via motions practice) to prevent Defendants from any reference it. This fact is irrelevant under Rule 401 and unfairly prejudicial under Rule 403, as the primary reason Defendants want this fact is to show he lied to his mother to gain money for drugs. It is a character smear—nothing more. |
| 23 | Verville's mother provided him with $850.00 over the last few weeks. | **Objection.** No dispute with the fact, but Plaintiffs will seek (later, via motions practice) to prevent Defendants from referencing it. This fact is irrelevant under Rule 401 and unfairly prejudicial under Rule 403, as the primary reason Defendants want this fact is to show he lied to his mother to gain money for drugs. It is a character smear—nothing more. |

| # | Defendants' Alleged Fact | Plaintiffs' Response |
|---|---|---|
| 24 | Verville lied to his mother about what he was arrested (claiming random police warrant checks at his hotel). Verville had put on a lot of weight and his ankles were swollen. | **Objection.** This is two unrelated facts, not one. Plaintiffs will seek (later, via motions practice) to prevent Defendants from any reference the first fact. It is irrelevant under Rule 401 and unfairly prejudicial under Rule 403, as the primary reason Defendants want this fact is to show he lied to his mother to gain money for drugs. It is a character smear—nothing more. The second fact is also misleading, as it references Abby Snyder's Rule 701 observations about Mr. Verville's weight at a point in time before he entered the jail. |
| 25 | Verville's mother had a gut feeling he was using drugs heavily before going to jail. | **Objection.** "Gut feelings" about important facts like drug use are irrelevant under Rule 401, misleading under Rule 403, and not based on percipient observations under Rule 701. |
| 26 | Verville was last seen by his mother around his birthday—August 30, she last spoke with him on September 5, 2021 at 7:52 p.m. | **No dispute.** This fact supports Plaintiffs' damages, as it showed Mr. Verville and his mother routinely talked. |
| 27 | Verville's mother has been present with him while he had withdrawn from drugs and escribed the symptoms as "being ugly"—he's violently ill, shaking, almost convulsively vomiting, needed to drink lots of electrolytes, his head hurts and he can't sleep, can't close his eyes. It lasts several days. | **Objection.** No dispute with this fact, just what Defendants intend to do with it, which is compare Mr. Verville's symptoms from a prior withdrawal episode to what he was experiencing at the jail. It's misleading under Rule 403, as Dr. Matt Layton notes withdrawal symptoms for opioids usually peak around "36 to 72 hours after last dose and typically continue for 7 to 10 days but may last for a few weeks." (ECF No. 28-2, Ex. BB at 4) Mr. Verville died 38 hours into custody when his withdrawal symptoms had yet to peak. Trying to compare the events two misleads the jury about the symptoms he was experiencing. |
| 28 | Despite such graphic physical symptoms of withdrawal, Verville's mother never summoned medical help. | **Objection.** No dispute with this fact, just what Defendants intend to do with it, which is suggest Mr. Verville's mother never called for help when symptoms sounded worse, so why did the jail need to do anything different here. Trying to explain away Ms. Aldrich's inaction by pointing to the decisions of a non-medically-trained mother is grossly misleading under Rule 403. |
| 29 | During her taped phone conversation with Verville at the jail, he never told his mother he was ill or experiencing withdrawal. | **Objection.** No dispute with this fact, just what Defendants intend to do with it, which is to improperly shift the jail's *responsibility* to care for Mr. Verville onto *his shoulders*, not theirs. As Dr. Cummins said, Mr. Verville could not see or understand he was experiencing a hypertensive crisis—"it's a silent killer," and one Ms. Aldrich was responsible for identifying so she could contact someone qualified to help. (ECF No. 58, ¶1.55.) Additionally, by this time, Mr. Verville already told the jail he'd be withdrawing. (ECF No. 58, ¶1.6.) |
| 30 | The phone conversations described previously and noted in the SIU Report took place at 7:52 | **No dispute.** Though Plaintiffs note Defendants objected to every fact Plaintiffs listed in their LR 56 Statement that referenced the SIU report as a "regurgitation of a law |

| # | Defendants' Alleged Fact | Plaintiffs' Response |
|---|---|---|
| | p.m. on 09/05/2021 over four hours after he arrived at the jail at 3:37 p.m. | enforcement investigation," yet now seek to admit the same facts. |
| 31 | Verville recognized his mother was not thrilled to hear from him. | **Objection.** No dispute with this fact, just what Defendants intend to do with it, which is to improperly suggest Mr. Verville's mother somehow loved him less because he was calling from jail. |
| 32 | Verville's only concern was requesting his mother to take care of his dog while he was in jail. | **Objection.** Defendants mischaracterize the call. Yes, Mr. Verville's priority when he called his mom was asking her to look after his dog because "he's the only thing I'm caring about right now because I can't get to him." (ECF No. 48-7 at 4:8-11.) But it wasn't his only priority. At other points during the call, Mr. Verville expressed concern that he did not want his mother "to be mad" at him. (ECF No. 48-7 at 3:22-24.) Defendants do not get to distort Mr. Verville's final call with his mother to portray his mother as only concerned with himself and his dog, not his mother. |
| 33 | The second recorded call from jail continued moments later and Verville suggests his mother wants to fight with him and is mad at him. | **Objection.** Again, Defendants mischaracterize the conversation. (See Objection in #32.) |
| 34 | Verville's mother says she is not made, just tired of the whole thing. | **Objection.** No dispute with this fact, just what Defendants intend to do with it, which is introduce irrelevant evidence under Rule 401 to shift this case away from Defendants' inaction to Mr. Verville's relationship with his mother. It is also distracting and unfairly prejudicial under Rule 403. |
| 35 | Verville is untruthful with his mother, suggesting that he was not using drugs—simply arrested on a warrant. | **Objection.** No dispute with this fact, just want Defendants intend to do with it, which is introduce irrelevant information under Rule 401 about the basis of his arrest to smear Mr. Verville's character, which is unfairly prejudicial under Rule 403. Defendants want a jury to dislike Mr. Verville because he lied to his mother about a point that matters not in this case. |
| 36 | Verville pleaded with his mother to tell him she loves him which she eventually does. | **Objection.** This is false. Mr. Verville asks if his mother loves him, and the immediate answer is yes:<br>- **Mr. Verville**: You could say, you could say, "I love you." Or you could say things like that, mom.<br>- **Ms. Snyder**: I do love you. I've always loved you. But, you know, the boundaries have been set."<br>(ECF No. 48-8, 9:11-18.) Defendants mischaracterize this fact to wrongly suggest Ms. Snyder reluctantly loves her son and had to be persuaded to say it. |
| 37 | Verville returns to his cell—he demonstrates no signs of sweating, agitation, restlessness, abdominal pain, shivering, | **Objection.** Plaintiffs dispute this fact on four grounds. ***First***, Dr. Strote cannot credibly assess withdrawal signs such as dizziness, sweating, or pain from watching a video. That is why Dr. Darracq notes, a medical provider needs to question |

| # | Defendants' Alleged Fact | Plaintiffs' Response |
|---|---|---|
| | tearing, insomnia, tremor, yawning, sneezing, anorexia, dizziness, or extremity pain—typical signs of opiate withdrawal. | an individual in-person to gain a better understanding of hard-to-see symptoms such as dizziness, sweating, or pain. (ECF No. 27-3, Ex. M at 5-6.) **Second**, Dr. Darracq notes Mr. Verville was experiencing *anorexia* (lack of desire to eat) at this time, which is a recognized withdrawal symptom. (ECF No. 27-3, Ex. M at 4.) **Third**, Defendants omit Mr. Verville was experiencing vomiting and runny nose, two textbook withdrawal symptoms. (ECF No. 58, ¶1.167.) **Fourth**, Defendants ignore Mr. Verville was not experiencing overdose symptoms such as difficulty keeping eyes open, dragging feet, screaming, yelling, agitation, increased body movement, standing in the same location for long periods of time, or responding to imaginary objects. (ECF No. 58, ¶¶1.168, 1.169.) |
| 38 | It was not until over 14 hours later at 04:48 a.m. on 09/06/21, that the video shows a small amount of vomit deposited by Verville into a rag (less than 50 ml). | **Objection.** Plaintiffs agree Mr. Verville vomited at 4:48 a.m. on September 6, but Dr. Strote measuring the amount of vomit using jail footage is pure speculation. No jail staff collected the vomit to measure it. |
| 39 | Up to this point, Verville had taken in significant amounts of electrolytes (via food consumed and water). | **Objection.** This badly misrepresents the facts. At 5:24 p.m. on Sep. 5, Mr. Verville received dinner and ate "some food" (he picked at it) and "drank water from a cup" before returning the food tray otherwise uneaten. (ECF No. 58, ¶¶1.14–1.15.) Fourteen hours later, at 4:48 a.m., without eating any new food, he vomited what little he ate the night before into a towel. So, yes, Plaintiffs object to Defendants' efforts to misrepresent how many electrolytes he took on before he first started vomiting. Also, water does not add electrolytes to the body, but rather dilutes them, which is why the jail's medical protocols tell nurses to *caution* inmates against free intake of water. (ECF No. 27-12, Ex. L at 8 ("Inmate should be cautioned to avoid intake of free water.") |
| 40 | Corrections expert Penny Bartley notes that Verville interacted with jail staff, moved about his cell and 14 hours later at 04:48 on 09/06/21 appears to vomit into a white towel—folds the towel—and placed the same on the ground beside his bed. Because he folded the towel, no vomit is noticed. | **Objection.** Plaintiffs agree Mr. Verville vomited into a towel and set it on the ground at 4:48 a.m. on Sep. 6. Plaintiffs object to Defendants' second sentence, which is not a fact, but an argument to justify the deputies' brief-glance cell checks. The intimation is Mr. Verville was *hiding* his vomit, preventing deputies from noticing anything was amiss. This, of course, does not explain how Deputy Nores noticed nothing amiss when he entered Mr. Verville's cell on September 7 and saw vomit on both the white towel (more this time) and across the floor, yet did nothing but walk away: |

| # | Defendants' Alleged Fact | Plaintiffs' Response |
|---|---|---|
| | | |
| | | (ECF No. 58, ¶¶1.114–1.115.) |
| 41 | There is no evidence Verville used the call button from his cell to alert deputies that he had vomited. | **No dispute.** Plaintiffs agree Mr. Verville did not press the call button. Plaintiffs will object, of course, when Defendants use this fact to impermissibly shift their special responsibility to care for Mr. Verville onto him. |
| 42 | Shortly after his deminimus amount of vomit into the rag/towel at 5:24 on 09/06/21, Verville is awakened for breakfast, eats food, and consumes water. | **Objection.** Again, this badly misrepresents the facts. *First,* at 5:24 a.m., Mr. Verville at "a couple bites" from the tray before returning it. (ECF No. 58, ¶1.23.) That quote—"a couple bites"—comes straight from Detective DeMyers's SIU report and captures how little food Mr. Verville ate at dinner before he threw it up at 9:51 a.m., when he vomited "several times" in the toilet—again, Detective DeMyer's words. (ECF No. 58, ¶1.24.) *Second,* Plaintiffs again object to Defendants' efforts to quantify (and downplay) Mr. Verville's vomiting episodes. |
| 43 | After consuming breakfast, Verville sleeps comfortably until 09:50 a.m. (some 4+ hours) until he urinates and vomits a small amount as before. | **Objection.** Again, this badly misrepresents the facts. *First*, Defendants—through Dr. Strote—continue to minimize Mr. Verville's withdrawal symptoms. The fact that Mr. Verville is laying immobile under a blanket in no way allows Dr. Strote to opine he was sleeping "comfortably." Complete speculation. As Dr. Darracq makes clear, many withdrawal symptoms cannot be seen, as they are the "subjective experiences by the patient." (ECF No. 42-4, Ex. C at 7.) That is why Dr. Darracq says an in-person assessment (an accurate one) is required to fully appreciate the severity of someone's withdrawal. (ECF No. 27, Ex. M at 3.) *Second,* Defendants call this second vomiting episode a "small" one. Meanwhile, Detective DeMyer said Mr. Verville vomited "several times" into the toilet. (ECF No. 58, ¶1.24.) |
| 44 | Verville goes back to sleep until 12:25 p.m. when he is awakened, offered food and refuses. | **No dispute.** As Plaintiffs laid out in their facts, this was the first of three consecutive missed meals. (ECF No. 58, ¶1.25.) |
| 45 | At 14:01, he vomits again a small amount and drinks a full glass of water. | **Objection.** Plaintiffs agree Mr. Verville vomited into the toilet and drank a full glass of water. But Plaintiffs object to Defendants' continued effort to minimize Mr. Verville's withdrawal symptoms by claiming they can quantify the amount he vomited into the toilet. Not possible, especially |

| # | Defendants' Alleged Fact | Plaintiffs' Response |
|---|---|---|
| | | when a computer-generated "privacy blur" over the toilet area prevents someone watching the video feed from seeing anything directly over the toilet. Also, it is worth noting this is yet another glass of water to dilute the electrolytes in his body—electrolytes that are not being replaced by a replacement drink in his cell, per the jail's medical protocols. (ECF No. 58, ¶¶2.93–2.94.) |
| 46 | He falls back asleep and is observed sleeping comfortably—no signs of acute withdrawal—and demonstrates no signs of physical withdrawal symptoms. He also falls back asleep. | **Objection. *First*,** Defendants—through Dr. Strote—continue to minimize Mr. Verville's withdrawal symptoms. The fact that Mr. Verville is laying immobile under a blanket in no way allows Dr. Strote to opine he was sleeping "comfortably." Complete speculation. ***Second*,** Defendants ignore Mr. Verville was not experiencing overdose symptoms such as difficulty keeping eyes open, dragging feet, screaming, yelling, agitation, increased body movement, standing in the same location for long periods of time, or responding to imaginary objects. (ECF No. 58, ¶¶1.168, 1.169.) |
| 47 | Verville is awakened at 14:50 hours—and examined by Nurse Aldrich. He provides vital signs and readings recorded as heart rate of 121 and a blood pressure of 156/122. Because vitals need to be taken more than one minute after a change in position (from sleeping to walking to the door), and the vital [sic] were taken only 42 seconds after standing, the readings were inaccurately high. | **Objection.** Plaintiffs agree those are the vitals Ms. Aldrich collected from Mr. Verville. Everything else in this fact is incorrect, including the time. ***First*,** Mr. Verville was not awakened for his medical screening at 14:50 hours (2:50 p.m.), but rather 4:50 p.m.—*over* 24 hours after being booked into custody (ECF No. 58 at ¶1.30.) ***Second*,** Defendants incorrectly claim Mr. Verville's readings were "inaccurately high" because he didn't stand for a minute. As Dr. Darracq points out, Defendants' expert, Dr. Strote, misrepresented the medical literature, as this stand-for-a-minute advice referred to collecting blood pressure (not vitals) from someone with hypotension (not hypertension). (ECF No. 64-2, Ex. B at 2.) |
| 48 | Verville did not have hypertensive crisis based on his vital sign readings, there was no evidence of [end] organ damage, no evidence of acute hypertensive injury of any level on autopsy, and on autopsy, he was found to have cardiomyopathy consistent with untreated hypertension. | **Objection.** Defendants incorrectly write off a hypertensive crisis because Dr. Strote did not see potential signs of end-organ damage. That's incorrect, says Dr. Darracq. Mr. Verville experienced nausea and vomiting, which are recognized symptoms of end organ damage in hypertensive crisis—citing several articles supporting his opinion. (ECF No. 64 at 16, Ex. B.) He needed immediate follow-up. |
| 49 | Verville had Phenergan (Promethiazine) used to treat nausea and vomiting in his system at autopsy indicating he would provide [sic] the same by Nurse Aldrich. | **No dispute.** Plaintiffs do not dispute Mr. Verville received 1 dose of Phenergan at meal time on Sep. 6. This does not change Mr. Verville skipped dinner that night, marking his second missed meal. (ECF No. 58, ¶1.126.) Or that after taking the medication, he continued to throw up. Repeatedly. At 10:42 p.m. on Sep. 6. (*Id.* ¶1.127.) At 1:58 a.m. on Sep. 7. (*Id.* ¶1.128.) At 3:44 a.m. on Sep. 7. (*Id.* ¶1.129.) At 3:47 a.m. |

| # | Defendants' Alleged Fact | Plaintiffs' Response |
|---|---|---|
| | | on Sep. 7. (*Id.* ¶1.130.) And at 4:46 a.m. on Sep. 7. (*Id.* ¶1.131.) |
| 50 | Plaintiff's purported expert, Dr. Cummins, was provided the wrong use information on what medical protocol was administered and consequently incorrectly opined that Nurse Aldrich did not provide the proper medication for his nausea. | **Objection.** Plaintiffs addressed this false fact in their Response Opposing *Daubert* Challenge. (ECF No. 64 at 12–13.) Defendants claim (again) Dr. Cummins relied on the wrong jail protocols (i.e., those enacted *after* Mr. Verville's death) when arriving at his opinions. This is false—Plaintiffs' experts had access to *both* protocols when crafting their opinions—the ones in effect *before* Mr. Verville died and the ones enacted *after*.<br><br>This is easily provable. Under the "Major Documents Reviewed" section in his report, Dr. Cummins *literally* said he reviewed both: "Medical Dept Standing Orders, (two versions, one pre- and one post-Verville's death)." (ECF No. 27-7, Ex. G at 4.) As if that was not enough, Dr. Cummins's report compares the jail protocols in effect *at the time* of Mr. Verville's death with those enacted *after* his death, commenting the jail's changes to its withdrawal protocols "came too late" to help Mr. Verville. (ECF No. 27-7, Ex. G at 6, 17.) It is unclear why Defendants continue pushing this false fact when a quick glance at Dr. Cummins's opinion disproves it. Plaintiffs' experts possessed both sets of protocols when arriving at their informed opinions. |
| 51 | Verville is noted on Nurse Aldrich's WOWS calculation to have vomiting and diarrhea—however per the video surveillance, he had not vomiting in the last one-half hour as should be evaluated by protocol. | **Objection.** Dr. Darracq, who is board-certified in addiction medicine and teaches medical students how to administer the WOWs, disagrees with Dr. Strote's scoring. (ECF No. 58, ¶¶ 1.62, 1.65.) Specifically, Dr. Darracq indicated Ms. Aldrich should have *raised* the score on vomiting, not reduced it, as she neglected to ask Mr. Verville how about many vomiting episodes he had. (ECF No. 58, ¶¶1.66–1.71, 1.78.) |
| 52 | Verville's actual WOWS score suggested an extremely mild level of withdrawal. | **Objection.** Dr. Darracq, who is board-certified in addiction medicine and teaches medical students how to administer the WOWs, disagrees with Dr. Strote's scoring. (ECF No. 58, ¶¶ 1.62, 1.65.) Specifically, Dr. Darracq indicated Ms. Aldrich should have *raised* the score on vomiting, not reduced it, as she neglected to ask Mr. Verville how about many vomiting episodes he had. (ECF No. 58, ¶¶1.66–1.71, 1.78.) Based on Dr. Darracq's score (*at least* an 11), the jail's medical protocols required her to call 911 or contact a qualified medical provider. (ECF No. 58, ¶¶1.78, 1.80–1.81.) |
| 53 | At 17:05 Verville gets and consumes another cup of water but does not consume his dinner at that time. He goes back to sleep at 17:30. | **Objection.** This fact says Mr. Verville did not consume his dinner "at that time," which suggests he consumed it some other time. He did not. His dinner tray was returned to deputies, "which appear[ed] to be untouched." (ECF No. 58, ¶1.126, fn. 168.) |

| # | Defendants' Alleged Fact | Plaintiffs' Response |
|---|---|---|
| | | It is worth mentioning this is yet another glass of water Mr. Verville consumed, which further diluted his electrolytes—a situation the jail's protocols tell nurses to *caution* inmates against. (ECF No. 27-12, Ex. L at 8 ("Inmate should be cautioned to avoid intake of free water.") |
| 54 | Verville wakes up at 21:08, eats some food, urinates, drinks another cup of water, and goes back to sleep at 21:19. | **No dispute.** It is worth mentioning this is yet another glass of water Mr. Verville consumed, which further diluted his electrolytes—a situation the jail's protocols tell nurses to *caution* inmates against. (ECF No. 27-12, Ex. L at 8 ("Inmate should be cautioned to avoid intake of free water.") |
| 55 | At 22:42, he vomits a very small amount. | **Objection.** Plaintiffs agree Mr. Verville vomited, but object to Defendants' continued effort to minimize Mr. Verville's withdrawal symptoms by claiming they can quantify the amount he vomited into the toilet. Not possible, especially when a computer-generated "privacy blur" over the toilet area prevents someone watching video feed from seeing anything directly over the toilet. |
| 56 | Verville was able to get out of his bunk, pick up his dinner tray and carry it form the counter to the cub part with one hand. At 22:42, Verville vomits a small about in the toilet, cleans his face with toilet paper, cleans the toilet and the floor. He then flushed the toilet. | **Objection.** Plaintiffs agree Mr. Verville vomited, attempted to wipe away the vomit, and then flushed the toilet. But Plaintiffs object to Defendants' continued effort to minimize the withdrawal symptoms by claiming they can quantify the amount he vomited. Additionally, Mr. Verville did not eat any food from his dinner tray. (ECF No. 58 at 1.126.) |
| 57 | A short time later at 23:35, a deputy enters his room, has a conversation with Verville. Verville makes no request and no complaints of withdrawal. | **Objection.** Plaintiffs agree a deputy entered his room, but dispute anyone knowing what was said—there's no audio. Saying Mr. Verville made "no complaints" has no basis in fact. |
| 58 | At 01:58, Verville spits a small amount of vomit into a rag and drinks more water. | **Objection.** Plaintiffs' dispute this characterization. According to Detective DeMyer, at 1:58 a.m., Mr. Verville did not "spit up a small amount of vomit"; he "vomits onto white rag on cell floor near bed while seated," then "vomits into the toilet standing up." (ECF No. 58, ¶1.127.) Once again, Defendants minimize Mr. Verville's withdrawal symptoms. |
| 59 | In fact, Verville after spitting a small amount of vomit on the towel, gets up, paced in his cell, got his water and returned to his bunk. | **Objection.** Plaintiffs dispute this characterization. According to Detective DeMyer, at 1:58 a.m., Mr. Verville did not "spit up a small amount of vomit"; he "vomits onto white rag on cell floor near bed while seated," then "vomits into the toilet standing up." (ECF No. 58, ¶1.127.) Once again, Defendants minimize Mr. Verville's withdrawal symptoms. |
| 60 | At 03:44 hours, Verville vomits onto the towel while sitting in his bed. | **Objection.** Plaintiffs dispute this characterization. According to Detective DeMeyer, at 3:44 a.m., "Joseph vomits onto the floor by the stool and table while sitting up in bed. Joseph |

| # | Defendants' Alleged Fact | Plaintiffs' Response |
|---|---|---|
| | | vomits more while seated on the bed." (ECF No. 58, ¶1.129.) Once again, Defendants minimize Mr. Verville's withdrawal symptoms. |
| 61 | At 03:47, Verville retrieved toilet paper, wiped his face, spat vomit into the toilet, wiped his face again and threw the toilet paper across the cell. | **Objection.** Plaintiffs dispute this characterization. According to Detective DeMyer, at 3:47 a.m., "Joseph gets out of bed and vomits at the toilet and then returns to bed." (ECF No. 58, ¶1.130.) |
| 62 | At 04:46, Verville spits a small amount of vomit onto a towel, laid back down, covers himself with a blanket, and adjust himself, yawns, and moves his feet for several minutes. | **Objection.** Plaintiffs dispute this characterization. According to Detective DeMyer, at 4:46 a.m., "Joseph sits up in the bed and vomits." (ECF No. 58, ¶1.131.) Once again, Defendants minimize Mr. Verville's withdrawal symptoms. They also imply Mr. Verville is comfortably setting in for a nap—this was shortly before fatal cardiac event. |
| 63 | Verville knew how to use the call button for help. There is no evidence he ever called requesting help because of adverse physical symptoms. | **Objection.** Plaintiffs agree Mr. Verville knew how to use the panic button. But Plaintiffs dispute there's no evidence Mr. Verville ever asked for help because of adverse physical symptoms. He asked for help during booking. (ECF No. 27-2, Ex. B. at 1) (Verville checks "yes" to interest in opioid program). He also asked for help from Ms. Aldrich, specifically saying he "would appreciate" medication to address his nausea and vomiting. (ECF No. 27-9, Ex. I at 1.) Additionally, Plaintiffs object to Defendants using this fact to impermissibly shift their special responsibility to care for Mr. Verville onto him. As Dr. Cummins said, Mr. Verville could not see or understand he was experiencing a hypertensive crisis—"it's a silent killer," and one Ms. Aldrich was responsible for identifying so she could contact someone qualified to help. (ECF No. 58, ¶1.55.) |
| 64 | Dr. Strote observes Verville spitting a small amount of commit and goes to sleep, noting that during this period Verville spends the vast majority of his time sleeping comfortably, with intermittent blanket coverage, showing signs of acute withdrawal—at no point demonstrating sweating, agitation, restlessness, abdominal pain, diarrhea, shivering, tearing, insomnia, tremors, yawning, sneezing, rhinorrhea, anorexia, dizziness, or extremity pain, The vomiting he demonstrates is extremely limited in volume and frequency. | **Objection.** Plaintiffs' expert dispute Dr. Strote's interpretation of Mr. Verville's symptoms as something other than withdrawal. To Dr. Matt Layton, who ran an opioid treatment clinic at Washington State University, "Mr. Verville's post-arrest symptoms were definitely consistent with someone actively withdrawing from substances." (ECF No. 58, ¶¶1.170, 1.171.) Additionally, Dr. Darracq, who is board-certified in addiction medicine, said there is ample evidence showing Mr. Verville exhibits signs of withdrawal while incarcerated at the jail. (ECF No. 58, ¶1.167.) |

| # | Defendants' Alleged Fact | Plaintiffs' Response |
|---|---|---|
| 65 | Verville's behavior in the jail was observed by corrections expert Barley to be typical. | **Objection.** Plaintiffs object, as this fact far too vague. What does "typical behavior" mean? If Defendants are referring to withdrawal behavior such as nausea, vomiting, runny nose, and chills, then Plaintiffs agree. |
| 66 | Bartley addresses policy 717 and states that after reviewing the cell video from Mr. Verville I can say he that [sic] exhibited signs of vomiting. There is no visible evidence or observable behaviors consistent with sweating, anxiety, agitation, tremors, hallucination, or rapid breathing. I do not believe that abdominal cramps, nausea, or generalized aches and pains would be apparent from the video unless they were severe and at no time in the video did his behavior suggest that. | **Objection.** Defendants misrepresent Policy 717. To downplay Mr. Verville's withdrawal symptoms, they cite Policy 717 and point out how Mr. Verville was not experiencing many of the symptoms listed there, including "agitation," "hallucinations," or "rapid breathing." What Defendants overlook, however, is that 717.3 describes symptoms for both withdrawal *and* overdose. (ECF No. 27-14, Ex. N at 37) (Jail Policy 717.3). |
| 67 | Dr. Richard Harruff is the King County Medical Examiner, and Board-Certified Forensic Pathologist who performed an autopsy on Verville. | **No dispute.** |
| 68 | Dr. Harruff also testified that fentanyl has caused the huge increase in drug overdose deaths and is approximately 100 times more potent that heroin. | **No dispute.** |
| 69 | As the medical examiner indicates, he explained that in his opinion that any argument that the level of drugs found in Verville's blood were not appreciably impacted by post-mortem redistribution because he performed a peripheral blood draw. | **Objection.** Experts on both sides dispute Dr. Harruff's point about post-mortem redistribution—one of the reasons his opinion is being challenged under *Daubert*. Dr. Lindsey Harle disagrees, who is Defendants' hired pathologist, as well as Dr. Michael Darracq, who is Plaintiffs' toxicologist. Both say Mr. Verville's blood was impacted by post-mortem redistribution, no matter where it was drawn from, making the toxicology numbers "poorly correlate" to reality. (ECF No. 42-4, Ex. C at 5) (Dr. Darracq's Rebuttal); ECF No. 42-3, Ex. B at 11) (Dr. Harle's Report). |
| 70 | Dr. Harruff also points out that post-mortem redistribution does not cause fentanyl to appear. It was present in sufficient amounts to cause death. | **Objection.** Experts on both sides dispute Dr. Harruff's point about post-mortem redistribution—one of the reasons his opinion is being challenged under *Daubert*. This point is disputed by Dr. Lindsey Harle, who is Defendants' hired pathologist, as well as Dr. Michael Darracq, who is Plaintiffs' toxicologist. Both say you need to understand an individual's tolerance before claiming drug levels in a toxicology report are "present in sufficient amounts to cause death." (ECF |

| # | Defendants' Alleged Fact | Plaintiffs' Response |
|---|---|---|
| | | No. 58, ¶1.152); (ECF No. 42-3, Ex. B at 11) (Dr. Harle's Report) |
| 71 | Dr. Harruff also points out that anatomically there is no indication of dehydration. If found at autopsy, it would have been noted. | **Objection.** Dr. Richard Cummins points out dehydration is not required to cause either electrolyte imbalances or the fatal cardiac event that claimed Mr. Verville's life. (ECF No. 64-3, Ex. C at 3) (Dr. Cummins' *Daubert* Response). He goes on to note both parties agree Mr. Verville experienced "[s]ome type of cardiac stimulation and stress," they just disagree where it came from. (ECF No. 64-3, Ex. C at 5) (Dr. Cummins's *Daubert* Response). |
| 72 | Dr. Harruff, in addition to his Board-Certification in clinical pathology, also has a PhD in chemistry which is the basis for his opinions. | **Objection.** Plaintiffs do not dispute Dr. Harruff has a Ph.D in chemistry, but they do dispute a Ph.D somehow makes his opinion any more methodologically sound. A Ph.D does not help Dr. Harruff conduct a complete investigation, which is what Dr. Harle said is necessary for a "defensible" opinion from a medical examiner. (ECF No. 42-3, Ex. B at 11) (Dr. Harle's Report). |
| 73 | Dr. Linsey [sic] Harle is a Board-Certified Forensic Pathologist who prepared an expert report in this case. | **No dispute.** |
| 74 | Dr. Harle in her opinion on a more probable than not medical basis opines that based on her review of the considerable materials provided, Mr. Verville died to [sic] the combination of hypertensive cardiovascular disease and the toxic effects of drugs (methamphetamine, fentanyl, and alprazolam). Obesity/overweight is a contributory factor/ Conversely, acute opioid withdrawal and/or dehydration as the cause(s) of death are unlikely, based on the totality of information available. | **Objection.** *First*, Dr. Harle disagrees with an opinion that does not exist. Defendants continue to argue Plaintiffs' experts said Mr. Verville died from opioid withdrawal. They did not. Plaintiffs' experts *never* held this out as their opinion. Rather, they say Mr. Verville died of the *complications* from opioid withdrawal—something else entirely. Here is Dr. Cummins's opinion from the beginning: "It is the complications of opioid withdrawal, rather than withdrawal itself, that prove lethal." (ECF No. 27-7, Ex. G at 18). Here is Dr. Darracq's opinion from the beginning: "It is my opinion that Mr. Verville's death was the result of *complications* arising from opioid withdrawal." (ECF No. 27-13, Ex. M at 3.) *Second*, Dr. Harle's opinion contradicts Dr. Harruff's opinion (she never mentions *acute* intoxication). (ECF No. 42-4, Ex. C at 2) (Dr. Darracq's Expert Rebuttal). |
| 75 | Dr. Harle also opines that opioid withdrawal symptoms are recognized to be very uncomfortable but rarely fatal. | **Objection.** Dr. Harle disagrees with an opinion that does not exist. At no point did Dr. Cummins say Mr. Verville died from "acute opioid withdrawal"; he said Mr. Verville died from the "complications" of opioid withdrawal, pointing to the same heart issues Dr. Harle identified. (ECF No. 27-7, Ex. G at 18) (Dr. Cummins's Expert Report). |
| 76 | Dr. Harle also opines that opioid withdrawal symptoms are recognized to be very | **Objection.** Dr. Harle disagrees with an opinion that does not exist. At no point did Dr. Cummins say Mr. Verville died from "acute opioid withdrawal"; he said Mr. Verville died |

| # | Defendants' Alleged Fact | Plaintiffs' Response |
|---|---|---|
| | uncomfortable but rarely fatal. | from the "complications" of opioid withdrawal, pointing to the same heart issues Dr. Harle identified. (ECF No. 27-7, Ex. G at 18) (Dr. Cummins's Expert Report). |
| 77 | Abigail Snyder as Joseph Verville's mother testified in her deposition that she has seen him withdraw from her drug use. | **No dispute.** |
| 78 | Her description of physically watching her son withdrawal from opiates is: "It's ugly, having sat through it with him more than once—it's ugly. It's violently—he's violently ill, shaking almost convulsively, shaking, almost convulsively vomiting, needing to drink a lot of electrolytes, his head hurts, and he can't sleep, can't close his eyes. It'll last several days. | **Objection.** No dispute with this fact, just what Defendants intend to do with it, which is compare Mr. Verville's symptoms from a prior withdrawal episode to what he was experiencing at the jail. It's misleading under Rule 403, as Dr. Layton notes withdrawal symptoms for opioids usually peak around "36 to 72 hours after last dose and typically continue for 7 to 10 days but may last for a few weeks." (ECF No. 28-2, Ex. BB at 4) Mr. Verville died 38 hours into custody when his withdrawal symptoms had yet to peak. Trying to use one withdrawal episode as a metric for whether Mr. Verville was experiencing withdrawal 36 hours into custody is misleading. |
| 79 | Despite observing her son going through withdrawal symptoms not demonstrated while he was in jail, she nevertheless failed to call for medical help—because Verville assured her that we could do it together. | **Objection.** Framing this fact as Ms. Snyder "failed" to call 911 when Mr. Verville previously withdrew violates Rule 403, as this is nothing more than an attempt to shift Defendants' special responsibility to care for Mr. Verville onto his shoulders. |
| 80 | Head Jail Nurse Billy[e] Tollackson testified in her deposition that opioid withdrawal deaths are rare. | **Objection.** Billye Tollackson disagrees with an opinion that does not exist. At no point did Dr. Cummins say Mr. Verville died from "acute opioid withdrawal"; he said Mr. Verville died from the "complications" of opioid withdrawal, pointing to the same heart issues Dr. Harle identified. (ECF No. 27-7, Ex. G at 18) (Dr. Cummins's Expert Report). |
| 81 | She also testified that Nurse Aldrich followed appropriate protocol in her treatment of Verville. | **Objection.** *First*, this is factually incorrect. Ms. Aldrich violated jail policy by waiting over 24 hours before assessing Mr. Verville, which isn't a "prompt" response. (ECF No. 58, ¶1.31.) *Second*, Plaintiffs' experts disagree on Ms. Aldrich violating other protocols. Dr. Lori Roscoe said Ms. Aldrich acted outside her licensure and deviated significantly from the standard of care by not reporting Mr. Verville's vitals. (ECF No. 58, ¶¶1.48, 1.50, 1.51.) Dr. Cummins also said Mr. Verville's vitals demanded immediate action. (ECF No. 58, ¶1.54.) And Dr. Darracq said Ms. Aldrich did violate protocols, for if she correctly administered the WOWs instrument, jail protocols would have required her to call a qualified medical provider or 911. (ECF No. 58, ¶¶1.62–1.82.) |
| 82 | Defendant Christopher Sharp is a Director of the Chelan County | **No dispute.** But Plaintiffs wonder why Defendants objected to this same fact in their LR 56 statement. (ECF No. 48, ¶2.1) |

| # | Defendants' Alleged Fact | Plaintiffs' Response |
|---|---|---|
| | Jail Regional Justice Center located in Wenatchee. | (noting Defendants objected to the statement "Chris Sharp serves as Director of the Chelan County Jail, a position he's held since April 1, 2020," arguing this fact is "irrelevant and prejudicial"). |
| 83 | He became director of the CCRJC on April 1, 2020. | **No dispute.** But Plaintiffs wonder why Defendants objected to this same fact in their LR 56 statement. (ECF No. 48, ¶2.1) (noting Defendants objected to "Chris Sharp serves as Director of the Chelan County Jail, a position he's held since April 1, 2020," arguing this fact is "irrelevant and prejudicial"). |
| 84 | Significantly, during his tenure with the jail, and as Director, the only deaths taking place in the jail alleged to be from a drug withdrawal/overdose was Joseph Verville on September 7, 2021. | **Objection.** Defendants continue to argue Plaintiffs' experts said Mr. Verville died from opioid withdrawal. They did not. Plaintiffs' experts *never* held this out as their opinion. Rather, they say Mr. Verville died of the *complications* from opioid withdrawal—something else entirely. Here is Dr. Cummins's opinion from the beginning: "It is the complications of opioid withdrawal, rather than withdrawal itself, that prove lethal." (ECF No. 27-7, Ex. G at 18). Here is Dr. Darracq's opinion from the beginning: "It is my opinion that Mr. Verville's death was the result of *complications* arising from opioid withdrawal." (ECF No. 27-13, Ex. M at 3.) |
| 85 | The SIU investigation was a separate investigation conducted by the task force comprised of law enforcement officers and reviewed by Chelan County Prosecuting Attorney, Robert W. Sealby. | **No dispute.** But it is unclear how this fact carries any relevance under Rule 401. |
| 86 | None of the disciplined anticipated to be referenced by Plaintiff was because a member of the corrections staff failed to do something to prevent Verville's drug overdose at death. | **Objection.** Plaintiffs object on three grounds. ***First***, the discipline doled out by Director Sharp does involve Mr. Verville's death, as he sanctioned several staff for conducting cell checks that "lasted no more than a few seconds," as well as not checking on Mr. Verville after he missed meals. (ECF No. 58, ¶¶2.28–2.29, 2.32–2.34.) Thos same deficient cell checks were the reason deputies never saw Mr. Verville decompensating. ***Second***, it is also misleading to say Director Sharp did not discipline staff for any acts leading up to Mr. Verville's death because he artificially narrowed the misconduct investigation to a 4.5-hour window the morning Mr. Verville died. (ECF No. 58, ¶2.17.) ***Third***, Plaintiffs object to Defendants calling Mr. Verville's death an overdose, as Plaintiffs' experts have laid out extensively why an overdose is impossible under this case's timeline. (ECF No. 58, ¶¶1.160–1.179.) |
| 87 | As a result of the Verville situation and having fentanyl in | **No dispute.** But Plaintiffs wonder why Defendants objected to this same fact in their LR 56 statement. (ECF No. 58, |

| # | Defendants' Alleged Fact | Plaintiffs' Response |
|---|---|---|
| | his system, the medical health manager requested that we order urine kits that would test for fentanyl. | ¶2.52) ("After Mr. Verville's death, the jail ordered UA kits that could identify fentanyl.") Defendants objected, arguing this fact was "irrelevant and prejudicial." (ECF No. 40 at 28-29.) |
| 88 | Further, subsequent to Verville, the medical standard #27 was implemented to test an inmate's urine and administer a different treatment protocol. | **No dispute.** But Plaintiffs wonder why Defendants objected to this same fact in their LR 56 statement. (ECF No. 58, ¶¶2.56–2.57.) |
| 89 | Earl Crow is the Chief Deputy Coroner for Chelan County. | **No dispute.** |
| 90 | On April 13, 2022, the coroner complied with Abigail Snyder's request for a copy of the final autopsy and toxicology reports. | **No dispute.** Defendants seek this fact to support their argument Ms. Snyder "waived" her right to challenge Dr. Harruff's cause of death. Plaintiffs dispatch this argument in two separate briefs—the Reply Supporting Partial Summary Judgment (ECF No. 57 at 10); and the Reply Supporting *Daubert* Challenge on Dr. Harruff (ECF No. 65 at 6). |
| 91 | On April 14, 2022, coroner Crowe sent a letter from the Chelan County Coroner's Office fulfilling the above-referenced request from Ms. Snyder provider her with a copy of the toxicology and autopsy reports regarding Joseph A. Verville. | **No dispute.** Defendants seek this fact to support their argument Ms. Snyder "waived" her right to challenge Dr. Harruff's cause of death. Plaintiffs dispatch this argument in two separate briefs—the Reply Supporting Partial Summary Judgment (ECF No. 57 at 10); and the Reply Supporting *Daubert* Challenge on Dr. Harruff (ECF No. 65 at 6). |
| 92 | Coroner Crowe issued the final State of Washington Department of Health Certificate of Death on January 14, 2022, which sets forth the official cause of death. | **No dispute.** Defendants seek this fact to support their argument Ms. Snyder "waived" her right to challenge Dr. Harruff's cause of death. Plaintiffs dispatch this argument in two separate briefs—the Reply Supporting Partial Summary Judgment (ECF No. 57 at 10); and the Reply Supporting *Daubert* Challenge on Dr. Harruff (ECF No. 65 at 6). |
| 93 | No one from the Verville family requested any change to the official Certificate of Death or cause of death. | **No dispute.** Defendants seek this fact to support their argument Ms. Snyder "waived" her right to challenge Dr. Harruff's cause of death. Plaintiffs dispatch this argument in two separate briefs—the Reply Supporting Partial Summary Judgment (ECF No. 57 at 10); and the Reply Supporting *Daubert* Challenge on Dr. Harruff (ECF No. 65 at 6). |

Dated: January 10, 2025.

Connelly Law Offices, PLLC

By_____
John B. McEntire, IV, WSBA No. 39469
Nathan P. Roberts, WSBA No. 40457
Jackson R. Pahlke, WSBA No. 52812
2301 North 30th Street
Tacoma, Washington 98403
*Attorneys for Plaintiffs*

## Service Certificate

I certify that on January 10, 2025, I filed this document on CM/ECF, which sent an electronic copy to the following attorneys for Defendants: Pat McMahon.

Connelly Law Offices, PLLC

By_____
John B. McEntire, IV, WSBA No. 39469
2301 North 30th Street
Tacoma, Washington 98403
253.593.5100